# Exhibit 1

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

| | | |
|---|---|---|
| ADDISON ICE, LLC, an Illinois Limited Liability Company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 2018L000968 |
| INDIAN HARBOR INSURANCE COMPANY, a Delaware Company. | ) ) ) | |
| Defendants. | ) ) | |

Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
********* DuPage County *********
TRAN# : 170431049515/( 4348629 )
2018L000968
FILEDATE : 08/23/2018
Date Submitted : 08/23/2018 11:27 AM
Date Accepted : 08/23/2018 02:10 PM
GEIB,LAURA
Status 11/20/18 2014 9am
*************************

## COMPLAINT FOR BREACH OF CONTRACT AND BAD FAITH

NOW COMES the Plaintiff, ADDISON ICE, LLC, a Michigan limited liability company, registered to do business in the State of Illinois, by and through its attorneys, MARQUARDT & BELMONTE, P.C., as its Complaint against Defendant, INDIAN HARBOR INSURANCE COMPANY, a Delaware company, and states as follows:

### Parties

1.      Plaintiff, ADDISON ICE, LLC ("Addison Ice"), is a Michigan limited liability company, registered to do business in the State of Illinois, with its principal place of business located at 475 South Grace Street, Addison, DuPage County, Illinois 60101.

2.      Defendant, INDIAN HARBOR INSURANCE COMPANY ("Indian Harbor"), is a Delaware company, which conducts business in Illinois.

### Facts Common to Each Count

3.      Addison Ice owns and operates the Addison Ice Area (the "Arena"), which houses two ice skating rinks (the "NHL" and the "Olympic") used for ice skating and ice hockey.  The

Arena, located at 475 South Grace Street, Addison, Illinois 60101, was built in or about 1996, and Addison Ice purchased it in or about August of 2000.

4.    Between July 22, 2016 and July 22, 2017, Addison Ice had the Arena insured by Indian Harbor under insurance policy number RPP5435093-01 (the "Policy"). A copy of the Policy is attached hereto as Exhibit A.

5.    The Hartford Steam Boiler Inspection and Insurance Company ("HSB"), a Connecticut company, registered to do business in Illinois, was the equipment breakdown coverage reinsurer for the Policy.

6.    On or about February 24, 2017, Addison Ice advised its insurance agent, with Insurance Management Group ("IMG"), that there had been a catastrophic failure of the heating/refrigeration system that was responsible for keeping both rinks operating at the Arena.

7.    The system began malfunctioning in or about October 2016, however, at least initially, the ice surfaces remained usable.

8.    Addison Ice advised IMG that the extent of the damage and cause of the failure were not known at that time, however, it requested that a claims agent be assigned to the matter.

9.    On or about February 28, 2017, IMG submitted a Notice of Loss to Indian Harbor, advising Indian Harbor of the failure of the heating/refrigeration system and that Addison Ice had hired industry experts, including John Burley ("Mr. Burley") of Everything Ice, to determine the extent of the damage and the cause of the failure.

10.    The date of loss provided to Indian Harbor was January 10, 2017.

11.    At the time the loss was reported to Indian Harbor, the rinks were still operational, however, the refrigeration system that controlled the ice rinks was no longer operating properly.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:38 # 4348629/170431049515

12. On or about March 14, 2017, representatives from HSB and Engineering Systems, Inc. ("ESi") made an on-site inspection visit to the Arena.

13. In or about April 2017, the ice at the Arena was melted in order for a complete investigation and assessment of the equipment at the Arena to take place.

14. On or about May 6, 2017, ESi again returned to the Arena, in order to conduct another inspection, while the demolition of the rinks was occurring. The demolition of the rinks included the removal of the sub-soil heating system and related piping.

15. Another visual inspection was performed by ESi on or about May 15, 2017 at the Arena.

16. ESi returned, yet again, to the Arena in June and July 2017.

17. During the July 2017 visit, ESi participated in field leak testing of the shell and tube heat exchanger and pressure testing of the sub-soil heating system.

18. The heat exchanger was then provided to ESi for testing, which purportedly was to occur between August 8 and August 9, 2017.

19. On or about August 24, 2017, Addison Ice contacted Travis Henderson ("Mr. Henderson"), General Adjuster for HSB, and James Marciniak, P.E., Senior Consultant with ESi by letter.

20. Addison Ice sought a conclusion to its claim, and, stated the facts known to it at that time from the many inspections by ESi and Mr. Burley, including, among other things, that:

        (a)     the sub-soil heating system serving the two rinks at the Arena had failed;

        (b)     such failure was "catastrophic;"

3

    (c)      the system failure was confirmed by tests performed by professionals, which showed that there was a "zero pressure reading for the system;"

    (d)      the failure related to one of the rinks had been located, and, Mr. Burley was able to mitigate Addison Ice's losses by designing a system that permitted one of the rinks to remain functioning, thereby preventing further loss due to business interruptions and avoiding additional costs;

    (e)      there was no way to conclude that the heat exchanger failure was caused by a corrosion related break; and

    (f)      the three compressors in the system were severely damaged as a result of the heat exchanger failure.

A copy of the August 24, 2017 letter from Addison Ice is attached hereto as Exhibit B.

21.     On or about August 25, 2017, Mr. Henderson advised Addison Ice that ESi was to begin the metallurgical testing of the heat exchanger tubes on August 29, 2017.

22.     The same day, Addison Ice responded to Mr. Henderson by advising him that the heat exchanger tubes had been moved and had been available since July 15, 2017, and that HSB had been in sole possession of the tubes for approximately forty (40) days.

23.     Further, Addison Ice's expert had requested that certain markings be placed on the tubes, and that the removal of the tubes be videotaped since he could not be present for the metallurgical testing. Addison Ice's expert's requests were ignored.

24.     The drain branch pipes from the sub-soil heating system for one of the rinks were also provided to ESi for metallurgical testing in September 2017.

4

25.     On or about September 5, 2017, Mr. Henderson contacted counsel for Addison Ice, and stated that HSB's investigation was ongoing.

26.     Further, Mr. Henderson advised that HSB did not have an official copy of the Policy to provide Addison Ice, and that the request for a copy had been sent to North American Risk Services.  A copy of HSB's September 5, 2017 letter is attached hereto as <u>Exhibit C</u>.

27.     On or about September 26, 2017, after learning that HSB had directly contacted Mr. Burley, Addison Ice's expert, seeking his opinion, including supporting facts and documentation, counsel for Addison Ice contacted Mr. Henderson by email.

28.     In addition to asking that HSB only contact Addison Ice's expert through counsel, counsel for Addison Ice also reiterated repeated requests by Addison Ice for reports and information generated in response to any testing or investigations relating to the claim.  A copy of the September 26, 2017 e-mail exchange is attached hereto as <u>Exhibit D</u>.

29.     Mr. Henderson responded the same day by stating that HSB had still not made a determination regarding coverage, that their investigation was continuing and that he needed Addison Ice's expert to provide information.  A copy of Mr. Henderson's email is included within Exhibit D.

30.     Counsel for Addison Ice responded the same day, again asking for the information from HSB's expert in order to provide it to Addison Ice's expert, however, HSB took the position that it did not have any such information or reports, and that it would not provide its position until it had received and reviewed their expert's final report.  A copy of these communications is also included within Exhibit D.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:38 # 4348629/170431049515

31.     On October 11, 2017, counsel for Addison Ice and Mr. Henderson exchanged emails indicating that Addison Ice was seeking a coverage decision, but Defendant had not yet made such a decision. A copy of these communications is also included within Exhibit D.

32.     On October 27, 2017, counsel or Addison Ice demanded that a coverage determination be made by October 30, 2017. This e-mail from October 27, 2017 is also included within Exhibit D.

33.     By December 5, 2017, HSB had still provided no response to Addison Ice's claim or requests for information and reports from the testing related to the failure of the heating/refrigeration system at the Arena. A copy of the December 5 communication from counsel for Addison Ice is included with Exhibit D.

34.     Even though notice of Addison Ice's claim had been provided to Indian Harbor and HSB through its agent in February 2017, out of the abundance of caution, Addison Ice provided Indian Harbor and HSB an updated Proof of Loss Statement on December 5, 2017. A copy of the updated proof of loss is attached hereto as Exhibit E.

35.     On or about January 11, 2018, Addison Ice received a correspondence from North American Risk Services ("NARS"), at the direction of Indian Harbor, which stated that Indian Harbor was "unable at this point to find coverage under the Policy or issue payment for" Addison Ice's loss related to the failure of the heating/refrigeration system in the Arena. A copy of the January 11, 2018 denial of coverage is attached hereto as Exhibit F.

36.     On or about March 7, 2018, Addison Ice, through counsel, responded to NARS. A copy of Addison Ice's response from March 7, 2018 is attached hereto as Exhibit G.

6

37.     Addison Ice's March 7 response stated, among other things, that NARS failed to address the fact that the leak that occurred in the sub-soil heating system would have led to corrosion when the brine within the system was exposed to air, and that would have led to corrosion in the heat exchanger, and that any evidence which might be able to show the cause of the breach would likely have been destroyed by corrosion.  The only existing evidence showed that the leak occurred first and that corrosion would have been secondary to a failure.

38.     Addison Ice's March 7 response also pointed out that there was no mention of any pH testing in any of the evidence presented by NARS on behalf of Indian Harbor and HSB.

39.     Such testing should have been among the primary tests to determine if corrosion was systemic.

40.     In addition to addressing the NARS rejection of the claim as provided in its March 7, 2018 letter, Addison Ice also advised NARS that there were certain losses of which it had already alerted Indian Harbor and HSB that could never have been caused by corrosion, even if Indian Harbor was correct in its determination of the cause of the loss (which is denied), and, therefore, should be paid immediately.

41.     At the conclusion of the March 7, 2018 letter, Addison Ice demanded that additional information, including, but not limited to, the reports or information that relate to the "factual findings" referenced in the January 11, 2018 NARS letter be provided within ten (10) days and that the collateral losses be paid immediately.

42.     Prior to approximately May 9, 2018, Addison Ice had not been provided the information requested in its March 7, 2018 letter, nor had it received any other response from Indian Harbor, HSB or NARS.

7

43.     On or about May 9, 2018, Steven Knoche ("Mr. Knoche"), a Senior Claims Adjuster from NARS contacted counsel for Addison Ice.

44.     During the telephone call between Mr. Knoche and counsel for Addison Ice on or about May 9, 2018, Mr. Knoche apologized profusely for the matter not being handled.

45.     During the telephone call on or about May 9, 2018, Mr. Knoche was advised by counsel for Addison Ice that a Complaint had been drafted and was about to be filed, however Mr. Knoche requested that counsel hold off on filing the Complaint.

46.     Mr. Knoche also inquired during the May 9, 2018 telephone call as to whether:

        (a)     the experts for each side had met and communicated; and

        (b)     Addison Ice wanted the full replacement value of the rinks or the value of repairs.

47.     Also, during the May 9, 2018 telephone call, counsel for Addison Ice advised Mr. Knoche that it had still not been provided a certified copy of the Policy.

48.     Following the May 9, 2018 telephone call, counsel for Addison Ice forwarded a chain of e-mails documenting prior communications between the parties. A copy of that email is included in the e-mail chain attached hereto as Exhibit H.

49.     On or about May 11, 2018, Mr. Knoche advised counsel for Addison Ice that a certified copy of the Policy would be sent to Addison Ice and that the two would speak the following week. *See* Ex. H.

50.     On or about May 22, 2018, Mr. Knoche advised counsel for Addison Ice that he had received a report, and that following a review, he would call Addison Ice's counsel. *See id.*

8

51.     On May 29, 2018, counsel for Addison Ice had to email Mr. Knoche, again, as he had not yet called. *See id.*

52.     On June 1, 2018, counsel for Addison Ice emailed Mr. Knoche, again, because he had not yet heard from him. *See id.*

53.     On or about June 3, 2018, counsel for Addison Ice responded by e-mail, seeking times during which a conference call could be set up between Mr. Knoche and Addison Ice's counsel and expert to answer any of Mr. Knoche's questions. *See id.*

54.     Counsel for Addison Ice and Mr. Knoche spoke by telephone on or about June 4, 2018.

55.     Following the June 4, 2018 telephone call, on June 6, 2018, counsel for Addison Ice emailed Mr. Knoche and advised him that, among other things:

    (a)     Addison Ice still had no basis for a denial of its claim, or whether it was even denied;

    (b)     Addison Ice had never been provided the underlying reports relied upon by NARS in denying Addison Ice's claim; and

    (c)     Addison Ice still did not have a certified copy of the Policy. *See id.*

56.     To date, Addison Ice has not received any of the information requested in the June 6, 2018 email. *See id.*

57.     On June 8, 2018, the parties communicated again and counsel for Addison Ice, again, requested all of the information upon which Defendant was basing its denial. *See id.*

58.     Defendant has not communicated with Addison Ice since June 8, 2018.

9

59.     Addison Ice has complied with all duties and requirements contained within the Policy in the event of a loss.

60.     After the ice was melted on both rinks in April 2017, it was not until on or about August 21, 2017 that the NHL was again operating, and, even though the Olympic began operating again, it had to be shut down again on or about May 21, 2018.

61.     Prior to the May 21, 2018 shutdown of the Olympic, Addison Ice's primary patron, the Chicago Bruins, refused to use the Olympic due to its condition.

62.     As a result of the shutdowns of both the NHL and the Olympic, Addison Ice has lost significant revenue, and will continue to lose revenue.

## COUNT I
## BREACH OF CONTRACT

63.     Addison Ice repeats and realleges the allegations contained in Paragraphs 1 through 62 of the Facts Common to Each Count above as if restated and realleged herein.

64.     The Policy is a binding agreement between Addison Ice and Indian Harbor.

65.     Addison Ice fulfilled all of its obligations under the Policy, including those imposed upon Addison Ice in the event of a loss.

66.     Under Section A of the Building and Personal Property Coverage Form within the Policy, it states that Indian Harbor "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."

67.     Addison Ice suffered physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:38 # 4348629/170431049515

68.     The Equipment Breakdown Coverage within the Policy states that Indian Harbor "will pay for direct physical damage to Covered Property that is the direct result of an 'accident.' As used in this Additional Coverage, 'accident' means a fortuitous event that causes direct physical damage to 'covered equipment.'"

69.     The same coverage provides that Indian Harbor "will pay for loss or damage caused by or resulting from an 'accident' to 'buried vessels or piping' which forms a part of an ice rink refrigeration and under floor heating system."

70.     The same coverage further provides that Indian Harbor "will pay to excavate 'buried vessels or piping' that is part of an ice rink refrigeration and under floor heating system during the repair or replacement following an 'accident' to 'buried vessels or piping' and to restore the excavated area to the same condition prior the 'accident.'"

71.     The losses suffered at the Arena by Addison Ice were covered under the Policy, and no exclusions applied to limit the coverage that should have been provided by Indian Harbor.

72.     Upon recognizing that there was a significant problem with the heating/refrigeration system at the Arena, Addison Ice alerted its insurance agent, who notified Indian Harbor of the issue on February 28, 2017, in compliance with the Policy.

73.     Despite ongoing communications regarding the claim, out of the abundance of caution, and because Indian Harbor had still not made a determination of liability, on or about December 5, 2017, Addison Ice submitted a Sworn Statement in Proof of Loss.

74.     The Policy provides that Indian Harbor "will give notice of our intentions within 30 days after we receive the sworn proof of loss."

11

75.     It was not until January 11, 2018 that NARS, at Indian Harbor's direction, advised Addison Ice that Indian Harbor did not find coverage under the policy for Addison Ice's loss.

76.     The losses suffered by Addison Ice were to "Covered Property" as defined in the Policy and such losses were caused by or resulting from a Covered Cause of Loss.

77.     None of the exclusions contained within the Policy should have prevented Indian Harbor from finding coverage under the Policy.

78.     Indian Harbor has breached the Policy by, among other things:

(a)     failing to find coverage for a covered loss under the Policy;

(b)     failing to provide notice of its intentions within thirty (30) days after receiving the sworn proof of loss; and

(c)     failing to pay covered losses within a reasonable period of time.

79.     Indian Harbor's breach of the Policy has proximately caused damage to Addison Ice, for which Addison Ice is entitled to recover from Indian Harbor an amount in excess of $2,000,000.00.

WHEREFORE, the Plaintiff, ADDISON ICE, LLC, prays this Honorable Court will enter judgment in its favor and against the Defendant, INDIAN HARBOR INSURANCE COMPANY, in an amount in excess of $2,000,000.00 plus all attorney's fees and costs incurred by Plaintiff and providing such other and further relief as this Court deems just and equitable.

## COUNT II
## BAD FAITH/IMPROPER CLAIMS PRACTICES

80.     Addison Ice repeats and realleges the allegations contained in Paragraphs 1 through 79 of Count I as and for its Paragraphs 1 through 79 of this Count II as if restated and realleged herein.

12

81.     Indian Harbor has failed to acknowledge with reasonable promptness pertinent communications with respect to the claim filed by Addison Ice under the Policy by, among other things:

(a)     failing to promptly provide a determination of coverage after a Notice of Loss was submitted on or about February 28, 2017;

(b)     failing to provide a determination of coverage after Addison Ice's August 24, 2017 letter;

(c)     failing to provide Addison Ice with information and/or reports obtained by HSB's expert after such information was requested on or about August 24, 2017, September 26, 2017, and March 7, 2018, among other dates;

(d)     failing to respond to Addison Ice's December 5, 2017 Sworn Statement In Proof of Loss within thirty (30) days;

(e)     failing to respond to Addison Ice's March 7, 2018 letter in which it both responded to NARS's January 11, 2018 letter and advised NARS and, thereby, Indian Harbor, of certain damages that would have been collateral to anything that was the result of corrosion, if Indian Harbor was correct, which Addison Ice does not concede; and

(f)     failing to respond at all to Addison Ice from and after June 8, 2018.

82.     Indian Harbor also has refused to pay Addison Ice's claim without conducting a reasonable investigation based on all available information.

13

83    The investigation took in excess of a year, despite having access to equipment and information for months, and when provided alternative, plausible explanations for certain evidence, Indian Harbor has failed to consider such information.

84.    Indian Harbor refused to affirm or deny coverage within a reasonable time after it was notified of the claim initially in February 2017, after a demand for a determination was made on or about August 24, 2017, after a subsequent demand was made on or about October 27, 2017, and after an updated Proof of Loss Statement was submitted on or about December 5, 2017.

85.    Indian Harbor has also refused to affirm or deny coverage within a reasonable time after it was advised that certain losses suffered by Addison Ice, if the explanations provided by NARS on January 11, 2018 are accurate, which Addison Ice denies, would have been collateral, and therefore covered losses.

86.    Indian Harbor failed to promptly provide a reasonable and accurate explanation for the basis of the denial of coverage based upon the Policy.

87.    The bases for the denial provided to Addison Ice almost a year after Indian Harbor was advised of the loss were not the sole explanations for what was found during the inspections.

88.    Indian Harbor has repeatedly failed to provide Addison Ice with the reports or documentation from the inspections upon which it based its denial of coverage.

89.    After NARS notified Addison Ice of the denial of coverage, Addison Ice, through its March 5, 2018 response, provided plausible, alternative explanations for the existence of conditions described by NARS in the January 11, 2018 letter.  These plausible, alternative explanations would be covered losses under the Policy.

14

90.     Despite being provided with plausible, alternative explanations for the existence of conditions which led to Indian Harbor's denial of coverage under the Policy, Indian Harbor has failed to respond to Addison Ice.

91.     As a result of being unable to resolve the claim directly with Indian Harbor, or through communications with NARS, Addison Ice has been forced to commence this lawsuit.

92.     Due to Indian Harbor's bad faith in assessing and denying coverage to Addison Ice, Addison Ice is entitled to recover the statutorily permitted punitive damages, attorneys' fees and costs as permitted under 215 ILCS 5/155.

WHEREFORE, Plaintiff, ADDISON ICE, LLC, respectfully requests that:

1.      Plaintiff recover damages in excess of $2,000,000.00;

2.      Plaintiff recover punitive damages, attorneys' fees and other costs as permitted under 215 ILCS 5/155; and

3.      The Court grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT III
## DECLARATORY JUDGMENT
## (In the alternative)

80.     Addison Ice repeats and realleges the allegations contained in Paragraphs 1 through 79 of Count I as and for its Paragraphs 1 through 79 of this Count III as if restated and realleged herein.

81.     Indian Harbor has failed and refused to cover the loss Addison Ice claims is covered under the Policy.

15

82.     Therefore, an actual controversy exists between Addison Ice and Indian Harbor as to whether the claim is covered under the Policy.

83.     The declaration of and resolution and determination of whether this loss is covered under the Policy will aid in the termination of the controversy.

84.     The denial of Addison Ice's loss is contrary to the terms of the Policy, is improper and causes irreparable harm to Addison Ice.

85.     Addison Ice has a clear and ascertainable right to coverage under the Policy.

86.     Addison Ice has no adequate remedy at law, thus no mechanism other than the Court's equitable powers exists to resolve the dispute between the parties and because money damages cannot resolve the dispute.

WHEREFORE, Plaintiff, ADDISON ICE, LLC, prays this Honorable Court will enter a judgment in its favor and against the Defendant, INDIAN HARBOR INSURANCE COMPANY, by declaring that:

1.     The loss is covered by the Policy;

2.     Addison Ice is entitled to recover all amounts proven at trial; and

3.     Granting such other and further relief as this Court deems equitable and just.

ADDISON ICE, LLC


DANIEL E. HANLON, One of the Attorneys for the Plaintiff

MARQUARDT
& BELMONE, P.C.
311 South County Farm Road, Suite I
Wheaton, Illinois  60187
(630) 871-1100
Attorney No. 6
dfh@lawmb.com

16

EXHIBIT COVER SHEET                                                          4393 (Rev. 6/18)

| STATE OF ILLINOIS | UNITED STATES OF AMERICA | COUNTY OF DU PAGE |
|---|---|---|

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

Addison Ice LLC
_____
Plaintiff,

v.

Indian Harbor Insurance Co.
_____
Defendant,

**2018L000968**
_____
Case Number

Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
DuPage County
TRAN# : 170431049515/( 4348629 )
2018L000968
FILEDATE : 08/23/2018
Date Submitted : 08/23/2018 11:27 AM
Date Accepted : 08/23/2018 02:11 PM
GEIB,LAURA
................

File Stamp Here

## EXHIBIT COVER SHEET
Local Court Rules 5.06 and 5.09

**EXHIBIT NAME:** Complaint Ex. A

**TITLE OF DOCUMENT THIS EXHIBIT BELONGS WITH:**

Complaint for Breach of contract and
Bad Faith

**Document File Date:** 8/23/18
*(The file date of the document this exhibit belongs with)*

**EXHIBIT FILED ON BEHALF OF:** Plaintiff
*(Case Party Name)*

Submitted by: Dan Hanlon

Name: MB          ☐ Pro Se
DuPage Attorney Number: 6
Attorney for: Plaintiff
Address: 311 S. County Farm Rd #I
City/State/Zip: Wheaton IL 60187
Telephone Number: 630 871 1100
Email: dfh@lawmb.com

CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT©
WHEATON, ILLINOIS 60187-0707

## NOTICE TO POLICYHOLDER

**Notice to Policyholder: This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.**

Christopher McGovern

## NOTICE TO POLICYHOLDERS

**ILLINOIS**

This notice is to advise you if you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem.

FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL:

1-800-622-7311
XL CATLIN
SEAVIEW HOUSE
70 SEAVIEW AVENUE
STAMFORD, CT 06902-6040

You may also contact the Public Service Division of the Department of Insurance at the following address:

Illinois Department of Insurance
Consumer Division or Public Services Section
320 W. Washington Street
Springfield, IL 62767

Toll-free: 1-866-445-5364
TDD 217/524-4872 / Fax: 217/558-2083

http://mc.insurance.illinois.gov/messagecenter.nsf

PN IL 02 1015       © 2015 X.L. America, Inc. All Rights Reserved.       Page 1 of 1
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

### FRAUD NOTICE

| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
|---|---|
| Colorado | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable for insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| District of Columbia | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| Florida | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| Kansas | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| Kentucky | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| Louisiana | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Maine | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| Maryland | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| New Jersey | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| New Mexico | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

PN CW 01 0915

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Page 1 of 3

NOTICE TO POLICYHOLDERS

| New York | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.

**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| Ohio | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| Oklahoma | **WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| Pennsylvania | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| Puerto Rico | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

PN CW 01 0915

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:** It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:** Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison. (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

PN CW 01 0915

Page 3 of 3

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

NOTICE TO POLICYHOLDERS

## PRIVACY POLICY

The XL Catlin insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;

PN CW 02 1015

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Page 1 of 3

## NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

PN CW 02 1015

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

## NOTICE TO POLICYHOLDERS

### Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you. We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

### Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PN CW 02 1015

Page 3 of 3

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

NOTICE TO POLICYHOLDERS

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC and possibly the U.S. Department of State. **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy based on Presidential declarations of "national emergency". OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as *Specially Designated Nationals and Blocked Persons*. This list can be found on the U.S. Department of the Treasury's web site - http://www.treas.gov/ofac.

The Secretary of the Treasury also has identified a number of entities in the insurance, petroleum, and petrochemicals industries determined to be owned or controlled by the Iranian government. Business transactions with any of these entities are expressly prohibited. These entities have been added to OFAC's list of *Financial Institutions Determined To Be Owned or Controlled by the Government of Iran*. This list can be found on the U.S. Department of the Treasury's web site - http://www.treasury.gov/resource-center/sanctions/Programs/Pages/iran.aspx, see List of CISADA and NDAA Prohibitions or Conditions

In accordance with OFAC regulations, or any applicable regulation promulgated by the U.S. Department of State, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

PN CW 05 0914

©2014 X.L. America, Inc. All rights reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## NOTICE TO POLICYHOLDERS
## LEAD
## RESTRICTIONS OF COVERAGE

This notice has been prepared in conjunction with the implementation of changes to your policy. No coverage is provided by this summary nor can it be construed to replace any provisions of your policy. If there is any conflict between the policy and this summary, the provisions of the policy shall prevail.

This notice contains a brief explanation of restrictions and clarifications of coverage that are being made in your policy through endorsement.

Please read your policy, and the endorsements attached to your policy, carefully.

**LEAD EXCLUSION – Exclusion of Liability for Hazards of Lead**

When this endorsement

**XIL 428 -** LEAD EXCLUSION

is attached to your policy:

- Coverage is excluded for "Bodily injury", "Property damage" or "Personal and advertising injury" for Commercial General Liability Coverage and Products Completed Operations Coverage, caused in whole or in part, either directly or indirectly,
  - by lead, lead paint or lead contamination, or
  - arising out of or incidental to the inhalation, ingestion, use, handling, or contact with lead paint or lead contamination.

- Coverage is also excluded for
  - the costs of lead or lead paint removal;
  - "Property damage" or any other injury or damage resulting from such removal.

NTL 001 0306          © XL America, Inc. 2006

## NOTICE TO POLICYHOLDERS
## ASBESTOS
## RESTRICTIONS OF COVERAGE

This notice has been prepared in conjunction with the implementation of changes to your policy. No coverage is provided by this summary nor can it be construed to replace any provisions of your policy. If there is any conflict between the policy and this summary, the provisions of the policy shall prevail.

This notice contains a brief explanation of restrictions and clarifications of coverage that are being made in your policy through endorsement.

Please read your policy, and the endorsements attached to your policy, carefully.

**ASBESTOS EXCLUSION – Exclusion of Liability for Hazards of Asbestos**

When this endorsement

**XIL 401 -** ASBESTOS EXCLUSION

is attached to your policy:

- Coverage is excluded for "Bodily injury", "Property damage" or "Personal and advertising injury" for Commercial General Liability Coverage and "Bodily injury" or "Property Damage" for Products/Completed Operations Liability Coverage Part and Owners and Contractors Protective Liability Coverage, caused in whole or in part, either directly or indirectly by asbestos arising out of:

  - inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or
  - the use of asbestos from any goods, products or structures; or
  - the removal of asbestos in constructing or manufacturing any goods, products or structures; or
  - the manufacture, transportation, storage, handling, distribution, sale, application, mining, consumption or disposal of asbestos or goods or products containing asbestos.

NTL 004 0306          © XL America, Inc. 2006





Regulatory Office
505 Eagleview Blvd., Suite 100
Dept: Regulatory
Exton, PA 19341-1120
Telephone: 800-688-1840

## COMMERCIAL LINES POLICY
## COMMON POLICY DECLARATIONS

COMPANY PROVIDING COVERAGE:   Indian Harbor Insurance Company

POLICY NO.: RPP5435093-01

RENEWAL OF: NEW

POLICY PERIOD
FROM:   07/22/2016                          TO:   07/22/2017
              AT 12:01 A.M., Standard Time at your mailing address shown below

Named Insured and Address:
Addison Ice Arena

475 South Grace Street

Addison, IL 60101

Producer:   All Risks, LTD.

Business Description:  Skating Rink

Form of Business:   LLC

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE
AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

This policy consists of the following coverage parts for which a premium is indicated.
This premium may be subject to adjustment.

| | PREMIUM | |
|---|---|---|
| Commercial Property Coverage Part | $ | 17,272.00 |
| Commercial General Liability Coverage Part | $ | 15,853.00 |
| Commercial Crime Coverage Part | $ | |
| Commercial Inland Marine Coverage Part | $ | |
| Commercial Automobile Coverage Part | $ | |
| Equipment Breakdown Coverage Part | $ | 4,470.00 |
| | $ | |
| | | |
| **Policy Premium:** | $ | 33,125.00 |
| | | |
| | $ | 1,528.00 |
| Premium for Certified Acts of Terrorism | $ | EXCLUDED |
| **Total Policy Premium:** | $ | 39,123.00 |

XAI 000 0715

© 2015, XL America, Inc. All Rights Reserved.
May not be copied without permission.

POLICY NO.: RPP5435093-01

THESE DECLARATIONS TOGETHER WITH ANY APPLICABLE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART HEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Form(s) and Endorsement(s) applicable to the policy:

See Schedule of Forms

Date: 08/26/2016

By:

_____

(Authorized Representative)

Type Name:

© 2015, XL America, Inc. All Rights Reserved.
May not be copied without permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

# FORMS SCHEDULE

**POLICY NUMBER:** RPP5435093-01

**POLICY PERIOD:** 07/22/2016 to 07/22/2017

**NAMED INSURED:** Addison Ice Arena

Form Number☐ ☐ Form Name

PN IL 02 10 15,  Illinois Notice (Complaint)

PN CW 01 0915,  Fraud Notice

PN CW 02 1015,  Privacy Notice

PN CW 05 0914,  U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC")

NTL 001 0306,  Notice to Policyholders Lead Restrictions of Coverage

NTL 004 0306,  Notice to Policyholders Asbestos Restrictions of Coverage

XAI 000 07 15,  Commercial Lines Policy - Common Policy Declarations

XAI 300 10 06,  Forms Schedule

IL MP 9104 0314 IHIC,  In Witness - Indian Harbor Insurance Company

IL 00 03 09 08,  Calculation Of Premium

IL 00 17 11 98,  Common Policy Conditions

IL 01 62 10 13,  Illinois Changes - Defense Costs

CP 00 10 10 12,  Building And Personal Property Coverage Form

CP 00 30 10 12,  Business Income (And Extra Expense) Coverage Form

CP 00 90 07 88,  Commercial Property Conditions

CP 01 40 07 06,  Exclusion Of Loss Due To Virus Or Bacteria

CP 01 49 06 07,  Illinois Changes - Artificially Generated Electrical Current Exclusion

XAI 300 10 06 | © X.L. America Inc. | Page 1 of 1

# FORMS SCHEDULE

**POLICY NUMBER:** RPP5435093-01

**POLICY PERIOD:** 07/22/2016 to 07/22/2017

**NAMED INSURED:** Addison Ice Arena

Form Number  Form Name

CP 04 17 10 12,   Utility Services - Direct Damage

CP 10 30 10 12,   Causes Of Loss - Special Form

CP 12 18 10 12,   Loss Payable Provisions

CP 12 19 06 07,   Additional Insured - Building Owner

CP 14 10 06 95,   Additional Covered Property

CP 15 45 10 12,   Utility Services - Time Element

IL 01 18 10 10,   Illinois Changes

IL 02 84 12 05,   Illinois Changes - Cancellation And Nonrenewal

IL 09 35 07 02,   Exclusion Of Certain Computer-Related Losses

GII 900 0315,   Exclusion Of Certified Acts Of Terrorism And Nuclear, Biological Or Chemical Non-Certified Acts Of Terrorism

IH 99 06 04 05,   Schedule

GRPP 300 02 13,   Equipment Breakdown Coverage Schedule

GRPP 400 0314,   Property Enhancement Endorsement - Rink Pro

GRPP 401 02 13,   Equipment Breakdown Coverage

GL MP 7000 1104,   Commercial General Liability Coverage Part Declarations

CG 00 01 04 13,   Commercial General Liability Coverage Form (Occurrence)

CG 02 00 12 07,   Illinois Changes - Cancellation And Non Renewal

XAI 300 10 06                                © X.L. America Inc.                          Page 1 of 1

# FORMS SCHEDULE

**POLICY NUMBER:** RPP5435093-01

**POLICY PERIOD:** 07/22/2016 to 07/22/2017

**NAMED INSURED:** Addison Ice Arena

Form Number☐ ☐ Form Name

CG 04 35 12 07,  Employee Benefits Liability Coverage

CG 21 35 10 01,  Exclusion - Coverage C - Medical Payments

CG 21 47 12 07,  Employment Related Practices Exclusion

CG 21 65 12 04,  Total Pollution Exclusion With A Building Heating, Cooling And Dehumidifying Equipment Exception And A Hostile Fire Exception

CG 21 67 12 04,  Fungi Or Bacteria Exclusion

CG 21 96 03 05,  Silica Or Silica-Related Dust Exclusion

CG 22 43 04 13,  Exclusion - Engineers, Architects Or Surveyors Professional Liability

GRPL 401 1012,  Amendment To Definition Of Pollutants - Carbon Monoxide

GRPL 402 1012,  Crisis Management Expense Endorsement

GRPL 403 1012,  Hired Auto and Non-Owned Auto Liability Insurance

GRPL 600 1012,  Total Assault Or Battery Exclusion

IL 00 21 09 08,  Nuclear Energy Liability Exclusion Endorsement (Broad Form)

IL 01 47 09 11,  Illinois Changes - Civil Union

XIL 401 0605,  Asbestos Exclusion

XIL 402 0605,  Radioactive Matter Exclusion

XIL 403 0605,  Broad Form Securities Exclusion

XIL 428 0605,  Lead Exclusion

XAI 300 10 06                    © X.L. America Inc.                    Page 1 of 1

# FORMS SCHEDULE

**POLICY NUMBER:** RPP5435093-01

**POLICY PERIOD:** 07/22/2016 to 07/22/2017

**NAMED INSURED:** Addison Ice Arena

Form Number☐ ☐ Form Name

XL-ILSOP 11 10,   Service Of Process

XAI 300 10 06                    © X.L. America Inc.                    Page 1 of 1

## IN WITNESS

### INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT: REGULATORY
EXTON, PA 19341-1120
PHONE: 800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

_____
Joseph Tocco
President

_____
Toni Ann Perkins
Secretary

IL MP 9104 0314 IHIC

©2014 X.L. America, Inc. All rights reserved. May not be copied without permission.

IL 00 03 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was com-
puted based on rates in effect at the time the policy
was issued. On each renewal, continuation, or anni-
versary of the effective date of this policy, we will
compute the premium in accordance with our rates
and rules then in effect.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

IL 01 62 10 13

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS CHANGES – DEFENSE COSTS

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART – LEGAL LIABILITY COVERAGE FORM
COMMERCIAL PROPERTY COVERAGE PART – MORTGAGEHOLDERS ERRORS AND OMISSIONS
COVERAGE FORM
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK COVERAGE PART

**A.** The provisions of Paragraph **B.** are added to all Insuring Agreements that set forth a duty to defend under:

1. Section I of the Commercial General Liability, Commercial Liability Umbrella, Employment-related Practices Liability, Farm, Liquor Liability, Owners And Contractors Protective Liability, Pollution Liability, Products/Completed Operations Liability, Product Withdrawal, Medical Professional Liability, Railroad Protective Liability, Underground Storage Tank Coverage Parts, Auto Dealers Coverage Form and the Farm Umbrella Liability Policy;

2. Section II under the Auto Dealers, Business Auto and Motor Carrier Coverage Forms;

3. Section III under the Auto Dealers and Motor Carrier Coverage Forms;

4. Section A. Coverage under the Legal Liability Coverage Form; and

5. Coverage **C** – Mortgageholder's Liability under the Mortgageholders Errors And Omissions Coverage Form.

   Paragraph **B.** also applies to any other provision in the policy that sets forth a duty to defend.

**B.** If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

COMMERCIAL PROPERTY
CP 00 10 10 12

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.** Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.** Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Bridges, roadways, walks, patios or other paved surfaces;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

    (1) The lowest basement floor; or

    (2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, n., does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

    (1) Are licensed for use on public roads; or

    (2) Are operated principally away from the described premises.

    This paragraph does not apply to:

    (a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

© Insurance Services Office, Inc., 2011

CP 00 10 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

    (b) Vehicles or self-propelled machines, other than autos, you hold for sale;

    (c) Rowboats or canoes out of water at the described premises; or

    (d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers; or

q. The following property while outside of buildings:

    (1) Grain, hay, straw or other crops;

    (2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

## 3. Covered Causes Of Loss

See applicable Causes Of Loss form as shown in the Declarations.

## 4. Additional Coverages

### a. Debris Removal

    (1) Subject to Paragraphs (2), (3) and (4), we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

    (2) Debris Removal does not apply to costs to:

        (a) Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

        (b) Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

        (c) Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

        (d) Remove property of others of a type that would not be Covered Property under this Coverage Form;

        (e) Remove deposits of mud or earth from the grounds of the described premises;

        (f) Extract "pollutants" from land or water; or

        (g) Remove, restore or replace polluted land or water.

    (3) Subject to the exceptions in Paragraph (4), the following provisions apply:

        (a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

        (b) Subject to (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

    (4) We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

        (a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

        (b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---:|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |
| ($10,000 is 20% of $50,000.) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example 2**

| | |
|---|---:|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense: | $ 40,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000, capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

 © Insurance Services Office, Inc., 2011 CP 00 10 10 12

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

(1) This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

(2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

(3) The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

(4) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

(a) You were required to comply with before the loss, even when the building was undamaged; and

(b) You failed to comply with.

(5) Under this Additional Coverage, we will not pay for:

(a) The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

(b) Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

(6) The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

(7) With respect to this Additional Coverage:

(a) We will not pay for the Increased Cost of Construction:

(i) Until the property is actually repaired or replaced at the same or another premises; and

(ii) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

© Insurance Services Office. Inc.. 2011 CP 00 10 10 12

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

(4) The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

5. **Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

a. **Newly Acquired Or Constructed Property**

(1) **Buildings**

If this policy covers Building, you may extend that insurance to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) **Your Business Personal Property**

(a) If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

(i) Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

(ii) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(b) This Extension does not apply to:

(i) Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

(ii) Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

(3) **Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

© Insurance Services Office. Inc.. 2011

CP 00 10 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

    (a) The trailer is used in your business;

    (b) The trailer is in your care, custody or control at the premises described in the Declarations; and

    (c) You have a contractual responsibility to pay for loss or damage to the trailer.

(2) We will not pay for any loss or damage that occurs:

    (a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

    (b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

(2) If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

(3) Coverage under this Extension:

    (a) Will end 90 days after the business personal property has been placed in the storage unit;

    (b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

1. Fire Department Service Charge;

2. Pollutant Clean-up And Removal;

3. Increased Cost Of Construction; and

4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | | |
|---|---|---|
| Deductible: | $ | 250 |
| Limit of Insurance – Building 1: | $ | 60,000 |
| Limit of Insurance – Building 2: | $ | 80,000 |
| Loss to Building 1: | $ | 60,100 |
| Loss to Building 2: | $ | 90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

$ 60,100
−    250
$ 59,850 Loss Payable – Building 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

| | | |
|---|---|---|
| Loss to Building 1: | $ | 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss to Building 2: | $ | 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss Payable – Building 1: | $ | 60,000 |
| (Limit of Insurance) | | |
| Loss Payable – Building 2: | $ | 80,000 |
| (Limit of Insurance) | | |
| Total amount of loss payable: | $ | 140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties In The Event Of Loss Or Damage**

   a. You must see that the following are done in the event of loss or damage to Covered Property:

      (1) Notify the police if a law may have been broken.

© Insurance Services Office. Inc.. 2011                    CP 00 10 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Loss Payment**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

h.  A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

5.  **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

6.  **Vacancy**

a.  **Description Of Terms**

(1)  As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

(a)  When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b)  When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i)  Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii)  Used by the building owner to conduct customary operations.

(2)  Buildings under construction or renovation are not considered vacant.

b.  **Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1)  We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

(a)  Vandalism;

(b)  Sprinkler leakage, unless you have protected the system against freezing;

(c)  Building glass breakage;

(d)  Water damage;

(e)  Theft; or

(f)  Attempted theft.

(2)  With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

7.  **Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a.  At actual cash value as of the time of loss or damage, except as provided in **b.**, **c.**, **d.** and **e.** below.

b.  If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

© Insurance Services Office. Inc.. 2011  CP 00 10 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value, even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety-glazing material if required by law.

e. Tenants' Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

## F. Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example 1 (Underinsurance)**

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 100,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

Step (1): $250,000 x 80% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example 2 (Adequate Insurance)**

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 200,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

   **b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

When:    The value of the property is:

| | |
|---|---|
| Building at Location 1: | $ 75,000 |
| Building at Location 2: | $ 100,000 |
| Personal Property at Location 2: | $ 75,000 |
| | $ 250,000 |

| | |
|---|---|
| The Coinsurance percentage for it is: | 90% |
| The Limit of Insurance for Buildings and Personal Property at Locations 1 and 2 is: | $ 180,000 |
| The Deductible is: | $ 1,000 |

The amount of loss is:

| | |
|---|---|
| Building at Location 2: | $ 30,000 |
| Personal Property at Location 2: | $ 20,000 |
| | $ 50,000 |

Step **(1)**: $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2)**: $180,000 ÷ $225,000 = .80

Step **(3)**: $50,000 x .80 = $40,000

Step **(4)**: $40,000 − $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

   **a.** The term mortgageholder includes trustee.

   **b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

   **c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

   **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

   **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

   **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

   **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

   All of the terms of this Coverage Part will then apply directly to the mortgageholder.

   **e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

   **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

   **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

   At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

   **f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

   **(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

   **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

   **g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item:

**1. Agreed Value**

   **a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

© Insurance Services Office, Inc., 2011    CP 00 10 10 12

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

a. The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

If: The applicable Limit of Insurance is: $ 100,000

The annual percentage increase is: 8%

The number of days since the beginning of the policy year (or last policy change) is: 146

The amount of increase is: $100,000 x .08 x 146 ÷ 365 = $ 3,200

**3. Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(4) "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in d.(1) and d.(2) above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in e.(2) above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

a. If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

b. With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

© Insurance Services Office, Inc., 2011

CP 00 10 10 12

COMMERCIAL PROPERTY
CP 00 30 10 12

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit Of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises means:

**(a)** The portion of the building which you rent, lease or occupy;

**(b)** The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(c)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

CP 00 30 10 12

© Insurance Services Office, Inc., 2011

Page 1 of 9

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**3. Covered Causes Of Loss, Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Limitation – Interruption Of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**d.** This Additional Limitation does not apply when loss or damage to electronic data involves only electronic data which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

 © Insurance Services Office, Inc., 2011 CP 00 30 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

   **(a)** Used in the construction, alterations or additions; or

   **(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

**(1) Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

   **(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

   **(b)** Ends on the earlier of:

      **(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

      **(ii)** 60 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2) "Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

   **(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

   **(b)** Ends on the earlier of:

      **(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

      **(ii)** 60 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**d. Interruption Of Computer Operations**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Additional Limitation – Interruption Of Computer Operations.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

(2) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss. However, we will not provide coverage under this Additional Coverage when the Additional Limitation – Interruption Of Computer Operations does not apply based on Paragraph **A.4.d.** therein.

(3) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

(b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, includes Collapse as set forth in that form.

(c) If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Interruption Of Computer Operations.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, Interruption Of Computer Operations, is $2,500 (unless a higher limit is shown in the Declarations) for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(5) This Additional Coverage, Interruption Of Computer Operations, does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(4)** above has not been exhausted.

**6. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

a. You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location, unless a higher limit is shown in the Declarations.

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

(1) This policy expires;

 © Insurance Services Office, Inc., 2011

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

(2) 30 days expire after you acquire or begin to construct the property; or

(3) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

## B. Limits Of Insurance

The most we will pay for loss in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

1. Alterations And New Buildings;

2. Civil Authority;

3. Extra Expense; or

4. Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage.

## C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 2. Duties In The Event Of Loss

a. You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

3. **Loss Determination**

a. The amount of Business Income loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

b. The amount of Extra Expense will be determined based on:

(1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

(a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

(b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

c. **Resumption Of Operations**

We will reduce the amount of your:

(1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

(2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

d. If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

4. **Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

a. We have reached agreement with you on the amount of loss; or

b. An appraisal award has been made.

D. **Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

1. The Coinsurance percentage shown for Business Income in the Declarations; times

2. The sum of:

a. The Net Income (Net Profit or Loss before income taxes), and

b. Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

© Insurance Services Office, Inc., 2011

CP 00 30 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

Instead, we will determine the most we will pay using the following steps:

Step **(1)**: Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step **(2)**: Divide the Limit of Insurance for the described premises by the figure determined in Step **(1)**; and

Step **(3)**: Multiply the total amount of loss by the figure determined in Step **(2)**.

We will pay the amount determined in Step **(3)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

(1) Prepaid freight – outgoing;

(2) Returns and allowances;

(3) Discounts;

(4) Bad debts;

(5) Collection expenses;

(6) Cost of raw stock and factory supplies consumed (including transportation charges);

(7) Cost of merchandise sold (including transportation charges);

(8) Cost of other supplies consumed (including transportation charges);

(9) Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

(10) Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

(11) All payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

(12) Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion – not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example 1 (Underinsurance)**

| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: | $ 400,000 |
| | The Coinsurance percentage is: | 50% |
| | The Limit of Insurance is: | $ 150,000 |
| | The amount of loss is: | $ 80,000 |

Step (1): $400,000 x 50\% = \$200,000$

(the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $\$150,000 \div \$200,000 = .75$

Step (3): $\$80,000 \times .75 = \$60,000$

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example 2 (Adequate Insurance)**

| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: | $ 400,000 |
| | The Coinsurance percentage is: | 50% |
| | The Limit of Insurance is: | $ 200,000 |
| | The amount of loss is: | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Maximum Period Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

b. The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

(1) The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

(2) The Limit Of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

(1) The Limit of Insurance, multiplied by

(2) The fraction shown in the Declarations for this Optional Coverage.

**Example**

| When: | | |
|---|---|---|
| The Limit of Insurance is: | $ | 120,000 |
| The fraction shown in the Declarations for this Optional Coverage is: | | 1/4 |
| The most we will pay for loss in each period of 30 consecutive days is: | $ | 30,000 |
| ($120,000 x 1/4 = $30,000) | | |

If, in this example, the actual amount of loss is:

| Days 1–30: | $ | 40,000 |
|---|---|---|
| Days 31–60: | $ | 20,000 |
| Days 61–90: | $ | 30,000 |
| | $ | 90,000 |

We will pay:

| Days 1–30: | $ | 30,000 |
|---|---|---|
| Days 31–60: | $ | 20,000 |
| Days 61–90: | $ | 30,000 |
| | $ | 80,000 |

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

a. To activate this Optional Coverage:

(1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

(a) During the 12 months prior to the date of the Work Sheet; and

(b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

(2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

(a) The Coinsurance percentage shown in the Declarations; multiplied by

(b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

b. The Additional Condition, Coinsurance, is suspended until:

(1) 12 months after the effective date of this Optional Coverage; or

(2) The expiration date of this policy;

whichever occurs first.

c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

(1) Within 12 months of the effective date of this Optional Coverage; or

(2) When you request a change in your Business Income Limit of Insurance.

d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

(1) The Business Income Limit of Insurance; divided by

(2) The Agreed Value.

**Example**

| When: | | |
|---|---|---|
| The Limit of Insurance is: | $ 100,000 |
| The Agreed Value is: | $ 200,000 |
| The amount of loss is: | $ 80,000 |

Step (1): $100,000 ÷ $200,000 = .50

Step (2): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4. Extended Period Of Indemnity**

Under Paragraph **A.5.c., Extended Business Income,** the number 60 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

© Insurance Services Office, Inc., 2011

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

## F. Definitions

1. "Finished stock" means stock you have manufactured.

   "Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

   "Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

2. "Operations" means:

   a. Your business activities occurring at the described premises; and

   b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

3. "Period of restoration" means the period of time that:

   a. Begins:

      (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

      (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (2) The date when business is resumed at a new permanent location.

   "Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

      (1) Regulates the construction, use or repair, or requires the tearing down, of any property; or

      (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

   The expiration date of this policy will not cut short the "period of restoration".

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means Business Income that consists of:

   a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including:

      (1) Payroll; and

      (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

6. "Suspension" means:

   a. The slowdown or cessation of your business activities; or

   b. That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part; .

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:

   a. During the policy period shown in the Declarations; and

   b. Within the coverage territory.

2. The coverage territory is:

   a. The United States of America (including its territories and possessions);

   b. Puerto Rico; and

   c. Canada.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987
CP 00 90 07 88

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

COMMERCIAL PROPERTY
CP 01 40 07 06

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, includ-ing but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is ad-dressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion super-sedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

1. Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

2. Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, in-cluding any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

CP 01 40 07 06        Copyright, ISO Properties, Inc., 2006        Page 1 of 1

COMMERCIAL PROPERTY
CP 01 49 06 07

# ILLINOIS CHANGES – ARTIFICIALLY GENERATED ELECTRICAL CURRENT EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in:

1. Paragraph **B.2.a.** of the Standard Property Policy, the Causes Of Loss – Basic Form, the Causes Of Loss – Broad Form and the Causes Of Loss – Special Form; and

2. Paragraph **B.2.b.** of the Mortgageholders Errors And Omissions Coverage Form

is replaced by the following exclusion:

We will not pay for loss or damage caused by or resulting from artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

POLICY NUMBER: RPP5435093-01

**COMMERCIAL PROPERTY
CP 04 17 10 12**

# UTILITY SERVICES – DIRECT DAMAGE

This endorsement modifies insurance provided under the following:

BUILDERS' RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY
TOBACCO SALES WAREHOUSES COVERAGE FORM

## SCHEDULE

| Premises Number | Building Number | Utility Services Limit Of Insurance | Enter "X" for each applicable property. | | | | |
|---|---|---|---|---|---|---|---|
| | | | Water Supply Property | Communication Supply Property (including overhead transmission lines) | Communication Supply Property (not including overhead transmission lines) | Power Supply Property (including overhead transmission lines) | Power Supply Property (not including overhead transmission lines) |
| 1 | ALL | $ 250,000 | | | | X | |
| Covered Property: 475 South Grace Street, Addison, IL 60101 | | | | | | | |
| Causes Of Loss Form Applicable: CP1030 Cause of Loss Special Form | | | | | | | |
| | | $ | | | | | |
| Covered Property: | | | | | | | |
| Causes Of Loss Form Applicable: | | | | | | | |
| | | $ | | | | | |
| Covered Property: | | | | | | | |
| Causes Of Loss Form Applicable: | | | | | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | | | | |

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

## A. Coverage

We will pay for loss of or damage to Covered Property described in the Schedule, caused by an interruption in utility service to the described premises. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss (as indicated in the Schedule) to the property described in Paragraph **C.** if such property is indicated by an "X" in the Schedule.

## B. Exception

Coverage under this endorsement for loss or damage to Covered Property does not apply to loss or damage to electronic data, including destruction or corruption of electronic data. The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

## C. Utility Services

1. Water Supply Services, meaning the following types of property supplying water to the described premises:

   **a.** Pumping stations; and

   **b.** Water mains.

2. Communication Supply Services, meaning property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

   **a.** Communication transmission lines, including optic fiber transmission lines;

   **b.** Coaxial cables; and

   **c.** Microwave radio relays except satellites.

   It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

3. Power Supply Services, meaning the following types of property supplying electricity, steam or gas to the described premises:

   **a.** Utility generating plants;

   **b.** Switching stations;

   **c.** Substations;

   **d.** Transformers; and

   **e.** Transmission lines.

   It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

**D.** As used in this endorsement, the term transmission lines includes all lines which serve to transmit communication service or power, including lines which may be identified as distribution lines.

**E.** If a Utility Services Limit Of Insurance is shown in the Schedule, such limit is part of, not in addition to, the Limit Of Insurance stated in the Declarations or in the Separation Of Coverage endorsement as applicable to the Covered Property.

If no Limit of Insurance is shown for Utility Services, coverage under this endorsement is subject to the applicable Limit Of Insurance on the Covered Property as shown in the Declarations or in the Separation Of Coverage endorsement. But this Utility Services endorsement does not increase the applicable Limit of Insurance.

 © Insurance Services Office, Inc., 2011 CP 04 17 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

COMMERCIAL PROPERTY
CP 10 30 10 12

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of or compliance with any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

© Insurance Services Office, Inc., 2011

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

© Insurance Services Office, Inc., 2011 CP 10 30 10 12

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

**(1)** Applies whether or not an act occurs during your normal hours of operation;

**(2)** Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.,** does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage, Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.,** does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

© Insurance Services Office, Inc., 2011

CP 10 30 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

 © Insurance Services Office. Inc.. 2011

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

      However, this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      (2) Business Income Coverage or Extra Expense Coverage.

   e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

   g. Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

      (1) Dampness or dryness of atmosphere or of soil supporting the vegetation;

      (2) Changes in or extremes of temperature;

      (3) Disease;

      (4) Frost or hail; or

      (5) Rain, snow, ice or sleet.

2. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Animals, and then only if they are killed or their destruction is made necessary.

   b. Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass; or

      (2) Containers of property held for sale.

   c. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

      However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

      (2) To Business Income Coverage or to Extra Expense Coverage.

© Insurance Services Office, Inc., 2011

CP 10 30 10 12

3. The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

   **a.** $2,500 for furs, fur garments and garments trimmed with fur.

   **b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

   **c.** $2,500 for patterns, dies, molds and forms.

   **d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

   These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

   This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

   **a.** Results in discharge of any substance from an automatic fire protection system; or

   **b.** Is directly caused by freezing.

   However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   **a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   **b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   **c.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

   **d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      **(1)** A cause of loss listed in **2.a.** or **2.b.**;

      **(2)** One or more of the "specified causes of loss";

      **(3)** Breakage of building glass;

      **(4)** Weight of people or personal property; or

      **(5)** Weight of rain that collects on a roof.

3. This **Additional Coverage – Collapse** does **not** apply to:

   **a.** A building or any part of a building that is in danger of falling down or caving in;

   **b.** A part of a building that is standing, even if it has separated from another part of the building; or

   **c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

   **a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

b. Awnings, gutters and downspouts;

c. Yard fixtures;

d. Outdoor swimming pools;

e. Fences;

f. Piers, wharves and docks;

g. Beach or diving platforms or appurtenances;

h. Retaining walls; and

i. Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

(1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

(2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

a. The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

b. The personal property which collapses is inside a building; and

c. The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

E. **Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

a. A "specified cause of loss" other than fire or lightning; or

b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

© Insurance Services Office, Inc., 2011

CP 10 30 10 12

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

6. The following, **6.a.** or **6.b.,** applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

   **a.** If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   **b.** If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

   1. **Property In Transit**

      This Extension applies only to your personal property to which this form applies.

      **a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

      **b.** Loss or damage must be caused by or result from one of the following causes of loss:

         **(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

         **(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

         **(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

      **c.** The most we will pay for loss or damage under this Extension is $5,000.

      This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

   2. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

      If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

   3. **Glass**

      **a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

   **b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

   This Coverage Extension **F.3.** does not increase the Limit of Insurance.

**G. Definitions**

   **1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

   **2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   **(1)** The cost of filling sinkholes; or

   **(2)** Sinking or collapse of land into man-made underground cavities.

   **b.** Falling objects does not include loss or damage to:

   **(1)** Personal property in the open; or

   **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   **c.** Water damage means:

   **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

   **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

   But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

   To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

 © Insurance Services Office, Inc., 2011 CP 10 30 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

POLICY NUMBER: RPP5435093-01

**COMMERCIAL PROPERTY**
**CP 12 18 10 12**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDERS' RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE

| Location Number: 1 | Building Number: ALL | Applicable Clause        C.1 (Enter C.1., C.2., C.3. or C.4.): |
|---|---|---|
| **Description Of Property:** 475 South Grace Street☐ Addison, IL 60101 | | |
| **Loss Payee Name:** Republic Bank of Chicago | | |
| **Loss Payee Address:** 2221 Camden Court  Oak Brook, IL 60523 | | |
| **Location Number:** | **Building Number:** | **Applicable Clause** (Enter C.1., C.2., C.3. or C.4.): |
| **Description Of Property:** | | |
| **Loss Payee Name:** | | |
| **Loss Payee Address:** | | |
| **Location Number:** | **Building Number:** | **Applicable Clause** (Enter C.1., C.2., C.3. or C.4.): |
| **Description Of Property:** | | |
| **Loss Payee Name:** | | |
| **Loss Payee Address:** | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

A. When this endorsement is attached to the Standard Property Policy **CP 00 99**, the term Coverage Part in this endorsement is replaced by the term Policy.

B. Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

C. The following is added to the **Loss Payment** Loss Condition, as indicated in the Declarations or in the Schedule:

1. **Loss Payable Clause**

   For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

   a. Adjust losses with you; and

   b. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear

2. **Lender's Loss Payable Clause**

   a. The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

      (1) Warehouse receipts;

      (2) A contract for deed;

      (3) Bills of lading;

      (4) Financing statements; or

      (5) Mortgages, deeds of trust, or security agreements.

   b. For Covered Property in which both you and a Loss Payee have an insurable interest:

      (1) We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

      (2) The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

(3) If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

   (a) Pays any premium due under this Coverage Part at our request if you have failed to do so;

   (b) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

   (c) Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

   All of the terms of this Coverage Part will then apply directly to the Loss Payee.

(4) If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

   (a) The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

   (b) The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

   At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

c. If we cancel this policy, we will give written notice to the Loss Payee at least:

   (1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

   (2) 30 days before the effective date of cancellation if we cancel for any other reason.

d. If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

© Insurance Services Office. Inc.. 2011

CP 12 18 10 12

**3. Contract Of Sale Clause**

a. The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered into a contract with for the sale of Covered Property.

b. For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

(1) Adjust losses with you; and

(2) Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

c. The following is added to the **Other Insurance** Condition:

For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**4. Building Owner Loss Payable Clause**

a. The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building in which you are a tenant.

b. We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

c. We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

POLICY NUMBER: RPP5435093-01

COMMERCIAL PROPERTY
CP 12 19 06 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – BUILDING OWNER

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

## SCHEDULE

| Premises Number: 1 | | Building Number: All |
|---|---|---|
| **Building Description:** | 475 South Grace Street Addison, IL 60101 | |
| **Building Owner Name:** | Thirteen Forty Five Holdings LLC | |
| **Building Owner Address:** | 1101 Perimter Drive Suite 800 Schaumburg, IL 60173 | |
| **Premises Number:** | | **Building Number:** |
| **Building Description:** | | |
| **Building Owner Name:** | | |
| **Building Owner Address:** | | |
| **Premises Number:** | | **Building Number:** |
| **Building Description:** | | |
| **Building Owner Name:** | | |
| **Building Owner Address:** | | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The building owner identified in this endorsement is a
Named Insured, but only with respect to the coverage
provided under this Coverage Part or Policy for direct
physical loss or damage to the building(s) described
in the Schedule.

© ISO Properties, Inc., 2007

POLICY NUMBER: RPP5435093-01

**COMMERCIAL PROPERTY**
**CP 14 10 06 95**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL COVERED PROPERTY

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

The following is withdrawn from PROPERTY NOT COVERED and added to COVERED PROPERTY:

### SCHEDULE*

| Prem. No. | Bldg. No. | Paragraph Reference | Description of Property | Type of Property Coverage (Enter BUILDING or PERSONAL PROPERTY) |
|---|---|---|---|---|
| ALL | ALL | MAX LIMIT 250,000 | Pipes, Flues, Drains, and Refrigeration Equipment | Building |

* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

CP 14 10 06 95                Copyright, ISO Commercial Risk Services, Inc., 1994                Page 1 of 1

POLICY NUMBER: RPP5435093-01

COMMERCIAL PROPERTY
CP 15 45 10 12

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# UTILITY SERVICES – TIME ELEMENT

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM
EXTRA EXPENSE COVERAGE FORM

## SCHEDULE

| Premises Number | Building Number | Utility Services Limit Of Insurance | Water Supply Property | Waste-water Removal Property | Communication Supply Property (including overhead transmission lines) | Communication Supply Property (not including overhead transmission lines) | Power Supply Property (including overhead transmission lines) | Power Supply Property (not including overhead transmission lines) |
|---|---|---|---|---|---|---|---|---|
| | | | Enter "X" for each applicable property. | | | | | |
| 1 | ALL | $  250,000 | | | | | X | |

Causes Of Loss Form Applicable: CP1030 Cause of Loss Special Form

| | | $ | | | | | | |
|---|---|---|---|---|---|---|---|---|

Causes Of Loss Form Applicable:

| | | $ | | | | | | |
|---|---|---|---|---|---|---|---|---|

Causes Of Loss Form Applicable:

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

## A. Coverage

Your coverage for Business Income and/or Extra Expense, as provided and limited in the applicable Coverage Form, is extended to apply to a "suspension" of "operations" at the described premises caused by an interruption in utility service to that premises. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss (as provided under the applicable Causes of Loss Form indicated in the Schedule) to the property described in Paragraph **C.** if such property is indicated by an "X" in the Schedule.

## B. Exception

Coverage under this endorsement does not apply to Business Income loss or Extra Expense related to interruption in utility service which causes loss or damage to electronic data, including destruction or corruption of electronic data. The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

## C. Utility Services

1. Water Supply Property, meaning the following types of property supplying water to the described premises:

   a. Pumping stations; and

   b. Water mains.

2. Wastewater Removal Property, meaning a utility system for removing wastewater and sewage from the described premises, other than a system designed primarily for draining storm water. The utility property includes sewer mains, pumping stations and similar equipment for moving the effluent to a holding, treatment or disposal facility, and includes such facilities.

Coverage under this endorsement does not apply to interruption in service caused by or resulting from a discharge of water or sewage due to heavy rainfall or flooding.

3. Communication Supply Property, meaning property supplying communication services, including telephone, radio, microwave or television services, to the described premises, such as:

   a. Communication transmission lines, including optic fiber transmission lines;

   b. Coaxial cables; and

   c. Microwave radio relays except satellites.

   It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

4. Power Supply Property, meaning the following types of property supplying electricity, steam or gas to the described premises:

   a. Utility generating plants;

   b. Switching stations;

   c. Substations;

   d. Transformers; and

   e. Transmission lines.

   It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

## D.

As used in this endorsement, the term transmission lines includes all lines which serve to transmit communication service or power, including lines which may be identified as distribution lines.

## E.

The **Coinsurance** Additional Condition does not apply to this endorsement.

## F.

The Utility Services Limit Of Insurance, as shown in the Schedule, is the only Limit which applies to the coverage provided under this endorsement, and is part of, not in addition to, the Limit Of Insurance stated in the Declarations as applicable to the described premises.

   © Insurance Services Office, Inc., 2011   CP 15 45 10 12

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

IL 01 18 10 10

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS CHANGES

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to Standard Property Policy **CP 00 99,** the terms Coverage Part and Coverage Form in this endorsement are replaced by the term Policy.

**B.** The following is added to the **Legal Action Against Us** Condition:

The two year period for legal action against us is extended by the number of days between the date the proof of loss is filed with us and the date we deny the claim in whole or in part.

**C.** If this policy covers:

**1.** The following in **a.** and **b.,** then Paragraphs **2.** and **3.** apply:

**a.** Real property used principally for residential purposes up to and including a four family dwelling; or

**b.** Household or personal property that is usual or incidental to the occupancy of any premises used for residential purposes.

**2.** The second paragraph of the **Appraisal** Condition is deleted and replaced by the following:

**a.** Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally, except as provided in **b.** below.

**b.** We will pay your appraiser's fee and the umpire's appraisal fee, if the following conditions exist:

**(1)** You demanded the appraisal; and

**(2)** The full amount of loss, as set by your appraiser, is agreed to by our appraiser or by the umpire.

**3.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following:

**Concealment, Misrepresentation Or Fraud**

**a.** This Coverage Part or Coverage Form is void if you or any insured ("insured") commit fraud or conceal or misrepresent a fact in the process leading to the issuance of this insurance, and such fraud, concealment or misrepresentation is stated in the policy or endorsement or in the written application for this policy and:

**(1)** Was made with actual intent to deceive; or

**(2)** Materially affected either our decision to provide this insurance or the hazard we assumed.

However, this condition will not serve as a reason to void this Coverage Part or Coverage Form after the Coverage Part or Coverage Form has been in effect for one year or one policy term, whichever is less.

**b.** This Coverage Part or Coverage Form is void if you or any other insured ("insured"), at any time subsequent to the issuance of this insurance, commit fraud or intentionally conceal or misrepresent a material fact relating to:

**(1)** This Coverage Part or Coverage Form;

**(2)** The Covered Property;

**(3)** Your interest in the Covered Property; or

**(4)** A claim under this Coverage Part or Coverage Form.

IL 01 18 10 10      © Insurance Services Office, Inc., 2009      Page 1 of 2   ☐

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

c. Notwithstanding the limitations stated in **3.a.** above, we may cancel the Coverage Part or Coverage Form in accordance with the terms of the Cancellation Condition.

D. For the Commercial Property Coverage Part and the Standard Property Policy, the following exclusion and related provisions are added to Paragraph **B.2.** Exclusions in the Causes of Loss Forms and to any Coverage Form or policy to which a Causes of Loss Form is not attached:

1. We will not pay for loss or damage arising out of any act an insured commits or conspires to commit with the intent to cause a loss.

   In the event of such loss, no insured is entitled to coverage, even insureds who did not commit or conspire to commit the act causing the loss.

2. However, this exclusion will not apply to deny payment to an innocent co-insured who did not cooperate in or contribute to the creation of the loss if:

   a. The loss arose out of a pattern of criminal domestic violence; and

   b. The perpetrator of the loss is criminally prosecuted for the act causing the loss.

3. If we pay a claim pursuant to Paragraph **D.2.,** our payment to the insured is limited to that insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

E. The **Intentional Loss Exclusion** in the Causes of Loss Form – Farm Property, Mobile Agricultural Machinery And Equipment Coverage Form and Livestock Coverage Form is replaced by the following:

1. We will not pay for loss ("loss") or damage arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss ("loss").

   In the event of such loss ("loss"), no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss ("loss").

2. However, this exclusion will not apply to deny payment to an innocent co-"insured" who did not cooperate in or contribute to the creation of the loss ("loss") if:

   a. The loss ("loss") arose out of a pattern of criminal domestic violence; and

   b. The perpetrator of the loss ("loss") is criminally prosecuted for the act causing the loss.

3. If we pay a claim pursuant to Paragraph **E.2.,** our payment to the "insured" is limited to that "insured's" insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

F. The **Intentional Loss Exclusion** in the Capital Assets Program (Output Policy) Coverage Part, is replaced by the following:

1. We will not pay for loss or damage arising out of any act an insured commits or conspires to commit with the intent to cause a loss.

   In the event of such loss, no insured is entitled to coverage, even insureds who did not commit or conspire to commit the act causing the loss.

2. However, this exclusion will not apply to deny payment to an innocent co-insured who did not cooperate in or contribute to the creation of the loss if:

   a. The loss arose out of a pattern of criminal domestic violence; and

   b. The perpetrator of the loss is criminally prosecuted for the act causing the loss.

3. If we pay a claim pursuant to Paragraph **F.2.,** our payment to the insured is limited to that insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

© Insurance Services Office, Inc., 2009

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

IL 02 84 12 05

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES –
# CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. If this policy has been in effect for 60 days or less, except as provided in Paragraphs **8.** and **9.** below, we may cancel this policy by mailing written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

3. If this policy has been in effect for more than 60 days, except as provided in Paragraphs **8.** and **9.** below, we may cancel this policy only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** You have violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification to the Director of Insurance of the loss of reinsurance by the insurer which provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director that the continuation of the policy could place us in violation of the insurance laws of this State.

If we cancel this policy based on one or more of the above reasons except for nonpayment of premium, we will mail written notice at least 60 days before the effective date of cancellation. When cancellation is for nonpayment of premium, we will mail written notice at least 10 days before the effective date of cancellation.

4. We will mail our notice to you, any mortgagee or lienholder known to us and to the agent or broker.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

7. Our notice of cancellation will state the reason for cancellation.

8. **Real Property Other Than Residential Properties Occupied By 4 Families Or Less**

   The following applies only if this policy covers real property other than residential property occupied by 4 families or less:

   If any one or more of the following conditions exists at any building that is Covered Property in this policy, we may cancel this policy by mailing to you written notice of cancellation, by both certified and regular mail, if:

   **a.** After a fire loss, permanent repairs to the building have not started within 60 days of satisfactory adjustment of loss, unless the delay is due to a labor dispute or weather conditions.

IL 02 84 12 05        © ISO Properties, Inc., 2005        Page 1 of 2   □

**b.** The building has been unoccupied 60 or more consecutive days. This does not apply to:

**(1)** Seasonal unoccupancy; or

**(2)** Buildings under repair, construction or reconstruction, if properly secured against unauthorized entry.

**c.** The building has:

**(1)** An outstanding order to vacate;

**(2)** An outstanding demolition order; or

**(3)** Been declared unsafe in accordance with the law.

**d.** Heat, water, sewer service or public lighting have not been connected to the building for 30 consecutive days or more.

The policy will terminate 10 days following receipt of the written notice by the named insured(s).

**9. Residential Properties Occupied By 4 Families Or Less**

The following applies if this policy covers residential properties occupied by 4 families or less:

If this policy has been in effect for 60 days, or if this is a renewal policy, we may only cancel this policy for one or more of the following reasons:

**a.** Nonpayment of premium;

**b.** The policy was obtained by misrepresentation or fraud; or

**c.** Any act that measurably increases the risk originally accepted.

If we cancel this policy based on one or more of the above reasons except for nonpayment of premium, we will mail written notice at least 30 days before the effective date of cancellation. When cancellation is for nonpayment of premium, we will mail written notice at least 10 days before the effective date of cancellation.

**10.** For insurance provided under the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part, the following applies:

**GRAIN IN PUBLIC GRAIN WAREHOUSES**

(Not applicable to grain owned by the Commodity Credit Corporation)

The following applies only with respect to grain in public grain warehouses:

The first Named Insured or we may cancel this policy at any time by mailing to:

**a.** The other; and

**b.** The Director of the Illinois Department of Agriculture (at its Springfield Office);

60 days' written notice of cancellation.

**B.** The following is added:

**NONRENEWAL**

**1.** If we decide not to renew or continue this policy, we will mail you, your agent or broker and any mortgagee or lienholder known to us written notice, stating the reason for nonrenewal, at least 60 days before the end of the policy period. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

If we fail to mail proper written notice of nonrenewal and you obtain other insurance, this policy will end on the effective date of that insurance.

**2.** The following provision applies only if this policy covers residential properties occupied by 4 families or less:

**a.** If this policy has been issued to you and in effect with us for 5 or more years, we may not fail to renew this policy unless:

**(1)** The policy was obtained by misrepresentation or fraud;

**(2)** The risk originally accepted has measurably increased; or

**(3)** You received 60 days' notice of our intent not to renew as provided in **1.** above.

**b.** If this policy has been issued to you and in effect with us for less than 5 years, we may not fail to renew this policy unless you received 30 days' notice as provided in **1.** above.

**C.** The following is added:

**MAILING OF NOTICES**

We will mail cancellation and nonrenewal notices to the last addresses known to us. Proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2005

IL 02 84 12 05    □

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

   **1.** The failure, malfunction or inadequacy of:

      **a.** Any of the following, whether belonging to any insured or to others:

         **(1)** Computer hardware, including microprocessors;

         **(2)** Computer application software;

         **(3)** Computer operating systems and related software;

         **(4)** Computer networks;

         **(5)** Microprocessors (computer chips) not part of any computer system; or

         **(6)** Any other computerized or electronic equipment or components; or

      **b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

      due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

   **2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

   **1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

   **2.** Under the Commercial Property Coverage Part:

      **a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

      **b.** In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

   we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

This endorsement changes the policy
-- **PLEASE READ THIS CAREFULLY** --

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND NUCLEAR, BIOLOGICAL OR CHEMICAL NON-CERTIFIED ACTS OF TERRORISM

**A.  The following Exclusions are added:**

   **1.  "Certified Act of Terrorism"**

   We will not pay for any loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

   **2.  "Non-Certified Act of Terrorism"**

   We will not pay for any loss or damage caused directly or indirectly by a "non-certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence of the loss or damage. But this exclusion applies only when one or more of the following are attributed to such act:

   a)  the terrorism is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation, or radioactive contamination; or

   b)  radioactive material is released, and it appears that one purpose of the terrorism was to release such material; or

   c)  the terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

   d)  pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials;

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss, injury or damage which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the War and Military Action Exclusion.

**B.  The following exceptions apply:**

   **1.  Property Coverage Part only - Exception Covering Certain Fire Losses:**

   In the event that the law of the jurisdiction where the "Insured Property" sustaining a loss or damage where a "certified act of terrorism" results in fire, we will pay for the loss or damage caused by that fire.  Such coverage for fire applies only to direct loss or damage by fire to Covered Property.  Coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsement, if applicable, or to Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

   **2.  Liability Coverage Part only:**

   Terrorism is defined to include "any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

   For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**C.  The following Definitions are added:**

   1.  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

GII 900 0315

Page 1 of 2

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.
Includes copyrighted material of American Association of Insurance Services, Inc., with its permission.

a) The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b) The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or influence the policy or affect the conduct of the United States Government by coercion.

2. "Non-Certified Acts of Terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or influence the policy or affect the conduct of the United States Government by coercion, and such conduct is not certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.

GII 900 0315

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of American Association of Insurance Services, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

POLICY NUMBER:  RPP5435093-01

**COMMERCIAL INLAND MARINE**
**IH 99 06 04 05**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SCHEDULE

This endorsement modifies insurance provided under the following:

ANNUAL TRANSIT COVERAGE FORM
BUILDERS RISK COVERAGE FORM
COMMERCIAL FINE ARTS COVERAGE FORM
COMPUTER SYSTEMS COVERAGE FORM
CONTRACTORS EQUIPMENT COVERAGE FORM
DIFFERENCE IN CONDITIONS COVERAGE FORM
EXHIBITION COVERAGE FORM
INSTALLATION COVERAGE FORM
MACHINERY AND EQUIPMENT COVERAGE FORM
MISCELLANEOUS ARTICLES COVERAGE FORM
MOTOR TRUCK CARGO CARRIERS COVERAGE FORM
MOTOR TRUCK CARGO OWNERS COVERAGE FORM
PATTERNS AND DIES COVERAGE FORM
RADIO AND TELEVISION TOWERS AND EQUIPMENT COVERAGE FORM
RAILROAD ROLLING STOCK COVERAGE FORM
SCIENTIFIC AND MEDICAL DIAGNOSTIC EQUIPMENT COVERAGE FORM
TANK STORAGE COVERAGE FORM
WAREHOUSE OPERATORS LEGAL LIABILITY COVERAGE FORM

### SCHEDULE

| Item No. | Description | Limit Of Insurance |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |
| | Total | $ |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

| |
|---|
| **Schedule Of Property Dated:** 7/22/2016 |
| **On File In Our Office Located At: (If Applicable)** |

© ISO Properties, Inc., 2005

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m., 07/22/2016    forms a part of

Policy No. RPP5435093-01    issued to  Addison Ice Arena

by  Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE SCHEDULE**

*Equipment Breakdown is subject to the Limits of Insurance shown in the Declarations except as specifically shown below.*

*These coverages apply to all locations covered on the policy, unless otherwise specified.*

| Coverages | Limits |
|---|---|
| Equipment Breakdown Limit | $ 10,274,900 |
| Business Income | $ Included |
| Extra Expense | $ Included |
| Expediting Expenses | $ 25,000 |
| Hazardous Substances | $ 25,000 |
| Spoilage | $ 25,000 |
| Data Restoration | $ 25,000 |
| Service Interruption | $ 25,000 |
| Ice Rink Piping | $ 250,000 |
| Ice Rink Piping Excavation Costs | $ 25,000 |

| Deductibles | | |
|---|---|---|
| Combined, All Coverages | $ 5,000 | |
| Direct Coverages | $ | |
| Indirect Coverages | $ | |
|  | or | hrs. |
|  | or | times ADV |
| Spoilage | $ | |
|  | or | % of loss, $ | minimum |

GRPP 300 0213

Page 1 of 2

© 2013 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Other Conditions**

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

ENDORSEMENT #

This endorsement, effective 12:01 a.m., 7/22/2016    forms a part of

Policy No. RPP5435093-01    issued to  Addison Ice Arena

by  Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### PROPERTY COVERAGE ENHANCEMENT – RINK PRO

This endorsement modifies insurance provided under the following:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM – CP 00 10**
**CAUSES OF LOSS – SPECIAL FORM – CP 10 30**

**If coverage is provided elsewhere in this policy for the same loss or damage, the coverage under this Property Coverage Enhancement will apply excess over any other coverage.**

**The total amount payable in any one occurrence shall not exceed the Limit of Insurance specified in the Schedule of this Property Coverage Enhancement regardless of the number of locations insured.**

### SCHEDULE

| PROPERTY COVERAGE ENHANCEMENT | LIMIT OF INSURANCE |
|---|---|
| A. Accounts Receivable | $ 100,000 |
| B. Valuable Papers and Records (Other Than "Electronic Data") | $ 100,000 |
| C. Outdoor Signs | $ 25,000 |
| D. Glass | $ 50,000 ($500 per plate for exterior glass and $100 per plate for interior glass) |
| E. Fine Arts | $ 25,000 |
| F. Outdoor Property | $ 100,000 ($500 any one tree, shrub, plant) |
| G. Newly Acquired Property: | |
|     Buildings | $ 1,000,000 |
|     Your Business Personal Property | $ 500,000 |
| H. Employee Personal Effects | $ 25,000 ($5,000 any one employee) |
| I. Property of Others | $ 25,000 |
| J. Electronic Data | $ 250,000 |
| K. Property Off-Premises | $ 50,000 |
| L. Property in Transit | $ 250,000 |
| M. Back Up of Sewers and Drains | $ 100,000 |
| N. Loss to the Undamaged Portion of the Building, Demolition Cost Coverage, Increased Cost Of Construction | $ 500,000 |
| O. Pollution Clean-up | $ 50,000 |
| P. Debris Removal | $ 25,000 |
| Q. Fire Department Service Charge | $ 25,000 |
| R. Fire Protection Equipment Recharge | $ 10,000 |
| S. Arson Reward | $ 10,000 |
| T. Employee Theft | $ 20,000 |
| U. Money and Securities | $ 25,000 (on premises) $ 25,000 (off premises) |
| V. Interruption Of Water Supply Services | $ 100,000 |

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

1. **Coverage Enhancements**

    We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Causes of Loss only as described in **Causes of Loss – Special Form CP 10 30** and **Building And Personal Property Coverage Form CP 00 10.**

    If any other Causes of Loss forms or endorsements are made part of this policy, (for example Flood under **CP 10 65**), those additional Causes of Loss will not apply to any of the coverage enhancements provided under this Property Coverage Enhancement.

2. **Broadened Premises Extension**

    Under **CP 00 10**, Section **A. Coverage**, Item 1. **Covered Property** is amended as follows:

    The limitation of 100 feet is increased to 1,000 feet in the following paragraphs:

    > **1.a. Building**, Item (5)(b)
    >
    > **1.b. Your Business Personal Property**
    >
    > **1.c. Personal Property Of Others**, Item (2)

    Under **CP 00 10**, Section **A. Coverage**, Item **5. Coverage Extensions** the first paragraph is deleted and replaced by the following:

    Except as otherwise provided, the following Coverage Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the premises described in the Declarations.

3. **Deductible**

    Each Property Coverage Enhancement shall be adjusted separately and from the amount of the adjusted loss an amount of **$1,000** (unless another Deductible is specified below or otherwise indicated within the Coverage Enhancement section itself) shall be deducted from all coverage(s) listed in this Property Coverage Enhancement. When the occurrence involves loss to more than one covered item, the losses will not be combined in determining application of the Deductible. However, the Deductible will be applied only once per occurrence.

    > Deductible (If other than $1,000 as specified above):  $  100 Indoor Glass /
    > 1000 All other Coverage's

4. **Covered Causes of Loss**

    See **Causes of Loss - Special Form CP 10 30**

5. **Covered Property**

    A. **Accounts Receivable**

        (1)    We will pay:

            (a)    All amounts due from your customers that you are unable to collect;

            (b)    Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

            (c)    Collection expenses in excess of your normal collection expenses that are made

GRPP 400 0314

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

necessary by the loss or damage; and

**(d)** Other reasonable expenses that you incur to re-establish your records of accounts receivable.

that result from direct physical loss of or damage to your records of accounts receivable from any Covered Causes of Loss.

**(2)** Additional exclusions applicable to the Property Coverage Enhancement:

We will not pay for loss or damage caused by or resulting from any of the following:

**(a)** Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or "other property".

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

**(b)** Bookkeeping, accounting or billing errors or omissions.

**(c)** Electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

**(i)** Programming errors or faulty machine instructions;

**(ii)** Faulty installation or maintenance of data processing equipment or component parts;

**(iii)** An occurrence that took place more than 1,000 feet from your premises described in the Declarations; or

**(iv)** Interruption of electrical power supply, power surge, blackout or brownout if the cause of such occurrence took place more than 1,000 feet from your premises described in the Declarations.

But we will pay for direct loss or damage caused by lightning.

**(3)** The most we will pay for loss or damage in any one occurrence under this Property Coverage Enhancement is $100,000.

**B.** **Valuable Papers and Records (Other Than "Electronic Data")**

Under CP 00 10, A. Coverage, 5. Coverage Extensions, Item c. Valuable Papers And Records (Other Than "Electronic Data"), is deleted and replaced by the following:

**(c)** **Valuable Papers and Records (Other Than "Electronic Data")**

**(1)** We will pay the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Property Coverage Enhancement does not apply to valuable papers and records which exist as "electronic data".

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

      (2)    The most we will pay to replace or restore the lost information under this Property Coverage Enhancement is $100,000 at each premises described in the Declarations. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**C.**    **Outdoor Signs**

Under **CP 00 10, C. Limits Of Insurance**, the second paragraph is deleted and replaced by the *following:*

The most we will pay for loss or damage to outdoor signs attached to buildings under this Property Coverage Enhancement is $25,000 per sign in any one occurrence.

**D.**    **Glass**

We will pay for direct physical loss of or damage to glass, including lettering and ornamentation that is part of the exterior of a covered building described in the Declarations which you own or are legally liable for at the time of the loss.

We will also pay the following:

    (1)    Your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss.

    (2)    Your expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

    (3)    Repair or replacement of the frames immediately encasing the damaged glass.

    (4)    Your expenses incurred to remove or replace obstructions when repairing or replacing the Covered Property. This does not include removing or replacing window displays.

    (5)    The total amount payable in any one occurrence shall not exceed $50,000, regardless of the number of locations insured, subject to a maximum of $500 per plate for exterior glass and $100 per plate for interior glass.

**E.**    **Fine Arts**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Causes of Loss.

    (1)    Covered Property means:

        (a)    Your fine arts; and

        (b)    Fine arts of others that are in your care, custody or control.

    (2)    Property Not Covered

        (a)    Property while on exhibition at fair grounds or any national or international exposition; or

        (b)    Contraband, or property in the course of illegal transportation or trade.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**(3)**    Additional exclusions applicable to the Property Coverage Enhancement:

We will not pay for loss or damage caused by or resulting from any of the following:

**(a)**    Breakage of art glass windows, statuary, glassware, bric-a-brac, marble, porcelain and similar fragile property.

But we will pay for such loss or damage caused directly by fire, lightning, explosion, windstorm, vandalism, aircraft, rioters, strikers, "theft" or attempted "theft", or by accident to the vehicle carrying the property if these causes of loss would be covered under **Causes of Loss - Special Form, CP 10 30**.

**(b)**    Any repairing, restoration or retouching of the Covered Property. This exclusion does not apply if damage to the fine art is caused by a Covered Cause Of Loss.

**(c)**    Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**(d)**    Unauthorized instructions to transfer property to any person or to any place.

**(e)**    Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**(f)**    Wear and tear, any quality in the property that causes it to damage or destroy itself, gradual deterioration; insects, vermin or rodents.

**(4)**    Valuation

The value of the Covered Property will be the least of the following amounts:

**(a)**    The actual cash value of that property;

**(b)**    The cost of reasonably restoring that property to its condition immediately before loss or damage;

**(c)**    The cost of replacing that property with substantially identical property; or

**(d)**    The most recent appraised valuation.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

**(5)**    The most we will pay for loss or damage in any one occurrence under this Property Coverage Enhancement is $25,000.

**F.**    **Outdoor Property**

Under **CP 00 10, A. Coverage, 5. Coverage Extensions**, Item **e., Outdoor Property**, is deleted and replaced by the following:

**e.**    **Outdoor Property**

We will pay for direct physical loss of or damage to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

GRPP 400 0314                                                                                           Page 5 of 23

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

      (1)     Fire;

      (2)     Lightning;

      (3)     Explosion;

      (4)     Riot or Civil Commotion; or

      (5)     Aircraft.

The most we will pay for loss or damage under this Property Coverage Enhancement is $100,000, but not more than $500 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**G.**    **Newly Acquired Property**

Under **CP 00 10, A. Coverage, 5. Coverage Extensions,** Item **a., Newly Acquired Or Constructed Property,** is deleted and replaced by the following:

**a.**    **Newly Acquired Or Constructed Property**

    **(1)**    **Buildings**

        If this policy covers Building(s), the Property Coverage Enhancement applies to:

        **(a)**    Your new buildings while being built on the premises described in the Declarations; and

        **(b)**    Buildings you acquire at locations, other than the premises described in the Declarations; intended for:

            **(i)**    Similar use as the building described in the Declarations; or

            **(ii)**    Use as a warehouse.

        The most we will pay for loss or damage under this Property Coverage Enhancement is $1,000,000 at each building.

    **(2)**    **Your Business Personal Property**

        **(a)**    If this policy covers Your Business Personal Property, coverage under the Property Coverage Enhancement applies to:

            **(i)**    Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

            **(ii)**    Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings.

        **(b)**    This Property Coverage Enhancement does not apply to:

            **(i)**    Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

         (ii)      Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

The most we will pay for loss or damage under this Property Coverage Enhancement is $500,000 at each building.

   (3)   **Period Of Coverage**

With respect to insurance provided under this Property Coverage Enhancement for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

   (a)   This policy expires;

   (b)   Thirty (30) days expire after you acquire the property or begin construction of that part of the building that would qualify as Covered Property; or

   (c)   You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as Covered Property.

**H.   Employee Personal Effects**

Under **CP 00 10, A. Coverage, 5. Coverage Extensions**, Item **b., Personal Effects And Property Of Others**, Paragraph **(1)** is deleted and replaced by the following:

   (1)   Personal effects owned by you, your officers, your partners or "members", your "managers" or your "employees". This Extension does not apply to loss or damage by "theft".

The most we will pay under this Property Coverage Enhancement for loss or damage is $25,000 (maximum of $5,000 for any one "employee") at each premises described in the Declarations. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

We will not pay for loss or damage in any one occurrence under this Property Coverage Enhancement until the amount of loss or damage exceeds $250. We will then pay the amount of loss or damage in excess of $250 up to the applicable limit of insurance under this Property Coverage Enhancement. No other deductible applies to this Property Coverage Enhancement.

**I.   Property of Others**

Under **CP 00 10, A. Coverage, 5. Coverage Extensions**, Item **b., Personal Effects And Property Of Others**, Paragraph **(2)** is deleted and replaced by the following:

   (2)   Personal property of others in your care, custody or control.

The most we will pay under this Property Coverage Enhancement **in any one occurrence** for loss or damage is $25,000 regardless of the number of locations insured. Our payment for loss of or damage to Personal Property of Others will only be for the account of the owner of the property.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**J.     Electronic Data**

Under **CP 00 10, A. Coverage, 4. Additional Coverages**, Item **f., "Electronic Data"**, is deleted and replaced by the following:

**f.      Electronic Data**

**(1)**    Covered Property does not include "electronic data", except as provided under Paragraphs **(2)**, **(3)** and **(4)** below.  This Paragraph **(1)** does not apply to your "stock" of prepackaged software, or to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)**    Subject to the provisions of this Property Coverage Enhancement, we will pay for the cost to replace or restore "electronic data" which has been destroyed or corrupted by a Covered Cause of Loss.  To the extent that "electronic data" is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the "electronic data" was stored, with blank media of substantially identical type.

**(3)**    The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage – "Electronic Data", subject to the following:

**(a)**    Coverage under this Additional Coverage – "Electronic Data" is limited to the "specified causes of loss", and Collapse under **CP 10 30, D. Additional Coverage - Collapse.**

**(b)**    The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a "computer system" (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.  But there is no coverage for loss or damage caused by or resulting from manipulation of a "computer system" (including "electronic data") by any "employee", including a temporary or leased "employee", or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)**    The total amount payable in any one occurrence shall not exceed $250,000, regardless of the number of locations insured, premises described in the Declarations or "computer systems" involved.  If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year.  With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**K.     Property Off-Premises**

Under **CP 00 10, A. Coverage, 5. Coverage Extensions**, Item **d., Property Off-premises**, is deleted and replaced by the following:

**d.      Property Off-premises**

**(1)**    We will pay for direct physical loss of or damage to your Covered Property while it is away from the premises described in the Declarations, if it is:

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

      **(a)**      Temporarily at a location you do not own, lease or operate;

      **(b)**      In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

      **(c)**      At any fair, trade show or exhibition.

**(2)**      This Property Coverage Enhancement does not apply to property:

      **(a)**      In or on a vehicle; or

      **(b)**      In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)**      The most we will pay under this Property Coverage Enhancement for loss or damage is $50,000.

**L.**      **Property in Transit**

Under **CP 10 30, F. Additional Coverage Extensions**, Item **1., Property in Transit**, is deleted and replaced by the following:

**1.**      **Property in Transit**

This Property Coverage Enhancement applies only to *your* personal property to which this form applies.

      **(a)**      We will pay for direct physical loss of or damage to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 1,000 feet from the premises described in the Declarations. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

      **(b)**      Loss or damage must be caused by or result from one of the following causes of loss:

            **(1)**      Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

            **(2)**      Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

            **(3)**      "Theft" of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

      **(c)**      The most we will pay under this Property Coverage Enhancement for loss or damage is $250,000.

**M.**      **Back up of Sewer and Drains**

Under **CP 10 30, B. Exclusions, g. Water**, Paragraph **(3)** is deleted. The following is added to **CP 10 30**, Item **C. Limitations:**

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

(5)     We will pay for loss of or damage to Covered Property caused directly by water that backs up or overflows or is otherwise discharged from a sewer, drain, sump pump that is part of the insured building or occupied by the insured as a tenant. The most we will pay under this Property Coverage Enhancement is $100,000 in any one occurrence.

**N.     Loss To The Undamaged Portion Of The Building, Demolition Cost Coverage, Increased Cost Of Construction**

Under **CP 00 10, A. Coverage, 4. Additional Coverages**, Item **e. Increased Cost Of Construction**, is deleted and replaced by the following:

**e.     Increased Cost Of Construction**

(1)     Coverage For Loss To The Undamaged Portion Of The Building

With respect to the building that has sustained covered direct physical damage, we will pay for the loss in value of the undamaged portion of the building as a consequence of a requirement to comply with an ordinance or law that requires demolition of undamaged parts of the same building.

(2)     Demolition Cost Coverage

With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building, as a consequence of a requirement to comply with an ordinance or law that requires demolition of such undamaged property.

The Coinsurance Additional Condition does not apply to Demolition Cost Coverage.

(3)     Increased Cost Of Construction Coverage

(a)     With respect to the building that has sustained covered direct physical damage, we will pay the increased cost to:

(i)     Repair or reconstruct damaged portions of that building; and/or

(ii)     Reconstruct or remodel undamaged portions of that building, whether or not demolition is required.

when the increased cost is a consequence of a requirement to comply with the minimum standards of the ordinance or law.

However:

(i)     This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

(ii)     We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

(b)     When a building is damaged or destroyed in accordance with (3)(a) above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same conditions stated in (3)(a):

GRPP 400 0314

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(i)      The cost of excavations, grading, backfilling and filling;

(ii)     Foundation of the building;

(iii)    Pilings; and

(iv)    Underground pipes, flues and drains.

The items listed in **(b)(i)** through **(b)(iv)** above are deleted from Property Not Covered, but only with respect to the coverage described in this Paragraph **(3)(a).**

The Coinsurance Additional Condition does not apply to Increased Cost of Construction Coverage.

(4)    Application of Coverage(s)

    (a)    The Coverage(s) provided by this endorsement applies only if both **(4)(a)** and **(4)(b)** are satisfied and are then subject to the qualification set forth in **(5)** below.

        The ordinance or law:

        (1)    Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the premises described in the Declarations; and

        (2)    Is in force at the time of loss.

        But coverage under this endorsement applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this endorsement.

    (b)    (1)    The building sustains direct physical damage that is covered under this policy, and as a result of such damage you are required to comply with the ordinance or law; or

        (2)    The buildings sustains both direct physical damage that is covered under this policy, and direct physical damage that is not covered under this policy, and as a result of the building damage in its entirety you are required to comply with the ordinance or law.

        (3)    But if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no coverage under this endorsement even if the building has also sustained covered direct physical damage.

    (c)    In the situation described in **(4)(b)(2)** above, we will not pay the full amount of loss otherwise payable under **(N)e.(1),(2)** and **(3)** above. Instead, we will pay a proportion of such loss; meaning the proportion that the covered direct physical damage bears to the total direct physical damage. However, if the covered direct physical damage, alone, would have resulted in a requirement to comply with the ordinance or law, then we will pay the full amount of loss otherwise payable.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

   (5)   This Property Coverage Enhancement applies only to buildings to which the Replacement Cost Optional Coverage applies.

   (6)   We will not pay for:

      (a)   any costs due to an ordinance or law that;

         (i)   You were required to comply with before the loss, even when the building was undamaged; and

         (ii)   You failed to comply with.

      (b)   Enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

      (c)   The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

The most we will pay under this Property Coverage Enhancement for the total of all covered losses under this Section **N.** individually or combined in any one occurrence is $500,000.

**O.**   **Pollution Clean-up**

Under **CP 00 10, A. Coverages, 4. Additional Coverages**, Item **d., Pollutant Clean-up And Removal**, is deleted and replaced by the following:

   **d.**   **Pollution Clean-up**

We will pay your expense to extract "pollutants" from land or water at the premises described in the Declarations if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that first occurs during the policy period. The expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The total amount payable in any one occurrence shall not exceed $50,000 for the sum of all covered expenses arising out of Covered Causes of Loss, regardless of the number of locations insured.

**P.**   **Debris Removal**

Under **CP 00 10, A. Coverage, 4. Additional Coverages**, Item **a. Debris Removal** Sections **(1), (2), (3)** and **(4)**, are deleted and replaced by the following:

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(1)     Subject to Paragraph **(2)**, we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.  The expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date of direct physical loss or damage.

(2)     Debris Removal does not apply to costs to:

(a)     Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

(b)     Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have contractual responsibility to insure such property and it is insured under this policy;

(c)     Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

(d)     Remove property of others of a type that would not be Covered Property under this Coverage Form;

(e)     Remove deposits of mud or earth from the grounds of the described premises;

(f)     Extract "pollutants" from land or water; or

(g)     Remove, restore or replace polluted land or water.

(3)     We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of direct physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a)     The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b)     The actual debris removal expense exceeds twenty-five percent (25%) of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(3)(a)** and/or **(3)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**Q.     Fire Department Service Charge**

Under **CP 00 10, A. Coverage, 4. Additional Coverages**, Item **c., Fire Department Service Charge**, is deleted and replaced by the following:

**c.     *Fire Department Service Charge***

When a fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 for your liability for fire department service charges.  Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

This additional Coverage applies to your liability for fire department service charges:

    **(1)**    Assumed by contract of agreement prior to loss; or

    **(2)**    Required by local ordinance.

No Deductible applies to this Additional Coverage.

**R.**    **Fire Protection Equipment Recharge**

At the premises described in the Declarations, we will pay your costs to:

    **(a)**    Recharge or refill your fire protective equipment; and

    **(b)**    Clean-up and remove the fire extinguishing agent, resulting from the discharge of the fire extinguishing agent from the fire protective equipment.

The discharge must be:

    **(i)**    Caused by a Covered Cause of Loss;

    **(ii)**    A result from the intended operation of the fire protective equipment to prevent or control Covered Cause of Loss;

    **(iii)**    Accidental; or

    **(iv)**    Result from a malfunction of the fire protective equipment.

We will not pay for damage:

    **(a)**    If you fail to maintain the fire protective equipment in proper operating condition; or

    **(b)**    Caused by discharge at the time of servicing, refilling or testing of the fire protective equipment.

The most we will pay under this Property Coverage Enhancement for loss or damage in any one occurrence is $10,000.

**S.**    **Arson Reward**

    **(1)**    We will pay a reward to anyone who provides information that leads to the arrest and conviction of the individual who commits arson with respect to any property covered by this policy. This Property Enhancement does not cover any reward in connection with a loss caused by or resulting from a Terrorism act as defined by the Terrorism Risk Insurance Act of 2002 or any extension thereof.

    **(2)**    The most we will pay under this Property Coverage Enhancement is $10,000 regardless of the number of individuals who provide information that leads to arrest and conviction as explained in Item (1) above.

No Deductible applies to this Additional Coverage.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**T.    Employee Theft**

(1)    We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(2)    This Property Coverage Enhancement does not cover:

(a)    Acts Committed by You, Your Partners, Your "Members", "Employees", "Managers", Directors, Trustees or Representatives

Loss resulting from "theft" or any other dishonest act committed by:

(i)    You;

(ii)    Any of your partners or "members"; or

(iii)    "Employees", "Managers", Directors, Trustees or Representatives.

whether acting alone or in collusion with other persons.

(b)    Acts Committed By Your "Employees" Learned Of By You Prior To The Policy Period

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the policy period shown in the Declarations.

(c)    Confidential Or Personal Information

Loss resulting from:

(i)    The disclosure of your or another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of non-public information; or

(ii)    The use of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of non-public information.

(d)    Indirect Loss

Loss that is an indirect result of an "event" covered under Section **T. Employee Theft** of this Property Coverage Enhancement including, but not limited to, loss resulting from:

(i)    Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

(ii)    Payment of damages of any type for which you are legally liable. But we will pay compensatory damages arising directly from a loss covered under this insurance; or

GRPP 400 0314                                                                                           Page 15 of 23

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

      **(iii)**     Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

**(e)**     Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

      **(i)**     An inventory computation; or

      **(ii)**    A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**(f)**     Trading

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**(g)**     Warehouse Receipts

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

**(h)**     Data Security Breach

Fees, costs, fines, penalties and other expenses incurred by you which are related to the access to or disclosure of another person's or organization's confidential or personal information including but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of non-public information.

**(3)**    The most we will pay under this Property Coverage Enhancement for loss in any one occurrence is $20,000.

**U.**    **Money and Securities**

**(1)**    Inside the "Premises" – Theft of Money And Securities

We will pay for:

**(a)**     Loss of "money" and "securities" inside the "premises" or "financial institution premises":

      **(i)**     Resulting directly from "theft" committed by a person present inside such "premises" or "financial institution premises"; or

      **(ii)**    Resulting directly from disappearance or destruction.

**(b)**     Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

    (c)    Loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

**(2)**    Inside the "Premises" – Robbery or Safe Burglary of Other Property

We will pay for:

    **(a)**    Loss of or damage to "other property":

        **(i)**    Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

        **(ii)**    Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

    **(b)**    Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

    **(c)**    Loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**(3)**    Outside the "Premises"

We will pay for:

    **(a)**    Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

    **(b)**    Loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**(4)**    This Property Coverage Enhancement does not cover:

    **(a)**    *Acts Committed by You, Your Partners or Your Members*

    Loss resulting from "theft" or any other dishonest act committed by:

        **(i)**    You; or

        **(ii)**    Any of your partners or "members";

    whether acting alone or in collusion with other persons.

    **(b)**    *Acts Committed By Your "Employees" Learned Of By You Prior To The Policy Period*

    Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the policy period shown in the Declarations.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

(c)    Acts Committed By Your "Employees", "Managers", Directors, Trustees or Representatives;

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

(i)    Whether acting alone or in collusion with other persons; or

(ii)    While performing services for you or otherwise.

(d)    Confidential Or Personal Information

Loss resulting from:

(i)    The disclosure of your or another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods customer lists, financial information, credit card information, health information or any other type of non-public information; or

(ii)    The use of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or other type of non-public information.

(e)    Indirect Loss

Loss that is an indirect result of an "event" covered under Section **U. Money and Securities** under this Property Coverage Enhancement including, but not limited to, loss resulting from:

(i)    Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

(ii)    Payment of damages of any type for which you are legally liable. But we will pay compensatory damages arising directly from a loss covered under this insurance; or

(iii)    Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

(f)    Accounting or Arithmetical Errors or Omissions

Loss resulting from accounting or arithmetical errors or omissions.

(g)    Exchanges or Purchases

Loss resulting from the giving or surrendering of property in any exchange or purchase.

(h)    Fire

Loss or damage resulting from fire, however caused, except:

(i)    Loss of or damage to "money" and "securities"; and

(ii)    Loss from damage to a safe or vault.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**(i)**     Money Operated Devices

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**(j)**     Motor Vehicles or Equipment and Accessories

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**(k)**     Transfer or Surrender of Property

**(i)**     Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "financial institution premises":

     **(a)**     On the basis of unauthorized instructions;

     **(b)**     As a result of a threat to do bodily harm to any person;

     **(c)**     As a result of a threat to do damage to any property;

     **(d)**     As a result of a threat to introduce a denial of service attack into any "computer system";

     **(e)**     As a result of a threat to introduce a virus or other malicious instruction into any "computer system" which is designed to damage, destroy or corrupt "electronic data" or computer programs stored within the "computer system";

     **(f)**     As a result of a threat to contaminate, pollute or render substandard your products or goods; or

     **(g)**     As a result of a threat to disseminate, divulge or utilize:

         **1.**     Your confidential information;

         **2.**     Confidential or personal information of another person or organization; or

         **3.**     Weakness in the source code within a "computer system".

**(ii)**     But this exclusion does not apply to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

     **(a)**     Had no knowledge of any threat at the time the conveyance began; or

     **(b)**     Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

      **(l)**    Vandalism

              Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

      **(m)**   Voluntary Parting of Title to or Possession of Property

              Loss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

  **(5)**    The most we will pay under this Property Coverage Enhancement for loss in any one occurrence is $25,000 on-premises and $25,000 off-premises.

**V.**    **Interruption Of Water Supply Services**

We will pay for loss or damage to Covered Property at the Covered Location(s) described in the Declarations caused by the interruption of **Water Supply Services**.

**Water Supply Services** means the following types of property supplying water to the described premises:

  **(1)**    Pumping stations; and

  **(2)**    Water mains.

The most we will pay for loss or damage in any one occurrence under this Property Coverage Enhancement Endorsement is $100,000.

**6.**    **Definitions**

  **(1)**    "Computer program" means a set of related electronic instructions which direct the operation and function of a computer or device connected to it, which enable the computer or devices to receive, process, store, retrieve or send "electronic data".

  **(2)**    "Computer Systems" means:

      **(a)**    Computers, including Personal Digital Assistants (PDA's) and other transportable or handheld devices, electronic storage devices and related peripheral components;

      **(b)**    Systems and applications software; and

      **(c)**    Related communications networks.

    by which "electronic data" is collected, transmitted, processed, stored or retrieved.

  **(3)**    "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

  **(4)**    "Electronic data" means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on data storage devices, including hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc.. with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

(5)    (a)    "Employee(s)" means:

    1.    Any natural person:

        (i)    While in your service and for the first thirty (30) days immediately after termination of service, unless such termination is due to "theft" or any other dishonest act committed by the "employee";

        (ii)    Whom you compensate directly by salary, wages or commissions; and

        (iii)    Whom you have the right to direct and control while performing services for you.

    2.    Any natural person who is furnished temporarily to you

        (i)    To substitute for a permanent "employee" as defined in Paragraph **(5)(a)1.** who is on leave; or

        (ii)    To meet seasonal or short-term workload conditions.

        while that person is subject to your direction and control and performing services for you;

    3.    Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(5)(a)2.**

    4.    Any natural person who is:

        (i)    A trustee, officer, "employee", administrator or "manager", except an administrator or "manager" who is an independent contractor, of any "employee benefit plan"; or

        (ii)    Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of any "employee benefit plan".

    5.    Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained by you as a consultant while performing services for you;

    6.    Any natural person who is a guest, student or intern pursuing studies or duties;

    7.    Any natural person employed by an entity merged or consolidated with you prior to the effective date of this insurance; and

    8.    Any natural person who is your "manager", director or trustee while:

        (i)    Performing acts within the scope of the usual duties of an "employee"; or

        (ii)    Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

    (b)    "Employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Section **6. Definitions**, Item **(5)**.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 #4348629/170431049515

(6) "Event" means:

    (a)    An individual act or event;

    (b)    The combined total of all separate acts whether or not related; or

    (c)    A series of acts whether or not related.

committed by an "employee" acting alone or in collusion with other persons, during the policy period shown in the Declarations.

(7) "Financial institution" means:

    (a)    A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution; or

    (b)    An insurance company.

(8) "Financial institution premises" means the interior of that portion of any building occupied by a "financial institution".

(9) "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

(10) "Manager" means a natural person serving in a directorial capacity for a limited liability company.

(11) "Member(s)" means an owner of a limited liability company represented by its membership interest, who if a natural person, may serve as a "manager".

(12) "Messenger" means you, or your relative, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

(13) "Money" means:

    (a)    Currency, coins and bank notes in current use and having a face value;

    (b)    Travelers checks and money orders held for sale to the public; and

    (c)    Deposits in your account at any "financial institution".

(14) "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include "computer programs", "electronic data" or any property specifically excluded under this insurance.

(15) "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

(16) "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business. This definition of "Premises" only applies to coverage **U. Money and Securities.**

(17) "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

    (a)    Caused or threatened to cause that person bodily harm; or

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

    **(b)**    Committed an obviously unlawful act witnessed by that person.

**(18)**    "Safe burglary" means the unlawful taking of:

    **(a)**    Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

    **(b)**    A safe or vault from inside the "premises".

**(19)**    "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

    **(a)**    Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    **(b)**    Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you.

but does not include "money".

**(20)**    "Specified Causes of Loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

    **(a)**    Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

        **(i)**    The cost of filling sinkholes; or

        **(ii)**    Sinking or collapse of land into man-made underground cavities.

    **(b)**    Falling objects does not include loss or damage to:

        **(i)**    Personal property in the open; or

        **(ii)**    The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

    **(c)**    Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

**(21)**    "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

**(22)**    "Theft" means the unlawful taking of property to your deprivation.

**(23)**    "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

All other terms and conditions of this policy remain unchanged.

© 2014 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m., 7/22/2016     forms a part of

Policy No. RPP5435093-01        issued to   Addison Ice Arena

by   Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EQUIPMENT BREAKDOWN COVERAGE**

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM – CP 00 10
CAUSES OF LOSS – BASIC FORM – CP 10 10
CAUSES OF LOSS – BROAD FORM – CP 10 20
CAUSES OF LOSS – SPECIAL FORM – CP 10 30

A.     The following is added as an Additional Coverage to the Causes of Loss – Basic Form, Broad Form or Special Form.

**Additional Coverage – Equipment Breakdown**

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below.

1.     We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

     a.     Mechanical breakdown, including rupture or bursting caused by centrifugal force;

     b.     Artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any electrical or electronic wire, device, appliance, system or network;

     c.     Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

     d.     Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

     e.     Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

2.     Unless otherwise shown in a "schedule," the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance.

     a.     Expediting Expenses

        With respect to your damaged Covered Property, we will pay the reasonable extra cost to:

        (1)     Make temporary repairs; and

        (2)     Expedite permanent repairs or permanent replacement.

GRPP 401 0213

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

The most we will pay for loss or expense under this coverage is $25,000 unless otherwise shown in a "schedule."

b.  Hazardous Substances

We will pay your additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property.

This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in 2.c.(1)(b) below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $25,000 unless otherwise shown in a "schedule."

c.  Spoilage

(1)  We will pay:

(a)  For physical damage to "perishable goods" due to spoilage;

(b)  For physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;

(c)  Any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

(2)  If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss, damage or expense under this coverage is $25,000 unless otherwise shown in a "schedule."

d.  Data Restoration

We will pay for your reasonable and necessary cost to research, replace and restore lost "data."

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $25,000 unless otherwise shown in a "schedule."

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

e.   Service Interruption

(1)   Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by the interruption of utility services. The interruption must result from an "accident" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

(2)   Unless otherwise shown in a "schedule," coverage for any loss of Business Income you sustain resulting from the interruption of utility services will not apply unless the failure or disruption of service exceeds 24 hours immediately following the "accident." If the interruption exceeds 24 hours, coverage will begin at the time of the interruption, and the deductible applicable to Business Income will apply.

(3)   The most we will pay in any "one accident" for loss, damage or expense under this coverage is the applicable limit for Business Income, Extra Expense or Spoilage, except that if a limit is shown in a "schedule" for Service Interruption, that limit will apply to Business Income and Extra Expense loss under this coverage.

f.   Business Income and Extra Expense

Any insurance provided under the coverage part for Business Income or Extra Expense is extended to the coverage provided by this endorsement. However, if a deductible is shown in a "schedule," then as respects Equipment Breakdown coverage, the "period of restoration" will begin immediately after the "accident," and the deductible shown in the "schedule" will apply. The most we will pay for loss or expense under this coverage is the applicable limit for Business Income and Extra Expense, unless otherwise shown in a "schedule."

g.   Ice Rink Piping

We will pay for loss or damage caused by or resulting from an "accident" to "buried vessels or piping" which forms a part of an ice rink refrigeration and under floor heating system.

The most we will pay for loss or damage under this coverage is $250,000 unless otherwise shown in a "schedule."

h.   Ice Rink Piping Excavation Costs

We will pay to excavate "buried vessels or piping" that is part of an ice rink refrigeration and under floor heating system during the repair or replacement following an "accident" to "buried vessels or piping" and to restore the excavated area to the same condition prior to the "accident."

The most we will pay for excavation costs of "buried vessels or piping," including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $25,000 unless otherwise shown in a "schedule."

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

3. EXCLUSIONS

All exclusions in the applicable Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this endorsement.

a. The following exclusions are modified but only as it applies to Equipment Breakdown Coverage:

(1) If the Causes of Loss – Basic Form or Causes of Loss – Broad Form applies, the following is added to Exclusion B.2.:

Depletion, deterioration, corrosion, erosion, wear and tear, or other gradually developing conditions. However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

(2) If the Causes of Loss – Special Form applies, as respects this endorsement only, the last paragraph of Exclusion B.2.d. is deleted and replaced with the following:

But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

b. The following exclusions are added:

(1) We will not pay for loss, damage or expense caused by or resulting from:

(a) Your failure to use all reasonable means to protect Covered Property from damage following an "accident";

(b) A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment; or

(c) Any of the following:

(i) Defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind; or

(ii) Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

(2) With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in A.1.c. above); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

(3) With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

(a) Loss caused by your failure to use due diligence and dispatch and all reasonable means to resume business; or

GRPP 401 0213

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

       (b)     Any increase in loss resulting from an agreement between you and your customer or supplier.

    (4)     We will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident": Any "fungus," wet rot, dry rot or bacteria, including any presence, growth, proliferation, spread or any activity of "fungus," wet rot, dry rot or bacteria. This includes, but is not limited to, costs arising from clean up, removal, or abatement of such "fungus," wet rot, dry rot or bacteria. However, this exclusion does not apply to spoilage of personal property that is "perishable goods," to the extent that such spoilage is covered under Spoilage coverage.

    (5)     We will not pay for any loss or damage to animals.

**4.**    **DEFINITIONS**

The following definitions are added:

a.    "Boilers and vessels" means:

    (1)     Any boiler, including attached steam, condensate and feedwater piping; and

    (2)     Any fired or unfired pressure vessel subject to vacuum or internal pressure other than the static pressure of its contents.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule."

b.    "Buried vessels or piping"

    (1)     "Buried vessels or piping" means any piping or vessel buried or encased in the earth, concrete or other material, whether above or below grade, or in an enclosure which does not allow access for inspection and repair.

    (2)     "Buried vessels or piping" does not mean piping buried in earth, concrete or other material that is part of an ice rink refrigeration and under floor heating system.

c.    "Covered equipment"

    (1)     "Covered equipment" means, unless otherwise specified in a "schedule," Covered Property:

        (a)     That generates, transmits or utilizes energy; or

        (b)     Which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

        "Covered equipment" may utilize conventional design and technology or new or newly commercialized design and technology.

    (2)     None of the following is "covered equipment":

        (a)     Structure, foundation, cabinet or compartment;

        (b)     Insulating or refractory material;

GRPP 401 0213

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(c)    Sewer piping, "buried vessels or piping," or piping forming a part of a sprinkler or fire suppression system, except as provided under A.2.g. Ice Rink Piping and A.2.h. Ice Rink Piping Excavation Costs coverages;

(d)    Water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

(e)    "Vehicle" or any equipment mounted on a "vehicle";

(f)    Satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

(g)    Dragline, excavation or construction equipment; or

(h)    Equipment manufactured by you for sale.

d.    "Data" means information or instructions stored in digital code capable of being processed by machinery.

e.    "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

f.    "Media" means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

g.    "One accident" means: If an initial "accident" causes other "accidents," all will be considered "one accident."  All "accidents" that are the result of the same event will be considered "one accident."

h.    "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

i.    "Production machinery" means any machine or apparatus that processes or produces a product intended for eventual sale.  This includes all component parts of such machine or apparatus and any other equipment used exclusively with such machine or apparatus. However, "production machinery" does not mean any boiler, or fired or unfired pressure vessel.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule."

j.    "Schedule" means the Equipment Breakdown Coverage Schedule.

k.    "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power.  "Vehicle" includes, but is not limited to: car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

B.    The Building and Personal Property Coverage Form is modified as follows.

The definitions stated above also apply to section B. of this endorsement.

1.    DEDUCTIBLE

The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in a "schedule." If a separate Equipment Breakdown deductible is shown, the following applies.

Only as regards Equipment Breakdown Coverage, provision D. DEDUCTIBLE is deleted and replaced with the following:

a.    Deductibles for Each Coverage

(1)    Unless the "schedule" indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one accident."

(2)    We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the "schedule." We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

(3)    If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one accident," only the highest deductible for each coverage will apply.

b.    Direct and Indirect Coverages

(1)    Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the "schedule."

(2)    Unless more specifically indicated in the "schedule":

(a)    Indirect Coverages Deductibles apply to Business Income and Extra Expense loss; and

(b)    Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this endorsement.

c.    Application of Deductibles

(1)    Dollar Deductibles

We will not pay for loss, damage or expense resulting from any "one accident" until the amount of loss, damage or expense exceeds the applicable Deductible shown in the "schedule." We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

(2)    Time Deductible

If a time deductible is shown in the "schedule," we will not be liable for any loss occurring during the specified number of hours or days immediately following the "accident." If a time deductible is expressed in days, each day shall mean twenty-four consecutive hours.

GRPP 401 0213                                                                          Page 7 of 9
© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

    (3)      Multiple of Average Daily Value (ADV)

If a deductible is expressed as a number times ADV, that amount will be calculated as follows:

The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" occurred, divided by the number of working days in that period. No reduction shall be made for the Business Income not being earned, or in the number of working days, because of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the "period of restoration."

The number indicated in the "schedule" will be multiplied by the ADV as determined above. The result shall be used as the applicable deductible.

    (4)      Percentage of Loss Deductibles

If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

**2.    CONDITIONS**

The following conditions are in addition to the Conditions in the Building and Personal Property Coverage Form, the Commercial Property Conditions and the Common Policy Conditions.

a.    Suspension

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." This can be done by mailing or delivering a written notice of suspension to:

    (1)      Your last known address; or

    (2)      The address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

b.    Jurisdictional Inspections

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

GRPP 401 0213

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

c.    Environmental, Safety and Efficiency Improvements

If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer for people, or more energy or water efficient than the equipment being replaced.

However, we will not pay to increase the size or capacity of the equipment and we will not pay more than 150% of what the cost would have been to replace with like kind and quality. This condition does not apply to the replacement of component parts or to any property to which Actual Cash Value applies and does not increase any of the applicable limits.

d.    Coinsurance

If a coinsurance percentage is shown in a "schedule" for specified coverages, the following condition applies.

We will not pay for the full amount of your loss if the applicable limit is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, we will determine what percentage this calculated product is compared to the applicable limit and apply that percentage to the gross amount of loss. We will then subtract the applicable deductible. The resulting amount, or the applicable limit, is the most we will pay. We will not pay for the remainder of the loss. Coinsurance applies separately to each insured location.

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in a "schedule." Coverage provided under this endorsement does not provide an additional amount of insurance.

GRPP 401 0213

© 2013 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:09 # 4348629/170431049515

EXHIBIT COVER SHEET                                                                    4393 (Rev. 6/18)

| STATE OF ILLINOIS | UNITED STATES OF AMERICA | COUNTY OF DU PAGE |
|---|---|---|
| | IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT | |

Addison Ice, LLC
_____
Plaintiff,

v.

Indian Harbor Insurance Co.
_____
Defendant,

**2018L000968**
_____
Case Number

*Chris Kachiroubas*
e-filed in the 18th Judicial Circuit Court
********* DuPage County *********
**TRAN# : 170431049515/( 4348629 )**
**2018L000968**
**FILEDATE : 08/23/2018**
*Date Submitted : 08/23/2018 11:27 AM*
*Date Accepted : 08/23/2018 02:11 PM*
**GEIB,LAURA**
*********************************
File Stamp Here

# EXHIBIT COVER SHEET
Local Court Rules 5.06 and 5.09

EXHIBIT NAME: Complaint Ex. A pt 2

TITLE OF DOCUMENT THIS EXHIBIT BELONGS WITH:

Complaint for Breach of contract and
Bad Faith

Document File Date: 8/23/18

*(The file date of the document this exhibit belongs with)*

EXHIBIT FILED ON BEHALF OF: Plaintiff

*(Case Party Name)*

Submitted by: Dan Hanlon

Name: MB                    ☐ Pro Se

DuPage Attorney Number: 6

Attorney for: Plaintiff

Address: 311 S. County Farm Rd #I

City/State/Zip: Wheaton IL 60187

Telephone Number: 630 871 1100

Email: dfh@kwmb.com

CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT©
WHEATON, ILLINOIS 60187-0707

GL MP 7000 1104

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

**Policy Number:** RPP5435093-01

**Effective Date:** 07/22/2016 ,**
12:01 A.M., Standard Time

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| General Aggregate Limit (Other Than Products — Completed Operations) | $ 5,000,000 | |
| Products — Completed Operations Aggregate Limit | $ 5,000,000 | |
| Personal and Advertising Injury Limit | $ 1,000,000 | Any One Person or Organization |
| Each Occurrence Limit | $ 1,000,000 | |
| Damage to Premises Rented to You Limit | $ 300,000 | Any One Premises |
| Medical Expense Limit | $ 5,000 | Any One Person |

### RETROACTIVE DATE (CG 00 02 only)

This Insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" which occurs before the Retroactive Date, if any, shown here: None

(Enter Date or "None" if no Retroactive Date applies)

### BUSINESS DESCRIPTION

Form of Business: ☐Individual ☐Partnership ☐Joint Venture ☐Trust ☒Limited Liability Company

☐Organization, including a Corporation (but not including a Partnership, Joint Venture or Limited Liability Company)

Business Description*: SKATING RINK

### PREMIUM

| Location No. | Classification | Class Code | Premium Base | Rate Prem/Ops | Rate Prod/Co Op | Advance Premium Prem/Ops | Advance Premium Prod/Co Ops |
|---|---|---|---|---|---|---|---|
| 1 | Skating Rinks - ice - Rink Sponsored | 48177 | 161,000 | INCL | INCL | $ 1,932 | $ |
| 1 | Skating Rinks - ice - Open Public Skating | 48177 | 102,000 | INCL | INCL | 1,530 | |
| 1 | Skating Rinks - ice - Groups with Insuranc | 48177 | 1,675,000 | INCL | INCL | 9,548 | |
| 1 | Vending Machine Operations - confectio | 49617 | 3,500 | INCL | INCL | 175 | |
| 1 | Building or Premise - bank/office - mercantil | 61217 | 16,500 | INCL | INCL | 908 | |
| All | Abuse and Molestation | | FLAT | FLAT | FLAT | 1,300 | |
| All | CRM - Crisis Response Manageme | | FLAT | FLAT | FLAT | 75 | |
| All | Employee Benefits Liability | | FLAT | FLAT | FLAT | 135 | |
| All | Non-Owned Auto Liability | | FLAT | FLAT | FLAT | 125 | |
| All | Hired Auto Liability | | FLAT | FLAT | FLAT | 125 | |

Total Advance Premium $ 15,853 $

*Information omitted if shown elsewhere in the policy.

GL MP 7000 1104

**Inclusion of date optional.

Page 1 of 2

Includes copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 2000.

| LOCATION OF PREMISES* |
|---|

Location of All Premises You Own, Rent or Occupy:

| Location No. | Address |
|---|---|
| 1 | 475 South Grace Street, Addison, IL 60101 |

| FORMS AND ENDORSEMENTS (other than applicable Forms and Endorsements shown elsewhere in the policy) |
|---|

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ See Forms Schedule

*Information omitted if shown elsewhere in the policy.        **Inclusion of date optional.

GL MP 7000 1104        Page 2 of 2

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  Copyright, Insurance Services Office, Inc., 2000.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

Document received on 8/23/18 11:27 AM · Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

**(2)** Any loss, cost or expense arising out of any:

    **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 26 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

    **(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

    **(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

     © Insurance Services Office, Inc., 2012      CG 00 01 04 13

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

Document received on 8/23/18 11:27 AM·Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k. **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l. **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

o. **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

p. **Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

 © Insurance Services Office, Inc., 2012

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

2.  Each of the following is also an insured:

    a.  Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

        (1) "Bodily injury" or "personal and advertising injury":

            (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

            (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

            (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

            (d) Arising out of his or her providing or failing to provide professional health care services.

        (2) "Property damage" to property:

            (a) Owned, occupied or used by;

            (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

            you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

    b.  Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

    c.  Any person or organization having proper temporary custody of your property if you die, but only:

        (1) With respect to liability arising out of the maintenance or use of that property; and

        (2) Until your legal representative has been appointed.

    d.  Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3.  Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

    a.  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

    b.  Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

    c.  Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    a.  Insureds;

    b.  Claims made or "suits" brought; or

    c.  Persons or organizations making claims or bringing "suits".

2.  The General Aggregate Limit is the most we will pay for the sum of:

    a.  Medical expenses under Coverage C;

    b.  Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    c.  Damages under Coverage B.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal And Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

### b. Excess Insurance

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

### c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 5. Premium Audit

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 6. Representations

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

   b. Those statements are based upon representations you made to us; and

   c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

   a. As if each Named Insured were the only Named Insured; and

   b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

     (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

     (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

     (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

CG 00 01 04 13       © Insurance Services Office, Inc., 2012       **Page 13 of 16**

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

       (1) Power cranes, shovels, loaders, diggers or drills; or

       (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

       (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

       (2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Document received on 8/23/18 11:27 AM · Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

    (a) Snow removal;

    (b) Road maintenance, but not construction or resurfacing; or

    (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

    f. The use of another's advertising idea in your "advertisement"; or

    g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

    a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a) When all of the work called for in your contract has been completed.

        (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    b. Does not include "bodily injury" or "property damage" arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

   **a.** Means:

   **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   **(a)** You;

   **(b)** Others trading under your name; or

   **(c)** A person or organization whose business or assets you have acquired; and

   **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   **b.** Includes:

   **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

   **(2)** The providing of or failure to provide warnings or instructions.

   **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

   **a.** Means:

   **(1)** Work or operations performed by you or on your behalf; and

   **(2)** Materials, parts or equipment furnished in connection with such work or operations.

   **b.** Includes:

   **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

   **(2)** The providing of or failure to provide warnings or instructions.

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

COMMERCIAL GENERAL LIABILITY
CG 02 00 12 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART

**A. Cancellation** (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. We may cancel this policy by mailing to you written notice stating the reason for cancellation. If we cancel:

   **a.** For nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **b.** For a reason other than nonpayment of premium, we will mail the notice at least:

      **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification to the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

If we decide not to renew or continue this policy, we will mail you and your agent or broker written notice, stating the reason for nonrenewal, at least 60 days before the end of the policy period. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

If we fail to mail proper written notice of nonrenewal and you obtain other insurance, this policy will end on the effective date of that insurance.

**C. Mailing Of Notices**

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

CG 02 00 12 07

© ISO Properties, Inc., 2006

Page 1 of 1

POLICY NUMBER: RPP5435093-01

COMMERCIAL GENERAL LIABILITY
CG 04 35 12 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYEE BENEFITS LIABILITY COVERAGE

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.
PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Limit Of Insurance | | Each Employee Deductible | Premium |
|---|---|---|---|---|
| Employee Benefits Programs | $ 1,000,000 **each employee** $ 1,000,000 **aggregate** | | $ 0 | $ 135 |
| Retroactive Date: | 07/15/2016 | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

**A.** The following is added to **Section I – Coverages:**

**COVERAGE – EMPLOYEE BENEFITS
LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Paragraph **D.** (Section **III – Limits Of Insurance**); and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to damages only if:

**(1)** The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

**(2)** The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

**(3)** A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **F.** of this endorsement.

**c.** A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

 © ISO Properties, Inc. 2006

Document received on 8/23/18 11:27 AM · Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

(2) When we make settlement in accordance with Paragraph **a.** above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

**d.** All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

**2. Exclusions**

This insurance does not apply to:

**a. Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

**b. Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**c. Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

**d. Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any "claim" based upon:

(1) Failure of any investment to perform;

(2) Errors in providing information on past performance of investment vehicles; or

(3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f. Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i. Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j. Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.** For the purposes of the coverage provided by this endorsement:

**1.** All references to Supplementary Payments – Coverages A and B are replaced by Supplementary Payments – Coverages A, B and **Employee Benefits Liability.**

**2.** Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **3.** of **Section II – Who Is An Insured** are replaced by the following:

**2.** Each of the following is also an insured:

**a.** Each of your "employees" who is or was authorized to administer your "employee benefit program".

**b.** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

© ISO Properties, Inc., 2006

CG 04 35 12 07

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

c. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

   b. Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

D. For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

1. **Limits Of Insurance**

   a. The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

      (1) Insureds;

      (2) "Claims" made or "suits" brought;

      (3) Persons or organizations making "claims" or bringing "suits";

      (4) Acts, errors or omissions; or

      (5) Benefits included in your "employee benefit program".

   b. The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

   c. Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

      (1) An act, error or omission; or

      (2) A series of related acts, errors or omissions

   negligently committed in the "administration" of your "employee benefit program".

   However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the *Limits Of Insurance*.

2. **Deductible**

   a. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

   b. The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

   c. The terms of this insurance, including those with respect to:

      (1) Our right and duty to defend any "suits" seeking those damages; and

      (2) Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

   apply irrespective of the application of the deductible amount.

   d. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

E. For the purposes of the coverage provided by this endorsement, *Conditions 2. and 4. of Section IV – Commercial General Liability Conditions* are replaced by the following:

2. **Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

   a. You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

      (1) What the act, error or omission was and when it occurred; and

Document received on 8/23/18 11:27 AM·Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515·

    (2) The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

**b.** If a "claim" is made or "suit" is brought against any insured, you must:

    (1) Immediately record the specifics of the "claim" or "suit" and the date received; and

    (2) Notify us as soon as practicable.

    You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.** You and any other involved insured must:

    (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

    (2) Authorize us to obtain records and other information;

    (3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

    (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

    (1) This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

        (a) No Retroactive Date is shown in the Schedule of this insurance; or

        (b) The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

    (2) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

    (3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

    (4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

© ISO Properties, Inc., 2006
CG 04 35 12 07 □

**F.** For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

**1.** You will have the right to purchase an Extended Reporting Period, as described below, if:

    **a.** This endorsement is canceled or not renewed; or

    **b.** We renew or replace this endorsement with insurance that:

        **(1)** Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

        **(2)** Does not apply to an act, error or omission on a claims-made basis.

**2.** The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

**3.** An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

    **a.** The "employee benefit programs" insured;

    **b.** Previous types and amounts of insurance;

    **c.** Limits of insurance available under this endorsement for future payment of damages; and

    **d.** Other related factors.

The additional premium will not exceed 100% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

**4.** If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

Paragraph **D.1.b.** of this endorsement will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **D.1.c.**

**G.** For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

**1.** "Administration" means:

    **a.** Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    **b.** Handling records in connection with the "employee benefit program"; or

    **c.** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

**2.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

**3.** "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

 © ISO Properties, Inc., 2006

4. "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

   a. Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

   b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

   c. Unemployment insurance, social security benefits, workers' compensation and disability benefits;

   d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

   e. Any other similar benefits designated in the Schedule or added thereto by endorsement.

H. For the purposes of the coverage provided by this endorsement, Definitions 5. and 18. in the **Definitions** Section are replaced by the following:

   5. "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

   18. "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

      a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

      b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

© ISO Properties, Inc. 2006 CG 04 35 12 07

POLICY NUMBER: RPP5435093-01

COMMERCIAL GENERAL LIABILITY
CG 21 35 10 01

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description And Location Of Premises Or Classification:**

**For any locations shown in the Declarations, Medical Payments and any of the references to it in the Coverage Part do not apply for any individuals involved in skating activities that occur on, or while entering or exiting, or while not on the ice surface. Skating activities means all activities while the individual is wearing skates or on the ice surface without skates.**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

1. Section I – Coverage C – Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

2. The following is added to Section I – Supplementary Payments:

   h. Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

CG2135 10/01 Ice Rink     © ISO Properties, Inc. 2000     Page 1 of 1     □

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – Coverage A – **Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – Coverage B – **Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

(a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

(b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

 © ISO Properties, Inc., 2003

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

Document received on 8/23/18 11:27 AM · Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

COMMERCIAL GENERAL LIABILITY
CG 22 43 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

This endorsement, effective 12:01 a.m., 7/22/2016     forms a part of

Policy No. RPP5435093-01       issued to Addison Ice Arena

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDMENT TO DEFINITION OF POLLUTANTS - CARBON MONOXIDE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SECTION V – DEFINITIONS, 15.** "Pollutants" is amended by addition of the following:

For the purposes of this insurance, "Pollutants" does not include carbon monoxide.

All other terms and conditions of this policy remain unchanged.

© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

This endorsement, effective 12:01 a.m., 7/22/2016     forms a part of

Policy No. RPP5435093-01     issued to Addison Ice Arena

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### CRISIS MANAGEMENT EXPENSE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**ADDITIONAL COVERAGE – CRISIS MANAGEMENT EXPENSE**

**A.**     We will reimburse you for reasonable and necessary "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered.

**B.**     We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the "crisis".

**Limit of Insurance**

Crisis Management Emergency Response Expenses - $25,000 per crisis and aggregate.

The Limit of Insurance shown above is the most we will pay for all "crisis management emergency response expenses" incurred during the policy period. This crisis management emergency response limit is in addition to and does not reduce any other Limit of Insurance applicable to this policy.

All related "incidents" or "crises" shall be deemed as a single "incident" or "crisis" respectively.

"Crisis management emergency response expenses" also shall not include claim adjustment expenses.

**EXCLUSIONS**

The exclusions of the policy apply to this endorsement.

**DEFINITIONS**

The following additional definitions apply to this endorsement:

"Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

"Crisis management emergency response expenses" mean those expenses incurred for crisis management services provided by a "crisis management firm." However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance. Crisis management services mean public relations and media management services for the purpose of maintaining and restoring public confidence in you.

"Crisis management firm" means any a public relations or crisis management service provider you hire in connection with an "incident" that is acceptable to us in writing. Our consent will not be unreasonably withheld.

"Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or "serious bodily injury" to three or more persons.

"Serious bodily injury" means a bodily injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of any bodily member, organ or mental faculty.

**CONDITIONS**

The following additional condition applies to this endorsement:

1.    You must provide written notice as soon as practicable of the details of the "incident" and the "crisis".

All other terms and conditions of this policy remain unchanged.

© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

ENDORSEMENT #

This endorsement, effective 12:01 a.m., 7/22/2016    forms a part of

Policy No. RPP5435093-01        issued to Addison Ice Arena

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## HIRED AUTO AND NON-OWNED AUTO LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Limit Of Insurance Per "Occurrence" | Premium |
|---|---|---|
| Hired Auto Liability Insurance | $    1,000,000 | $    125 |
| Non-Owned Auto Liability Insurance | $    1,000,000 | $    125 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**A.    Hired Auto Liability**

The insurance provided under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY (SECTION I – COVERAGES)** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

**B.    Non-Owned Auto Liability**

The insurance provided under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY (SECTION I – COVERAGES)** applies to "bodily injury" or "property damage" arising out of the use of a "non-owned auto" by any person in the course of your business.

**C.    Changes In Exclusions**

With respect to the insurance provided by this endorsement:

1.    Subparagraphs **b., c., e., g., h., j., k., l., m., n.,** of paragraph **2. Exclusions** of **COVERAGE A BODILY INJURY AND PROPERTY DAMGE LIABILITY (SECTION I – COVERAGES)** do not apply.

2.    The following exclusions are added to paragraph **2., Exclusions** of **COVERAGE A BODILY INJURY AND PROPERTY DAMGE LIABILITY:**

This insurance does not apply to:

a.    "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

GRPL 403 1012

© 2012 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 1 of 4

    (1)    That the insured would have in the absence of the contract or agreement; or

    (2)    Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

**b.**    "Bodily injury" to:

    (1)    An "employee" of the insured arising out of and in the course of:

        (a)    Employment by the insured; or

        (b)    Performing duties related to the conduct of the insured's business; or

    (2)    The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

    (1)    Whether the insured may be liable as an employer or in any other capacity; and

    (2)    To any obligation to share damages with or repay someone else who must pay the damages because of the injury.

This exclusion does not apply to:

    (1)    Liability assumed by the insured under an "insured contract"; or

    (2)    "Bodily injury" to domestic "employees" not entitled to workers' compensation benefits.

**c.**    "Property damage" to:

    (1)    Property owned or being transported by, or rented or loaned to the insured; or

    (2)    Property in the care, custody or control of the insured.

**d.**    "Bodily injury" or "property damage" if any vehicle is owned by or registered to the named insured, or any of its partnerships or joint ventures.

**D.**    **Who Is An Insured**

For the purposes of this endorsement only, **SECTION II – WHO IS AN INSURED** is replaced by the following:

**WHO IS AN INSURED**

1.    Each of the following is an insured under this insurance to the extent set forth below:

    a.    You.

    b.    Any other person using a "hired auto" with your permission.

    c.    With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in your business.

© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

      d.    Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under Paragraphs a., b. or c. above.

  2.    None of the following is an insured:

      a.    Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-employee of such person injured in the course of employment;

      b.    Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or a member of his or her household;

      c.    Any person while employed in or otherwise engaged in performing duties related to the conduct of an "auto business", other than an "auto business" you operate;

      d.    The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee;

      e.    Any person or organization with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**E.**    **Limits Of Insurance**

For the purposes of this endorsement only, **SECTION III - LIMITS OF INSURANCE** is replaced by the following:

**LIMIT OF INSURANCE**

Regardless of the number of "hired autos", "non-owned autos", insureds, premiums paid, claims made or vehicles involved in the "occurrence", the most we will pay for all damages resulting from any one "occurrence" is the applicable Limit of Insurance shown in the Schedule of this endorsement or in the Declarations.

**F.**    **Changes In Conditions**

For the purposes of this endorsement only, **4. OTHER INSURANCE (SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS)** is replaced by the following:

**OTHER INSURANCE**

This insurance is excess over any and all other insurance covering the "hired auto" or "non-owned auto".

**G.**    **Definitions**

For the purposes of this endorsement only, the following definitions are added to **SECTION V – DEFINITIONS:**

  1.    "Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

  2.    "Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", your partners or your "executive officers", or members of their households.

  3.    "Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners or your "executive officers", or members of their households, but only while used in your business.

GRPL 403 1012

© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

4.    "Insured Contract" is amended to add:

      g.    That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

All other terms and conditions of this policy remain unchanged.

© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m., 7/22/2016          forms a part of

Policy No. RPP5435093-01          issued to Addison Ice Arena

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**TOTAL ASSAULT OR BATTERY EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusions are **added** to Paragraph **2. Exclusions** under **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY** and **COVERAGE C MEDICAL PAYMENTS:**

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of any "assault" or "battery" by any person, whether provoked or unprovoked, including but not limited to:

(1)     The prevention or suppression of or the failure to prevent or suppress "assault" or "battery", including the failure to provide adequate security or keep any premises in a safe condition;

(2)     The failure to warn of the dangers of the environment which could contribute to "assault" or "battery";

(3)     Hiring, placement, training or supervision, whether negligent or otherwise, including the failure of the Insured or officers, employees, agents or servants of the Insured in the hiring, supervision, retention or control of any person, whether or not an officer, employee, agent or servant of the Insured;

(4)     Threats by words or deeds;

(5)     Reporting to the proper authorities, or failure to so report;

(6)     The use of force to protect persons or property whether or not the "bodily injury", "property damage" or "personal and advertising injury" was intended from the standpoint of the Insured or committed by or at the direction of the Insured; or

(7)     The failure to protect any person while that person was in the care, custody or control of the Insured, its employees, agents or servants.

**ADDITIONAL DEFINITIONS**

The following definitions are added to **SECTION V – DEFINITIONS:**

"Assault" means any attempt or threat to cause harmful or offensive contact with or injury to another including any conduct or display of force that would reasonably place another in apprehension of such contact or injury.

"Battery" means any harmful or offensive contact between or among two or more persons.

All other terms and conditions of this policy remain unchanged.

GRPL 600 1012

© 2012 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 1 of 1

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc. 2007

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

IL 01 47 09 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CIVIL UNION

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The term "spouse" is replaced by the following:

Spouse or party to a civil union recognized under Illinois law.

**B.** Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

**1.** Individual Named Insured by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of such Named Insured's household, including a ward or foster child; or

**2.** Individual named in the Schedule by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage – Broadened Coverage For Named Individual Endorsement is attached.

**C.** With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of your household, including a ward or foster child.

IL 01 47 09 11          © Insurance Services Office, Inc., 2011          Page 1 of 1

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m.,  7/22/2016  , forms a part of

Policy No. RPP5435093-01  issued to  Addison Ice Arena

by  Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**ASBESTOS EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

This policy does not apply to liability for any injury including "bodily injury", "property damage", "personal and advertising injury" any of which arise out of asbestos, including but not limited to:

1)      inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or

2)      the use of asbestos from any goods, products or structures; or

3)      the removal of asbestos in constructing or manufacturing any goods, products or structures; or

4)      the manufacture, transportation, storage, handling, distribution, sale, application, mining, consumption, or disposal of asbestos or goods or products containing asbestos.

All other terms and conditions remain unchanged.

XIL 401 0605
©, 2005, XL America, Inc.

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m.,  7/22/2016          , forms a part of

Policy No. RPP5435093-01   issued to  Addison Ice Arena

by  Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**RADIOACTIVE MATTER EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

In consideration of the premium charged, it is agreed that such coverage as is afforded under this policy for liability arising out of "bodily injury", "property damage", "personal and advertising injury" including any defense costs or expenses incurred, shall NOT apply to "bodily injury", "property damage", "personal and advertising injury" arising from the actual, alleged or threatened exposure of any person(s) or property to any radioactive matter.

All other terms and conditions remain unchanged.

XIL 402 0605
©, 2005, XL America, Inc.

ENDORSEMENT #

This endorsement, effective 12:01 a.m., 7/22/2016 , forms a part of

Policy No. RPP5435093-01 issued to Addison Ice Arena

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BROAD FORM SECURITIES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATION LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", directly or indirectly based on, attributable to, arising out of, resulting from or in any way related to any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any Rules or Regulations of the Securities Exchange Commission adopted thereunder, any like Federal, State or provincial statute regulating securities similar to the foregoing, all as they may be amended, any rules or regulations adopted pursuant thereto, or any other state law, provincial law or common law relating to securities.

All other terms and conditions remain unchanged.

XIL 403 0605
©, 2005, XL America, Inc.

## ENDORSEMENT #

This endorsement, effective 12:01 a.m.,  7/22/2016          , forms a part of

Policy No. RPP5435093-01     issued to   Addison Ice Arena

by  Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### LEAD EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS COVERAGE PART

It is agreed that:

**SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE
LIABILITY and COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY,** Item **2.
Exclusions** is amended to include the following:

    **Lead**

    "Bodily injury", "Property damage" or "Personal and advertising injury" arising out of or
    alleged to have arisen out of:

    **(1)**    exposure to lead, lead paint or any material containing lead or lead paint; or

    **(2)**    the existence, removal or abatement of lead, lead paint, or any material
        containing lead or lead paint, including without limitation:

        **(a)**    the costs of lead or lead paint removal; or

        **(b)**    "Property damage" or any other injury or damage suffered in the course
            of effecting such removal.

All other terms and conditions remain unchanged.

XIL 428 0605
©, 2005, XL America, Inc.

**ENDORSEMENT # 0**

This endorsement, effective 12:01 a.m., 07/22/16   forms a part of Policy No.  RPP5435093-01

issued to   Addison Ice Arena

by   Indian Harbor Insurance Company

**SERVICE OF PROCESS**

The Director of Insurance of the State of Illinois is hereby designated the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit or proceeding arising out of this policy.  The Company further designates:

> Sarah Mims
> Assistant Secretary
> 505 Eagleview Boulevard, Suite 100
> Exton, Pennsylvania 19341-0636

as its agent in Illinois to whom such process shall be forwarded by the Director of Insurance.

All other terms and conditions of this policy remain unchanged.

(Authorized Representative)

XL-ILSOP 11 10

© 2010 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Form **W-9**
(Rev. August 2013)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)

**Indian Harbor Insurance Company**

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
- [ ] Individual/sole proprietor
- [x] C Corporation
- [ ] S Corporation
- [ ] Partnership
- [ ] Trust/estate

- [ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

- [ ] Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any)  **5**

Exemption from FATCA reporting
code (if any)

Address (number, street, and apt. or suite no.)

**Seaview House, 70 Seaview Avenue**

Requester's name and address (optional)

City, state, and ZIP code

**Stamford, CT 06902**

List account number(s) here (optional)

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number

9 5 - 1 4 7 9 0 9 5

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**
Signature of
U.S. person ▶ *[signature]*          Date ▶ 12/13/2013

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 8-2013)



## HOW TO REPORT A CLAIM:

All claims should be reported to North American Risk Services (NARS) as soon after the loss as possible while information is fresh. Claims may be reported by any of the following options 24 hours a day, 7 days a week to the attention of the New Loss Unit.

| | | |
|---|---|---|
| ☐ | Telephone: | (800) 315-6090 |
| ☐ | Facsimile: | (866) 261-8507 |
| ☐ | Internet: | http://narisk.com/partnerEtools.php |
| ☐ | Electronic Mail: | reportaclaim@narisk.com |
| ☐ | Regular Mail: | North American Risk Services |
| | | P. O. Box 166002 |
| | | Altamonte Springs, FL 32716-6002 |

In order to ensure proper assistance, it is important to include the policy number as well as name of the insured and to provide as much information about the loss details and involved parties as possible. An adjuster will be assigned and after the reviewing the information provided will make personal contact so remember to include contact information such as your name, home and email addresses and alternate telephone numbers. A claim acknowledgement will be transmitted identifying the claim number and assigned claims examiner.

PDF to Word

Offices: Florida • Nevada • New Jersey
Mail • P.O. Box 945087 • Maitland, FL 32794-5087 • Toll Free (800) 315-6090 • Fax (866) 261-8507
www.narisk.com

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

AAIS
CU 0403 09 14
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- DATA BREACH LIABILITY
## COVERAGES E AND U

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

1. Exclusion m. under Coverage E, item 2. Exclusions, is deleted and replaced by the following:

   m. any of the following:

      1) "bodily injury", "property damage", or "personal and advertising injury" arising out of disclosure of or access to private or confidential information belonging to any person or organization; or
      2) any loss, cost, expense, or "damages" arising out of damage to, corruption of, loss of use or function of, or inability to access, change, or manipulate "data records".

      This exclusion also applies to "damages" for any expenses incurred by "you" or others arising out of 1) or 2) above, including expenses for credit monitoring, notification, forensic investigation, and legal research.

2. Exclusion x. under Coverage U, item 2. exclusions, is deleted and replaced by the following:

   x. any of the following:

      1) "bodily injury", "property damage", or "personal and advertising injury" arising out of disclosure of or access to private or confidential information belonging to any person or organization; or
      2) any loss, cost, expense, or "damages" arising out of damage to, corruption of, loss of use or function of, or inability to access, change, or manipulate "data records".

      This exclusion also applies to "damages" for any expenses incurred by "you" or others arising out of 1) or 2) above, including expenses for credit monitoring, notification, forensic investigation, and legal research.

CU 0403 09 14

Copyright, American Association of Insurance Services, Inc., 2014

AAIS
CU 0609 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- COMMUNICABLE DISEASE
## COVERAGES E AND U
### ILLINOIS

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

As used in this endorsement, a communicable disease is defined as a disease which is caused by parasites, bacteria, viruses, or organisms and is readily transmitted from person to person directly through human secretions, or is transmitted directly or indirectly from person to animal, animal or other property to person, or animal to animal or other property.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

The following exclusions are added under Coverage E and Coverage U, item 2. Exclusions:

"We" do not pay for:

a.  "bodily injury", "property damage", or "personal and advertising injury" that arises out of the actual or alleged transmission of a communicable disease by:

   1)  a person;
   2)  an "insured's" property, including "products"; or
   3)  the property of others in the care, custody, or control of an "insured".

This exclusion applies even if the claim or "suit" against any "insured" alleges negligence or other improper action in the:

   1)  failure to report the communicable disease to proper authorities;
   2)  failure to prevent the spread of the communicable disease;
   3)  hiring, supervising, training, employing, or monitoring of others who may be infected with and spread a communicable disease; or
   4)  testing or failure to test for a communicable disease.

b.  any loss, cost, or expense arising out of any:

   1)  request, demand, or order that any "insured" or others test for, monitor, report, clean up, remove, contain, treat, detoxify, disinfect, sterilize, neutralize, or in any way respond to, assess the effects of, or eliminate a communicable disease or the conditions to which a communicable disease is attributed; or
   2)  claim or "suit" by or on behalf of any governmental body or authority relating to testing for, monitoring, reporting, cleaning up, removing, containing, treating, detoxifying, disinfecting, sterilizing, neutralizing, or in any way responding to, assessing the effects of, or eliminating a communicable disease or the conditions to which a communicable disease is attributed.

CU 0609 09 10

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 0617 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- ABUSE OR MOLESTATION
## COVERAGES E AND U
## ILLINOIS

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All
other "terms" of the policy apply, except as amended by this endorsement.

---

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

---

The following exclusion is added under Coverage E and Coverage U, item 2.
Exclusions:

"We" do not pay for "bodily injury", "property damage", or "personal and
advertising injury" for any person who actively participates in any act of sexual
misconduct, sexual molestation, or physical or mental abuse of any person.

This exclusion applies even if the claim or "suit" against any "insured" alleges
negligence or other improper action in the employment, supervision,
investigation, reporting or failure to report to proper authorities, or retention of a
person for whom any "insured" is or was legally responsible and whose conduct
would be excluded under this endorsement.

---

CU 0617 09 10

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 0702 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- FUNGUS OR RELATED PERILS
## COVERAGES E AND U

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## DEFINITIONS

Under Definitions, the following definition is added:

"Fungus or related perils" means:

a. a fungus, including but not limited to mildew and mold;

b. a protist, including but not limited to algae and slime mold;

c. wet rot;

d. dry rot;

e. a bacterium; or

f. a chemical, matter, or compound produced or released by a fungus, a protist, wet rot, dry rot, or a bacterium, including but not limited to toxins, spores, fragments, and metabolites such as microbial volatile organic compounds.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

The following exclusions are added under Coverage E and Coverage U, item 2. Exclusions:

"We" do not pay for:

a. actual or alleged "bodily injury", "property damage", or "personal and advertising injury" that results directly or indirectly from ingestion of, inhalation of, physical contact with, or exposure to "fungus or related perils".

However, this exclusion does not apply to:

1) "bodily injury" that results from a fungus cultivated or harvested for human consumption or a food-borne or beverage-borne bacterium that causes illness commonly known as food poisoning (Food-borne or beverage-borne bacteria that cause illness commonly known as food poisoning include but are not limited to Staphylococcus aureus, Salmonella, Clostridium perfringens, Campylobacter, Listeria monocytogenes, Vibro parahaemolyticus, Bacillus cereus, and Escherichia coli.); or

2) "bodily injury" suffered by an "employee" of an "insured" while performing duties in connection with the "insured's" farming operations, but only to the extent that "bodily injury" to an "insured's" "employees" is covered by this policy.

b. any loss, cost, or expense arising out of any request, demand, or order that any "insured" or others test for, monitor, clean up, abate, remediate, dispose of, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of "fungus or related perils".

c. any loss, cost, or expense arising out of any claim or "suit" by or on behalf of any governmental authority relating to testing for, monitoring, cleaning up, abating, remediating, disposing of, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of "fungus or related perils".

CU 0702 09 10

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 0705 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- EXTERIOR INSULATION AND FINISH SYSTEMS
## COVERAGES E AND U

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## DEFINITIONS

Under Definitions, the following definition is added:

"EIFS" means an exterior wall cladding or finish system used on any part of any structure, and consisting of:

a. a rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

b. an adhesive or mechanical fastener used for the attachment of the insulation board to the substrate;

c. a reinforced or unreinforced base coat on the face of the insulation board or base coat and mesh;

d. a protective finish applied to the surface of the base coat providing surface texture to which color may be added; and

e. any conditioners, primers, accessories, flashings, coatings, caulking, and sealants that interact to form an energy efficient wall.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

The following exclusions are added under Coverage E and Coverage U, item 2. Exclusions:

"We" do not pay for:

a. actual or alleged "bodily injury", "property damage", or "personal and advertising injury" that arises out of the design, manufacture, sale, service, construction, fabrication, preparation, installation, application, maintenance, or repair, including any remodeling, correction, or replacement of an "EIFS" or any part thereof, or any substantially similar system or any part thereof, including any method or procedure to correct problems with installed or partially installed systems performed by or on behalf of an "insured".

b. actual or alleged "bodily injury", "property damage", or "personal and advertising injury" that arises out of "your work" and that results directly or indirectly from any exterior component, fixture, or feature of any structure if an "EIFS" is used on any part of that structure.

c. actual or alleged "bodily injury" or "property damage" included in the "products/completed work hazard" and that results directly or indirectly from any exterior component, fixture, or feature of any structure if an "EIFS" is used on any part of that structure.

d. "bodily injury" or "property damage" liability assumed by an "insured" under a contract or agreement for the design, manufacture, sale, service, construction, fabrication, preparation, installation, application, maintenance, or repair, including any remodeling, correction, or replacement of an "EIFS" or any part thereof, or any substantially similar system or any part thereof.

CU 0705 09 10

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 0706 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- AUTO LIABILITY
## COVERAGE E

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

The following exclusion is added under Coverage E, item 2. Exclusions:

"We" do not pay for "bodily injury" or "property damage" arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, supervision, operation, or "loading or unloading" of any "auto".

CU 0706 09 10

Copyright, American Association of Insurance Services, Inc., 2010

**AAIS**
**CU 0719 09 10**
**Page 1 of 1**

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- PROFESSIONAL LIABILITY
## COVERAGE E

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

The following exclusion is added under Coverage E, Item 2. Exclusions:

"We" do not pay for injury or damage arising out of the rendering of or failure to render a professional service.

CU 0719 09 10

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 0720 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- EMPLOYEE BENEFITS LIABILITY
## COVERAGE E

The Commercial Excess/Umbrella liability
Coverage is amended as follows. All other
"terms" of the policy apply, except as amended
by this endorsement.

## DEFINITIONS

Under Definitions, the following definitions are
added:

1.  "Employee Benefit Program" means one or
    more of the following types of plans or
    insurance maintained by "you" for the benefit
    of "your" "employees":

    a.  group life insurance; group accident and
        health insurance; dental, vision and
        hearing plans; and flexible spending
        accounts; provided that such benefits are
        made generally available to "employees"
        who are eligible for such benefits, and no
        one except an "employee" may
        subscribe to such benefits;

    b.  profit sharing plans, savings plans,
        pension plans, retirement plans, or
        employee stock ownership or
        subscription plans, provided that such
        benefits are made generally available to
        "employees" who are eligible for such
        benefits, and no one except an
        "employee" may subscribe to such
        benefits;

    c.  worker's compensation, unemployment
        insurance, salary continuation plans,
        social security benefits, or disability
        benefits insurance;

    d.  leave of absence programs, travel plans,
        vacation plans, or tuition assistance or
        education reimbursement plans;

    e.  subsidy plans for health clubs and
        transportation; or

    f.  any other type of insurance or plan
        described in the Schedule.

2.  "Administration" means performing the
    following acts for the "Employee Benefit
    Program":

    a.  giving information to "employees",
        including their dependents and
        beneficiaries, concerning scope of or
        eligibility for "employee benefit
        programs";

    b.  handling and maintaining of records with
        respect to "employee benefit programs";
        or

    c.  enrolling, continuing, or cancelling of any
        "employee's" participation in "employee
        benefit programs".

    However, "administration" does not include
    the handling of payroll deductions.

## COMMERCIAL EXCESS/UMBRELLA
## LIABILITY COVERAGES

The following exclusion is added under Coverage
E, item 2. Exclusions:

"We" do not pay for injury or damage an
"insured" becomes legally obligated to pay
arising from a claim or "suit" for injury to an
"employee" caused by the negligent act, error, or
omission of the "insured", or of any person for
whose acts the "insured" is legally liable, in the
"administration" of an "employee benefit
program".

**CU 0720 09 10**

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 0721 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- LIQUOR LIABILITY
## COVERAGE E

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

The following exclusion is added under Coverage E, item 2. Exclusions:

"We" do not pay for "bodily injury" or "property damage" for which any "insured" may be held liable by reason of:

a.   causing or contributing to the intoxication of a person;

b.   the furnishing of alcoholic beverages to a person under the influence of alcohol or under the legal drinking age; or

c.   a law or regulation relating to the sale, gift, distribution, or use of alcoholic beverages.

This exclusion applies only if "you" are in the business of manufacturing, distributing, furnishing, selling, or serving alcoholic beverages.

However, this exclusion does not apply to "bodily injury" or "property damage" that is covered by "underlying insurance" or that would have been covered but for the exhaustion of the "limits" of the "underlying insurance". The coverage provided by this policy will be subject to the provisions, exclusions, and limitations of the "underlying insurance".

CU 0721 09 10

Copyright, American Association of Insurance Services, Inc., 2010

**AAIS**
CU 0725 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- PUNITIVE DAMAGES
## COVERAGES E AND U

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

This policy does not apply to a claim or indemnification for punitive or exemplary "damages", or to any costs, attorney fees, interest, or "damages" attributable to an award of punitive or exemplary "damages". Punitive or exemplary "damages" means those "damages" imposed to punish a wrongdoer and to deter others from similar conduct.

However, if a "suit" seeking both compensatory "damages" and punitive or exemplary "damages" is brought against an "insured" for an "occurrence" or offense covered by this policy, "we" will provide defense coverage.

CU 0725 09 10

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 0736 09 10
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EXCLUSION -- TOTAL POLLUTION
## COVERAGE E

The Commercial Excess/Umbrella Liability Coverage is amended as follows. All
other "terms" of the policy apply, except as amended by this endorsement.

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

Under Coverage E, item 2. Exclusions, exclusions f. and h. are deleted and
replaced by the following:

f.   "bodily injury" or "property damage" arising out of the actual, alleged, or
     threatened discharge, dispersal, seepage, migration, release, escape, or
     emission of "pollutants" at any time.

h.   any loss, cost, or expense arising out of any:

     1)   request, demand, order, statute, or regulation requiring that any "insured"
          or others test for, abate, monitor, clean up, remove, contain, treat,
          detoxify, neutralize, or in any way respond to or assess the effects of
          "pollutants"; or
     2)   claim or "suit" by or on behalf of any governmental authority relating to
          testing for, abating, monitoring, cleaning up, removing, containing,
          treating, detoxifying, neutralizing, or in any way responding to or
          assessing the effects of "pollutants".

CU 0736 09 10

Copyright, American Association of Insurance Services, Inc., 2010

| | |
|---|---|
| **AAIS** | This endorsement changes |
| **CU 1303 09 10** | the policy |
| **Page 1 of 2** | – PLEASE READ THIS CAREFULLY – |

# TERRORISM EXCLUSION
## FOR AUTO BODILY INJURY OR PROPERTY DAMAGE

1.  This endorsement applies only to "bodily injury" or "property damage" arising out of the *ownership, maintenance, use, occupancy,* renting, operation, loaning, entrusting, supervision, or "loading or unloading" of an "auto" which is covered by "underlying insurance".

    This endorsement supersedes any other endorsement attached to this policy addressing terrorism with respect to any "auto" which is covered by "underlying insurance".

2.  The word terrorism, when shown in this endorsement in quotation marks, has the following meaning:

    "Terrorism" means activities against persons, organizations, or property of any nature:

    a.  that involve the following or preparation for the following:

        1)  use or threat of force or violence; or
        2)  commission or threat of a dangerous act; or
        3)  commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

    b.  when one or both of the following applies:

        1)  the effect is to intimidate or coerce a government or the civilian population *or any segment thereof, or to disrupt* any segment of the economy; or
        2)  it appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social, or economic objectives, or to express (or express opposition to) a philosophy or ideology.

3.  The following exclusion is added under Coverage E, item 2. Exclusions:

    "We" will not pay for injury or damage caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". Such injury or damage is excluded regardless of any other cause or event that *contributes concurrently or in any sequence* to the injury or damage.

    This exclusion applies only when one or more of the following are attributed to an incident of "terrorism":

    a.  the "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or *produces a nuclear reaction, nuclear* radiation, or radioactive contamination; or

    b.  radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

    c.  the "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

    d.  pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such *materials; or*

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CU 1303 09 10
Page 2 of 2

e. the total of insured damage to all types of property in the United States, its territories and possessions, Puerto Rico, and Canada exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, "we" will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

f. fifty or more persons sustain death or serious physical injury. For the purpose of this provision, serious physical injury means:

   1) physical injury that involves a substantial risk of death; or
   2) *protracted and obvious physical disfigurement*; or
   3) protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds described above under items 3.e. or 3.f. are exceeded.

Items 3.e. and 3.f. above describe the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Terrorism Exclusion will apply to that incident.

When this Terrorism Exclusion applies to an incident of "terrorism", there is no coverage under the policy to which this endorsement applies.

4. The following provision is added:

   *In the event of any incident of "terrorism" that is not subject to the Terrorism Exclusion set forth by this endorsement, coverage does not apply to injury or damage that is otherwise excluded under the policy to which this endorsement applies.*

CU 1303 09 10

Copyright, American Association of Insurance Services, Inc., 2010

ENDORSEMENT #

This endorsement, effective 12:01 a.m., 7/22/2016    forms a part of

Policy No. RPU5435901-01          issued to   Addison Ice Arena

By Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### EXCLUSION – TOTAL ASSAULT OR BATTERY
### COVERAGES E and U

The Commercial Excess/Umbrella Liability Coverage is amended as follows.  All other "terms" of the policy apply, except as amended by this endorsement.

---

## DEFINITIONS

---

Under Definitions, the following definitions are added:

"Assault" means any attempt or threat to cause harmful or offensive contact with or injury to another including any conduct or display of force that would reasonably place another in apprehension of such contact or injury.

"Battery" means any harmful or offensive contact between two or more persons.

---

## COMMERCIAL EXCESS/UMBRELLA LIABILITY COVERAGES

---

The following exclusions are added under Coverage E and Coverage U, item 2. Exclusions:

"We" do not pay for:

"bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of any "assault" or "battery" by any person, whether provoked or unprovoked, including but not limited to:

(1)    The prevention or suppression of or the failure to prevent or suppress "assault" or "battery", including the failure to provide adequate security or keep any premises in a safe condition;

(2)    The failure to warn of the dangers of the environment which could contribute to "assault" or "battery;"

(3)    Hiring, placement, training or supervision, whether negligent or otherwise, including the failure of the "Insured" or officers, employees, agents or servants of the "Insured" in the hiring, supervision, retention or control of any person, whether or not an officer, employee, agent or servant of the "insured;"

(4)    Threats by words or deeds;

(5)    Reporting to the proper authorities, or failure to so report;

GRPU 600 1012                                                                    Page 1 of 2
© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(6)    The use of force to protect persons or property whether or not the "bodily injury", "property damage" or "personal and advertising injury" was intended from the standpoint of the "Insured" or committed by or at the direction of the "Insured"; or

(7)    The failure to protect any person while that person was in the care, custody or control of the "Insured", its employees, agents or servants.

© 2012 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

AAIS                          This endorsement changes
CL 0678 07 11                         the policy
Page 1 of 1                  -- PLEASE READ THIS CAREFULLY --

# CIVIL UNIONS AMENDMENT
## ILLINOIS

Throughout this policy, any reference to a spouse includes a person who is a part of a civil union couple as defined by Illinois law.

Throughout this policy, any reference to a family member, relative, or any family relationship includes the families of a civil union couple as defined by Illinois law.

CL 0678 07 11

Copyright, American Association of Insurance Services, Inc., 2011

ENDORSEMENT # 0

This endorsement, effective 12:01 a.m., 07/22/16    forms a part of Policy No.  RPU5435901-01

issued to   Addison Ice Arena

by   Indian Harbor Insurance Company

**SERVICE OF PROCESS**

The Director of Insurance of the State of Illinois is hereby designated the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit or proceeding arising out of this policy.   The Company further designates:

> Sarah Mims
> Assistant Secretary
> 505 Eagleview Boulevard, Suite 100
> Exton, Pennsylvania 19341-0636

as its agent in Illinois to whom such process shall be forwarded by the Director of Insurance.

All other terms and conditions of this policy remain unchanged.

(Authorized Representative)

XL-ILSOP 11 10

© 2010 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

| Form **W-9**<br>(Rev. August 2013)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give Form to the<br>requester. Do not<br>send to the IRS. |

Name (as shown on your income tax return)

**Indian Harbor Insurance Company**

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor ☑ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any)  **5**

Exemption from FATCA reporting
code (if any)

Address (number, street, and apt. or suite no.)

**Seaview House, 70 Seaview Avenue**

City, state, and ZIP code

**Stamford, CT 06902**

Requester's name and address (optional)

List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Social security number

Employer identification number

| 9 | 5 | | 1 | 4 | 7 | 9 | 0 | 9 | 5 |

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign
Here | Signature of
U.S. person ▶ | *John Erickson* | Date ▶ | 12/15/2013

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 8-2013)



## HOW TO REPORT A CLAIM:

All claims should be reported to North American Risk Services (NARS) as soon after the loss as possible while information is fresh. Claims may be reported by any of the following options 24 hours a day, 7 days a week to the attention of the New Loss Unit.

- Telephone: (800) 315-6090
- Facsimile: (866) 261-8507
- Internet: http://narisk.com/partnerEtools.php
- Electronic Mail: reportaclaim@narisk.com
- Regular Mail: North American Risk Services
  P. O. Box 166002
  Altamonte Springs, FL 32716-6002

In order to ensure proper assistance, it is important to include the policy number as well as name of the insured and to provide as much information about the loss details and involved parties as possible. An adjuster will be assigned and after the reviewing the information provided will make personal contact so remember to include contact information such as your name, home and email addresses and alternate telephone numbers. A claim acknowledgement will be transmitted identifying the claim number and assigned claims examiner.

PDF to Word

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:18 # 4348629/170431049515

4393 (Rev. 6/18)

**STATE OF ILLINOIS**

UNITED STATES OF AMERICA
IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

**COUNTY OF DU PAGE**

Addison Ice, LLC
_____
Plaintiff,

v.

Indian Harbor Insurance co.
_____
Defendant,

**2018L000968**
_____
Case Number

Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
DuPage County
**TRAN# : 170431049515/( 4348629 )**
**2018L000968**
**FILEDATE : 08/23/2018**
Date Submitted : 08/23/2018 11:27 AM
Date Accepted : 08/23/2018 02:12 PM
**GEIB,LAURA**

File Stamp Here

# EXHIBIT COVER SHEET
Local Court Rules 5.06 and 5.09

**EXHIBIT NAME:**  complaint Ex.    B-H

**TITLE OF DOCUMENT THIS EXHIBIT BELONGS WITH:**
Complaint for Breach of contract and
Bad Faith

**Document File Date:**  8/23/18
*(The file date of the document this exhibit belongs with)*

**EXHIBIT FILED ON BEHALF OF:** Plaintiff
*(Case Party Name)*

Submitted by: Dan Hanlon

Name:  MB      ☐ Pro Se
DuPage Attorney Number:  6
Attorney for: Plaintiff
Address: 311 S. County Farm Rd #I
City/State/Zip: Wheaton IL 60187
Telephone Number: 630 871 1100
Email: dfh@lawmb.com

CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT©
WHEATON, ILLINOIS 60187-0707



August 24, 2017

**Mr. Travis Henderson**
**The Hartford Steam Boiler Inspection and Insurance Company**
General Adjuster
Complex Claims Unit
1011 Warrenville Rd Ste 400
Lisle, IL 60532
Travis.Henderson@hsb.com

**Mr. James Marciniak, P.E.**
**ESI**
Senior Consultant
4215 Campus Drive
Aurora, IL 60504
jgmarciniak@engsys.com

cc:     John Burley, Everything Ice Inc.
        Robert Charal, Republic Bank of Chicago
        Gerald Eberhardt, Republic Bank of Chicago
        Amiel J. Rossabi, Rossabi Reardon Klein Spivey PPLC
        Gavin J. Reardon, Rossabi Reardon Klein Spivey PPLC

<u>**BY ELECTRONIC MAIL ONLY**</u>

Gentlemen:

It is with utmost urgency that we have some conclusion to our claim. We have waited patiently for communication and resolution and at this point with no items left open for examination believe it is time to immediate resolve this claim.

I have consulted with our bankers and attorneys as well as having spoken in detail with our consultant John Burley of Everything Ice. We have thoroughly reviewed the situation in its entirety with Mr. Burley. Additionally, I know he has been in fairly constant and regular communication with both of you as well as to his progressive findings and opinions.

*ADDISON ICE LLC    475 South Grace Street Addison,  IL   60101*

At this writing we know the following facts:

1)      The underfloor sub-soil heating system serving the Olympic and NHL rinks had failed.

2)      Said underfloor system failure was catastrophic.

3)      All systems and related parts were professionally pressure tested and such test confirmed the system failure. When tested, there was a zero pressure reading for the system.

4)      The OLY underfloor failure was located and repaired to maintain that ice surface for the remainder of this season and a separate sub floor heating system was designed and installed by Everything Ice and AMS Mechanical to minimize damage to the business operations. Mr. Burley's design of a stand-alone system has mitigated the loss and that bypass system installed at a relatively minor cost preserved the Olympic board system so that will not require replacing generating a loss savings of over $125,000. His temporary system also prevented any further business interruption losses as the ice surface was at risk.

5)      The cause of the underfloor header failure cannot be determined with any certainty. The failure location shows external corrosion limited to the area of the failure but said corrosion is likely secondary to the initial failure since
    a.      the affected location was a specific spot and there was no signs of corrosion in any other areas of the approximately 350ft long header system;  and
    b.      once repaired the system has maintained full pressure without any leaks and is currently operational; and
    c.      once compromised, the metal pipe was exposed to air and brine and such environment creates the platform for external corrosion. As stated earlier, Mr. Burley's findings are that balance of the header is corrosion free both inside and out which points to the corrosion being a secondary by-product of the original leak. The corresponding NHL Header was also corrosion free inside and out and your expert examined it when it was removed with great detail and can confirm such results. If this was a corrosion issue, it would have been evidenced itself system-wide in many more than one location given the over 350 feet of length of the header system with the same fluid throughout the system. This conclusion is further supported by the PH levels of the calcium chloride tested by a third party testing agency that illustrated the brine solution was properly maintained as non-corrosive by the water treatment processes of the facility.

6)      The heat exchanger tube failure was verbally reported as being corrosion driven by your expert.  We are awaiting the testing data for this failure.  While this may, or may not be true, our expert states without reservation that
    a.      such corrosion is a reasonable and foreseeable result of a failure elsewhere in the system which permits air to infiltrate the fluid system.  As such, a failure of this type with the heat exchanger is secondary to the primary cause being that of the rink underfloor failure.  Our expert indicates that there is no way to exclude that the heat exchanger failure was the result of the floor failure.

*ADDISON ICE LLC*   *475 South Grace Street Addison,  IL   60101*

b.      Similarly, there is no way to conclude that the heat exchanger failure was not initially caused by non-corrosive break in the single pipe within the heat exchanger. Our expert has opined that since only 1 of the 85 tubes in the heat exchanger was damaged and exhibited corrosion of any kind, that the failure was not systemic to a corrosion problem. If in fact corrosion was the root cause of the failure, then many more of the tubes, if not all, would have had similar leaks especially in the closed environment of the heat exchanger.

If your expert wishes to assert otherwise, we demand his scientific, and supportable basis for such a conclusion.

7)      The three compressors in the system suffered severe damage as a result of the heat exchanger failure.

From the profession review and subsequent consultation with our technical experts and legal advisors, and based on a review of our policy and the technical merits, we have concluded that this is a valid claim and must be covered in whole or in part.

Attached as Addendum "A" is
    a.      a schedule of actual repair costs incurred to date; and
    b.      certain reserves estimated for the remaining work to remedy the physical damage; and
    c.      additional "To Be Determined" amounts related to business interruption.

These actual already incurred expenses can be documented for reimbursement and reserves can be held against completion of future work since the seasonal timing would require that work commence in March 2018. We ask you to submit of list of what information you need to calculate the business interruption coverage amounts.

At this time, we request that payment for no less than half of the actual expenses incurred to date be processed immediately to avoid our ownership group and bank lenders from asserting a bad faith claim.

We look forward to your timely affirmative response and an agreement on the partial claim payout as noted above at this time.

Sincerely,

**ADDISON ICE LLC**

Leon Lekai
President

*ADDISON ICE LLC*   *475 South Grace Street Addison,  IL   60101*

| | | |
|---|---|---|
| CIMCO | Floor Repair | $ 218,661.02 |
| | Diagnostic | $ 8,305.00 |
| | Filters | $ 1,286.60 |
| Everything Ice | Base Floor Repair | $ 72,000.00 |
| | Addl Work | $ 37,935.00 |
| | Addl Materials | $ 21,681.25 |
| | Ice Painting | $ 7,000.00 |
| Becker Arena Products | Board Repalcement - Used | $ 113,811.96 |
| AMS Mechanical | Refrigeration | $ 99,150.00 |
| | New Transmission Lines | $ 6,390.00 |
| | System Blowout | $ 3,200.00 |
| | Pump Wiring | $ 5,500.00 |
| | Pressure Tests | $ 6,600.00 |
| | Compressor Additional | $ 129,000.00 |
| Waz Construction | Netting Re-Install | $ 15,614.00 |
| | Electrical | $ 14,300.00 |
| | Rewire/Repipe Temp Heater | $ 6,275.00 |
| Tarp Supply Inc | Tarps for Sand Cover | $ 1,052.17 |
| JKS Ventures | Sand | $ 9,060.00 |
| Grohworks | Sub Floor Drain Re-Install | $ 20,700.00 |
| Republic Services | Dumpsters - Removal | $ 8,141.63 |
| PPM | Pump Repair | $ 3,960.00 |
| Pegasus Enviromental | Sonar testing NHL Floor | $ 2,950.00 |
| Chem-Tainer | Chemicals | $ 241.92 |
| Port Pipe & Supply | Piping | $ 446.00 |
| Halogen Supply Company | Temporary Inline Heater | $ 4,228.86 |
| CCS-CES | Ice Melt Heater | $ 2,000.00 |
| Feece Oil | Heater Fuel | $ 517.51 |
| Brine | estimated | $ 3,500.00 |
| TOTAL | | $ 823,507.92 |

| | | | |
|---|---|---|---|
| Olympic Sheet Reserve | $ 257,500 | Flooring | Everything Ice |
| | $ 23,500 | Trans Line | Everything Ice |
| | $ 3,200 | System Blowout | AMS Mechanical |
| | $ 3,850 | Borings | Everything Ice |
| | $ 40,000 | Ground Heat | Everything Ice |
| | $ 2,000 | Ice Melt Heater | CCS-CES |
| | $ 500 | Heater Fuel | Feece Oil |
| | $ 32,250 | Remove Dashers | Everything Ice |
| | $ 9,250 | Dumpsters | Republic |
| | $ 32,500 | Re-install Dashers | Everything Ice |
| | $ 3,500 | Brine | PPM |
| | $ 10,000 | Sand | JKS ventures |
| | $ 418,050 | | |
| Business Interruption | TBD | | |

**The Hartford Steam Boiler Inspection and Insurance Company**



Rossabi Law Partners
706 Green Valley Rd Ste 410
Greensboro, NC 27438

Copy
Leon Lekai
Addison Ice Arena
475 South Grace Street
Addison, IL 60101

Sep 05, 2017

Travis Henderson
General Adjuster
HSB/Claims
Tel.: 860-856-4625
Email:
Travis_Henderson@hsb.com

RE:
Insured:          Addison Ice Arena
HSB Claim #:    000481158
HSB Policy #:   1002732            Your Claim #:   RPIH17020004
Date of Loss:   Jan 10, 2017      Your Policy #:  RPP5435093-01

Locations:

475 South Grace Street
Addison, IL 60101
United States of America

**Risk Solutions**

Remit all correspondence to:
Email:
Claims_Documentation@hsb.com
Fax:  (877) 472-4329

Main Address:
P.O. Box 61510
King of Prussia, PA 19406
Overnight mail:
595 E Swedesford Rd Ste 100
Wayne, PA 19087
www.hsb.com

Dear Mr. Rossabi,

Our investigation into the reported occurrence is continuing. Once our investigation is completed, we will be in a position to measure the extent of any liability. This letter should not be construed as an admission of liability.

We are in receipt of your email dated September 3, 2017. Thank you for providing the requested letter of representation.

On August 30, 2017 you were provided with the testing protocol on the heat exchanger tubes. This testing has been performed and the results of the testing are being reviewed. Another copy of the testing protocol is attached for your file.

In continuing our investigation, we would like to perform the same destructive testing on the Olympic floor piping as has been performed on the heat exchanger piping. Please provide us the location of the Olympic floor piping so we can pick it up and arrange to have the testing completed.

As previously discussed, your request for an official copy of the policy was sent to Mr. Kevin McGuire of North American Risk Services. This policy was underwritten by XL Insurance America, Inc. Hartford Steam Boiler does not have access to an official copy of the Insured's policy. We have contacted Mr. McGuire on two different occasions and repeated your request for the official copy of the policy.

In order to proceed with our determination of any liability, we request the following be provided.

Page 1 of 2

1866

**Hartford Steam Boiler**

1. Please provide us with the location of the removed Olympic floor piping so we can pick it up and arrange to have the testing performed.

2. We request copies of all invoices and records of ammonia and brine purchases from September 1, 2014 through September 1, 2017.

Once we have received and reviewed the documentation and performed the testing on the Olympic floor piping, we will contact you with our findings.

Please be advised of the policy conditions which state in part:

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**3. Duties In The Event Of Loss Or Damage**
   **a.** You must see that the following are done in the event of loss or damage to Covered Property:

   **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

   **(8)** Cooperate with us in the investigation or settlement of the claim.

You are respectfully advised that neither this correspondence nor any conduct related to this matter shall be construed as a waiver of, nor shall XL Insurance America, Inc. or HSB be estopped from asserting in the future, any rights or defenses it may have under any applicable policy of insurance, regulation, or law relating to, concerning, or arising out of this claim. We are expressly reserving all such rights and defenses. No representations, express or implied, by XL Insurance America, Inc., its agents and/or representatives, of coverage for the claimed loss, shall be effective unless communicated in writing by XL Insurance America, Inc..

Sincerely,

Travis Henderson

Page 2 of 2

**Amiel Rossabi**

| | |
|---|---|
| From: | Amiel Rossabi |
| Sent: | Tuesday, December 05, 2017 3:44 PM |
| To: | 'Henderson Travis – Hartford-HSB' |
| Cc: | 'HSB-BDL-Claims Documentation'; 'Kevin McGuire' |
| Subject: | RE: 000481158/Addison Ice Claim |
| Attachments: | Sworn Proof of Loss with back up docs.pdf |

Mr. Henderson and Mr. McGuire,

I am shocked at your callous disregard of your insured's claim and your bad faith handling of same.  So that there is no misunderstanding or attempt to claim ignorance (despite the detailed history of communications about this claim), attached is an updated sworn proof of loss with back-up documents.

Please govern yourself accordingly.

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina  27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site:  www.r2kslaw.com



– – – – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee.  Do not read, copy or share this communication unless you are the intended addressee.  If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone.  Thank you.

1

**From:** Amiel Rossabi
**Sent:** Friday, October 27, 2017 11:03 AM
**To:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Kevin McGuire <KMcGuire@narisk.com>
**Subject:** RE: 000481158/Addison Ice Claim

Mr. Henderson and Mr. McGuire, what excuse could you possibly have for not making a coverage determination by now? There is no excuse. This is the culmination of your sequence of bad faith. I demand a coverage determination by noon on Monday, October 30, 2017.

We will then act accordingly.

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



– – – – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Henderson Travis - Hartford-HSB [mailto:Travis_Henderson@hsb.com]
**Sent:** Wednesday, October 11, 2017 11:27 AM
**To:** Amiel Rossabi <arossabi@r2kslaw.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Kevin McGuire <KMcGuire@narisk.com>
**Subject:** 000481158/Addison Ice Claim

We are still awaiting more information from our retained consultant. We have not accepted liability for loss. We hope to have our position to Kevin McGuire by next week. The final coverage decision will come from Kevin.

2

**Travis Henderson**
General Adjuster
Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

1011 Warrenville Rd Ste 400
Lisle, IL 60532
Telephone: (860) 856-4625
Mobile: (847) 212-6324
Fax: (877) 472-4329
Travis_Henderson@hsb.com

www.hsb.com

**Risk Solutions**

 

Hartford Steam Boiler



**From:** Amiel Rossabi [mailto:arossabi@r2kslaw.com]
**Sent:** Wednesday, October 11, 2017 10:14 AM
**To:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>
**Subject:** RE: 000481158/Addison Ice Claim

Why do you not yet have a report? Have you accepted this as a covered claim?

Amiel J. Rossabi

Rossabi Reardon Klein Spivey PLLC
706 Green Valley Road, Suite 410
Greensboro, North Carolina 27408

Telephone: (336) 895-4350
Facsimile: (336) 663-1143

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



3

– – – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Henderson Travis - Hartford-HSB [mailto:Travis_Henderson@hsb.com]
**Sent:** Tuesday, September 26, 2017 11:27 AM
**To:** Amiel Rossabi <arossabi@r2kslaw.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>
**Subject:** 000481158/Addison Ice Claim

We do not yet have a report from our expert. The expert will be setting up further testing of the newly acquired piping. We will provide our position once we have received and reviewed the final report.

**Travis Henderson**
General Adjuster
Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

1011 Warrenville Rd Ste 400
Lisle, IL 60532
Telephone: (860) 856-4625
Mobile: (847) 212-6324
Fax: (877) 472- 4329
Travis_Henderson@hsb.com

www.hsb.com



 

**From:** Amiel Rossabi [mailto:arossabi@r2kslaw.com]
**Sent:** Tuesday, September 26, 2017 10:00 AM
**To:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>
**Cc:** Kevin McGuire <KMcGuire@narisk.com>; John S. Burley <jburley@everything-ice.com>; HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>
**Subject:** RE: 000481158/Addison Ice Claim

That's precisely the problem and the sort of backwards logic that has led us to this point and, further, is in violation of your obligation to promptly assess this claim.

You had an expert perform testing;
Mr. Burley has inspected the heat exchanger and has requested the information from your expert;
You have failed to cooperate and, therefore, Mr. Burley can do nothing else other than stand by his opinion as stated in my previous email.
Please read my email and you will have the answer to your question.

I am not going to continue this merry-go-round with you.

4

Are you going to provide your expert's reports and the information that Mr. Burley has requested?

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Henderson Travis - Hartford-HSB [mailto:Travis_Henderson@hsb.com]
**Sent:** Tuesday, September 26, 2017 10:54 AM
**To:** Amiel Rossabi <arossabi@r2kslaw.com>
**Cc:** Kevin McGuire <KMcGuire@narisk.com>; John S. Burley <jburley@everything-ice.com>; HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>
**Subject:** 000481158/Addison Ice Claim

We have not made a coverage determination on this file to date. Our investigation is continuing. If John Burley has information regarding this loss that supports a covered loss I need him to provide it.

Mr. John Burley,

Per the email below you have provided your opinion to the insured and his attorney that you have found a covered loss under our policy. Please provide this opinion with supporting facts and documentation to us in writing as soon as possible.

Thank you

Document received on 8/23/18 11:27 AM Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

**Travis Henderson**
General Adjuster
Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

1011 Warrenville Rd Ste 400
Lisle, IL 60532
Telephone: (860) 856-4625
Mobile: (847) 212-6324
Fax: (877) 472-4329
Travis_Henderson@hsb.com

www.hsb.com

 **Risk Solutions**

 

Hartford Steam Boiler

**From:** Amiel Rossabi [mailto:arossabi@r2kslaw.com]
**Sent:** Tuesday, September 26, 2017 9:38 AM
**To:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>
**Cc:** Kevin McGuire <KMcGuire@narisk.com>
**Subject:** Addison Ice Claim

Mr. Henderson, I have been forwarded an email that you sent to my client's expert behind my back. How do you justify such action? The email, that was sent yesterday to Mr. Burley states:

Mr. Burley, Per the email below you have provided your opinion to the insured and his attorney that you have found a covered loss under our policy. Please provide this opinion with supporting facts and documentation to us in writing as soon as possible.

Thank you

**Travis Henderson**
General Adjuster
Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

My client's expert can be contacted through me. You have no right to contact him directly and your action is just another example of your bad faith in handling this claim.

As you know, my client has requested on numerous occasions from you and/or Mr. Marciniak and/or Mark Sanchez the reports on the heat exchanger from early August and any other information that has been gathered about this occurrence, yet such reports and information have not been provided. Mr. Burley needs that information to form the most accurate and comprehensive conclusion possible.

Nevertheless, without that information, at this point, based on his review of information made available to him, his inspections and 30+ years of experience, his opinion is that all of the evidence points to this occurrence being a covered loss under the policy and no evidence points to the occurrence amounting to an exclusion based on corrosion.

6

Here are some of the factors that he has considered (even without the cooperation from the insurance company in providing requested information): a) the isolated nature of the leak to one area; b) the properly maintained brine with proper PH levels; c) the breach required a single 6 inch repair with the integrity of the rest of the 300 foot header system showing no signs of corrosion; d) once repaired the system under full high pressure has held the full charge.

The insured has fully cooperated in this matter. The insurance companies have not. I will have to you our detailed damages figures within one week. I expect that you will promptly pay this claim upon receipt of our claim amounts.

Thank you.


**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC


– – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.


**From:** Amiel Rossabi
**Sent:** Monday, September 18, 2017 4:56 PM
**To:** Travis Henderson <Travis_Henderson@hsb.com>
**Subject:** Brine invoices

Mr. Henderson, see attached.

The pipe can be picked up at the rink Mon-Fri anytime between 9am and 1:30pm. Have your representative ask for Jay Kermer or Ateka Powell. You may call Mr. Lekai at 615-395-2000 to confirm a time.

Document received on 8/23/18 11:27 AM · Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina  27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site:  www.r2kslaw.com



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

_ _ _ _ _ _ _ _ _ _ _ _ _

This e-mail contains confidential information for the addressee.  Do not read, copy or share this communication unless you are the intended addressee.  If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone.  Thank you.

IMPORTANT NOTICE:
The information in this email (and any attachments hereto) is confidential. If you are not the intended recipient, you must not use or disseminate the information. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by The Hartford Steam Boiler Inspection and Insurance Company or its subsidiaries or affiliates either jointly or severally, for any loss or damage arising in any way from its use.

# SWORN STATEMENT IN PROOF OF LOSS

POLICY NUMBER
RPP5435093-01/HSB Policy No. 1002732
DATE ISSUED

COMPANY CLAIM NUMBER
RPIH17020004/HSB Claim No. 000481158

_____ July 22, 2016
DATE EXPIRES

_____ July 22, 2017

To _ Indian Harbor Insurance Company and The Hartford Steam Boiler Inspection and Insurance Company _
[INSURANCE COMPANY NAME]

of _ Exton, Pennsylvania and Lisle, Illinois _
[CITY, STATE]

At time of loss, by the above indicated policy of insurance you insured _Addison Ice, LLC d/b/a Addison Ice Arena and_
_Thirteen Forty-Five Holdings, LLC_
against loss to the property described according to the terms and conditions of said policy and of all forms, endorsements, transfers and assignments attached thereto.

**TIME AND ORIGIN**
A loss occurred on the _10th_ day of _January_, 20 _17_

The cause and origin of the said loss were _leak caused damage to equipment and property located within the ice arena_

**OCCUPANCY**
The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever _The building was occupied for use as an ice arena with two separate ice skating rinks._

**TITLE AND CHANGES**
At the time of the loss, the interest of your insured in the property described therein was _100_ % INTEREST held by _Addison Ice, LLC_ _____ No other person or persons had any interest herein or encumbrance thereon, except _mortgage held by Republic Bank of Chicago_ _____ Since the said policy was issued, there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described

**TOTAL**
THE TOTAL AMOUNT OF INSURANCE upon the property described by this policy was, at the time of the loss, described in the policy limits, as more particularly specified in the apportionment attached, besides which there was no policy or other contract of insurance, written or oral, valid or invalid

**VALUE**
THE ACTUAL CASH VALUE of said property at the time of the loss was ............ $ _15,600,000.00_

**LOSS**
THE WHOLE LOSS AND DAMAGE was ............ $ _2,005,847.69_

**AMT CLAIMED**
THE AMOUNT CLAIMED under the above numbered policy number is ............ $ _2,005,847.69_

**STATEMENTS OF INSURED**
The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant, nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void, no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss, no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights

State of _Tennesee_

County of _Davidson_

Insured: _(signature)_

Insured: _(signature)_

Subscribed and sworn to before me this the _04th_ day of _DEC_ _(signature)_ _20()_
Personally known to me
I.D. _FL #L302-571L-2101_ _____ Notary _(signature)_
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURANCE COMPANY FILES A STATEMENT OF CLAIM CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE

# ADDISON ICE LLC CLAIM ANALYSIS

| | | | | |
|---|---|---|---|---|
| CIMCO | Floor Repair | $ 218,661.02 | CLAIM 1 | |
| | Diagnostic | $ 8,305.00 | CLAIM 2 | |
| | Filters | $ 652.05 | CLAIM 3 | |
| Everything Ice | Base Floor Repair | $ 85,283.91 | CLAIM 4 | |
| | Addl Work | $ 37,935.00 | CLAIM 5 | TBD waiting on Final Invoice |
| | Addl Materials | $ 21,681.25 | CLAIM 6 | TBD waiting on Final Invoice |
| | Ice Painting | $ 7,000.00 | CLAIM 7 | TBD waiting on Final Invoice |
| Becker Arena Products | Board Repalcement - Used | $ 113,811.96 | CLAIM 8 | |
| AMS Mechanical | Refrigeration | $ 99,150.00 | CLAIM 9 | |
| | Addl Items #1 | $ 94,930.81 | CLAIM 10 | |
| | Addl Compressor #2 | $ 37,033.00 | CLAIM 11 | |
| | Oil Pot Repair | $ 10,854.00 | CLAIM 12 | |
| | Chiller Liquid Feed repair | $ 1,850.00 | CLAIM 13 | |
| Waz Construction | Electrical | $ 4,300.00 | CLAIM 14 | |
| | Various | $ 24,130.00 | CLAIM 15 | |
| Tarp Supply Inc | Tarps for Sand Cover | $ 1,052.17 | CLAIM 16 | |
| JKS Ventures | Sand | $ 1,172.40 | CLAIM 17 | |
| | | $ 3,891.18 | CLAIM 18 | |
| | | $ 586.20 | CLAIM 19 | |
| Grohworks | Sub Floor Drain Re-Install | $ 20,700.00 | CLAIM 20 | |
| | Concrete Cut Refill | $ 3,072.00 | CLAIM 21 | |
| Republic Services | Dumpsters - Removal | $ 8,141.63 | CLAIM 22 | |
| | Dumpsters - Removal | $ 1,596.11 | CLAIM 23 | |
| PPM | Pump Repair | $ 6,420.00 | CLAIM 24 | |
| Pegasus Enviromental | Sonar Testing NHL Floor | $ 2,950.00 | CLAIM 25 | |
| Chem-Tainer | Chemicals | $ 241.92 | CLAIM 26 | |
| Porter Pipe & Supply | Piping | $ 446.52 | CLAIM 27 | |
| Halogen Supply Co | Temporary Inline Heater | $ 4,228.86 | CLAIM 28 | |
| CCS-CES | Ice Melt Heater | $ 2,000.00 | CLAIM 29 | |
| Feece Oil | Heater Fuel | $ 517.51 | CLAIM 30 | |
| JL Concrete | Concrete Cutting for Access | $ 2,850.00 | CLAIM 31 | |
| | | $ 500.00 | CLAIM 32 | |
| CRS Industries | P Traps for Rink Drain | $ 1,689.00 | CLAIM 33 | |
| Village of Bensenville | Ice Paint | $ 1,500.00 | CLAIM 34 | TBD waiting on Final Invoice |
| Various | Cleaning Labor | $ 1,700.00 | CLAIM 35 | |
| TOTAL | | $ 829,133.50 | | |

| Olympic Sheet Reserve | | | | | |
|---|---|---|---|---|---|
| | $ | 325,000.00 | Flooring | Everything Ice | Estimated | per proposal |
| | $ | 23,500.00 | Trans Line | Everything Ice | Estimated | per proposal |
| | $ | 3,200.00 | Warm System Blowout | AMS Mechanical | Estimated | per NHL |
| | $ | 3,200.00 | Cold System Blowout | AMS Mechanical | Estimated | per NHL |
| | $ | 5,484.00 | Pressure Testing | AMS Mechanical | Estimated | per NHL |
| | $ | 5,500.00 | Borings | Everything Ice | Estimated | per NHL |
| | $ | 58,700.00 | Ground Heat | Everything Ice | Estimated | per NHL |
| | $ | 2,000.00 | Ice Melt Heater | CCS-CES | Estimated | per NHL |
| | $ | 500.00 | Heater Fuel | Feece Oil | Estimated | per NHL |
| | $ | 20,700.00 | Sub Floor Drain Install | Groh Works | Estimated | per NHL |
| | $ | 1,052.17 | Tarps for Sand Cover | Tarp Supply Inc | Estimated | per NHL |
| | $ | 1,689.00 | P Traps | CRS Industries | Estimated | per NHL |
| | $ | 35,178.00 | Remove Dashers | Everything Ice | Estimated | per EI proposal |
| | $ | 9,250.00 | Dumpsters | Republic Services | Estimated | per NHL |
| | $ | 32,500.00 | Re-install Dashers | Everything Ice | Estimated | per EI proposal |
| | $ | 3,350.00 | Concrete Cutting | JL Concrete | Estimated | per NHL |
| | $ | 50,000.00 | Recharge Systsm | AMS Mechanical | Estimated | per NHL |
| | $ | 3,500.00 | Brine | Producers Chem | Estimated | per NHL |
| | $ | 10,000.00 | New Sand | JKS Ventures | Estimated | per NHL |
| | $ | 9,500.00 | Sand Dumping | JKS Ventures | Estimated | per proposal |
| | $ | 7,000.00 | Ice Painting | Everything Ice | Estimated | per NHL |
| | $ | 282,955.51 | Loss of Revenue | | Estimated | per NHL |
| | $ | 893,758.68 | | | | |

| | $ | 383,698.45 | 3/15/17-8/18/17 | Claim - 36 |
|---|---|---|---|---|
| | $ | 666,653.96 | 3/15-16-8/18/16 | |
| | $ | (282,955.51) | Loss of Revenue | |

| NH Actual | $ | 829,133.50 | |
|---|---|---|---|
| OLY Reserve | $ | 893,758.68 | includes projected loss of revenue (see reserve analysis) |
| Business Interruption | $ | 282,955.51 | |
| **TOTAL CLAIM** | $ 2,005,847.69 | | |

# CLAIM

# #

# 1

# FINAL WAIVER OF LIEN



STATE OF ILLINOIS

COUNTY OF DUPAGE

Gty #

Escrow # 17007849WHC

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by ADDISON ICE LLC
to furnish NHL ICE FLOOR REPLACEMENT SERVICES AND MATERIALS
for the premises known as the Addison Ice Arena 475 S Grace Street Addison, IL 60101
of which ADDISON ICE LLC is the owner.

THE undersigned, for and in consideration of One Hundred Forty-Four Thousand Seven Hundred Ninety-Three Dollars &
50/100
($144,793.52) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es)
hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics'
liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or
machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor,
services, material, fixtures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by the
undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE 7/6/17   COMPANY NAME Cimco Refrigeration Inc

SIGNATURE AND TITLE   ADDRESS 2501 Commercial Park Dr., Mobile, AL 36606
V.P. US Operations

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT

## CONTRACTOR'S AFFIDAVIT

STATE OF ILLINOIS

COUNTY OF

TO WHOM IT MAY CONCERN:

THE UNDERSIGNED, (NAME) Jose Mergulhao
AND SAYS THAT HE OR SHE IS (POSITION) V.P. of US Operations   BEING DULY SWORN, DEPOSES
(COMPANY NAME) CIMCO REFRIGERATION. WHO IS THE   OF
CONTRACTOR FURNISHING NHL ICE FLOOR REPLACEMENT SERVICES AND MATERIALS WORK ON THE BUILDING
LOCATED AT ADDISON ICE ARENA 475 S Grace Street Addison, IL 60101
OWNED BY ADDISON ICE LLC

That the total amount of the contract including extras* is $218,661.02 on which he or she has received payment of
$73,867.50 prior to this payment.  That all waivers are true, correct and genuine and delivered unconditionally and that
there is no claim either legal or equitable to defeat the validity of said waivers.  That the following are the names and addresses of all
parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific
portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the
items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES AND ADDRESSES | WHAT FOR | CONTRACT PRICE INCLDG EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE. | | | | | |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material,
labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

DATE July 6 / 2017   SIGNATURE:

SUBSCRIBED AND SWORN TO BEFORE ME THIS   6th   DAY OF June   2017

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE   Tanya Johnston
ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.   NOTARY PUBLIC

F.3870 R5/96   Provided by Chicago Title Insurance Company

TANYA JOHNSTON
My Commission Expires
March 9, 2019

NOTARY PUBLIC

**Completion Spreadhseet**

| | | Status Who | Status Ordered |
|---|---|---|---|
| 20 | 1" socket weld 45's | Addison | Yes |
| 20 | 1" socket weld 90's | Addison | Yes |
| 20 | 6" x 1" socket service saddles | Addison | Yes |
| 332 | 4' x 8' 1.5" extruded insulation foam | CIMCO | |
| 2 | 6" Steel Weld Flanges to connect existing pipe weld | Addison | |
| 2 | 6" Flange Bolt abd Gasket Kits | Addison | |
| 2 | 3" Steel Weld flanges to connect existing pipe (slip on weld) | Addison | |
| 2 | 3" flange bolt kits and gasket | Addison | |
| 2 | 6" lug type butterfly valves with bolts | n/a | |
| 2 | 3" lug type butterfly valves with bolts | n/a | |
| 19 | Saddles and fiting assemblies for the large header | Addison | Yes |
| 10 | feet of 3" HDPE | Addison | |
| 4 | 3" Fusion Elbows | Addison | |
| 10 | 3" Electro Couplers | Addison | |
| 4 | 6" Electro Couplers | Addison | |
| 60 | feetr of 1 5/8 strut | Addison | |
| 30 | 6" fusion pipe strut clamps (Bline strut) | Addison | |
| 4 | Sensors | Addison | |
| 1 | Misc Surround Materual( anchors, cables) | Addison | |
| | TOTAL - Materials | | |
| | Shipping | | |
| | Shipping | | |
| | GRAND TOTAL | | |
| 1 | Project Drawings | CIMCO | |

| | |
|---|---|
| Total Materials Supplied by Addison or Not Supplied | $3,313.87 |
| Settlement Value | $215,000.00 |
| Less Materials Not Supplied | $3,313.87 |
| Settlement Value | $211,686.13 |
| Materials Original | $90,500.00 |
| Materials Net | $87,186.13 |
| Taxes | 8% $6,974.89 |
| Total Settlement | $218,661.02 |



| Status Delivered | Quoted Cost Per | | Quoted Total Cost | | Addison Markup 20% | | Grand Total | | CIMCO to Deliver |
|---|---|---|---|---|---|---|---|---|---|
| Yes | $ | 7.91 | $ | 158.20 | $ | 31.64 | $ | 189.84 | |
| Yes | $ | 8.23 | $ | 164.60 | $ | 32.92 | $ | 197.52 | |
| Yes | $ | 9.01 | $ | 180.20 | $ | 36.04 | $ | 216.24 | |
| | | | | | | | | | 332 Sheets |
| | $ | 28.00 | $ | 56.00 | $ | 11.20 | $ | 67.20 | |
| | $ | 7.76 | $ | 15.52 | $ | 3.10 | $ | 18.62 | |
| | $ | 19.00 | $ | 38.00 | $ | 7.60 | $ | 45.60 | |
| | $ | 5.39 | $ | 10.78 | $ | 2.16 | $ | 12.94 | |
| | | n/a | | n/a | | n/a | | n/a | |
| | | n/a | | n/a | | n/a | | n/a | |
| Yes | $ | 28.81 | $ | 547.39 | $ | 109.48 | $ | 656.87 | |
| | $ | 1.90 | $ | 19.00 | $ | 3.80 | $ | 22.80 | |
| | $ | 25.42 | $ | 101.68 | $ | 20.34 | $ | 122.02 | |
| | $ | 22.30 | $ | 223.00 | $ | 44.60 | $ | 267.60 | |
| | $ | 79.41 | $ | 317.64 | $ | 63.53 | $ | 381.17 | |
| | $ | 2.00 | $ | 120.00 | $ | 24.00 | $ | 144.00 | |
| | $ | 5.80 | $ | 174.00 | $ | 34.80 | $ | 208.80 | |
| | $ | 55.00 | $ | 220.00 | $ | 44.00 | $ | 264.00 | |
| | $ | 250.00 | $ | 250.00 | $ | 50.00 | $ | 300.00 | |
| | | | $ | - | | | | | |
| | | | $ | 2,596.01 | $ | 519.20 | $ | 3,115.21 | |
| | | | | | | | $ | 109.34 | |
| | | | | | | | $ | 89.32 | |
| | | | | | | | $ | 3,313.87 | |
| | | | | | | | | | 1 Set |

## TERMINATION OF CONTRACT AND
## MUTUAL RELEASE BY AND BETWEEN
## CIMCO REFRIGERATION, INC.
## AND ADDISON ICE LLC

CIMCO REFRIGERATION, INC. and ADDISON ICE LLC had entered into an Agreement dated April 4th, 2017 (attached hereto as Exhibit "A") for CIMCO REFRIGERATION, INC to provide certain ice floor rebuilding services and materials to ADDISON ICE LLC. The parties have agreed to terminate said Agreement and in exchange for services and materials rendered to the date of this Agreement CIMCO REFRIGERATION, INC shall be paid a total sum of Two Hundred and Eighteen Thousand Six Hundred and Sixty-One Dollars and 02/100 ($218,661.02) of which Seventy-Three Thousand Eight Hundred and Sixty-Seven Dollars and 50/100 ($73,867.50) has been already paid and the balance of One Hundred and Forty-Four Thousand Seven Hundred and Ninety-Three Dollars and 52/100 ($144,793.52) shall be paid contemporaneously with the delivery of this Agreement and the simultaneous delivery of the Final Waiver of Lien.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the CIMCO REFRIGERATION, INC. hereby remises, releases, and forever discharges ADDISON ICE LLC, and the above entities individuals assigns, successors, employees, managers, officers, owners, accountants, relatives, directors, affiliates subsequent contractors and members of and from all, and all manner of, actions, causes of action, liens, suits, proceedings, debts, dues, contracts, judgments, damages, claims, and demands whatsoever in law or equity, which the CIMCO REFRIGERATION, INC. ever had, now has, or which the CIMCO REFRIGERATION, INC.'s' heirs, executors, administrators or personal representatives hereafter can, shall, or may have for or by reason of any matter, cause, or thing whatsoever, relating to the Agreement.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, ADDISON ICE LLC hereby remises, releases, and forever discharges CIMCO REFRIGERATION, INC. and the above entities individuals assigns, successors, employees, managers, officers, owners, accountants, relatives, directors, affiliates and members of and from all, and all manner of, actions, causes of action, liens, suits, proceedings, debts, dues, contracts, judgments, damages, claims, and demands whatsoever in law or equity, which ADDISON ICE LLC ever had, now has, or which ADDISON ICE LLC's heirs, executors, administrators or personal representatives hereafter can, shall, or may have for or by reason of any matter, cause, or thing whatsoever relating to the Agreement.

IN WITNESS WHEREOF, the parties have executed this Release this 6th day of July 2017.

**CIMCO REFRIGERATION, INC.**

By: _____

Name: _Jose Mergulhao_

Its: _V.P. of US Operations_

**ADDISON ICE LLC**

By: _____

Leon A. Lekai

President

# CLAIM

# #

# 2

This document contains the following 1 invoices:

Invoice #s : 0090565133

Attn A/P

Please advise on the status of pymt of the attached invoice

thanks
paul

**TOROMONT** | **CIMCO**

# Invoice  90565133

ADDISON ICE LLC
475 S GRACE STREET
ADDISON IL 60101
USA

| | |
|---|---|
| Invoice Date | 15.03.2017 |
| **Purchase Order** | **LEON LEKAI** |
| Document Type | ZL2 |
| Service Order No. | 4292206 |
| Customer No. | 123905 |
| Currency | USD |
| Invoice Amount | 8,305.89 |
| Inquiry Phone No. | (519) 434-6444 |

Past due amounts are subject to interest charges of 2.0% per month (24% per annum)

**Service Location:**
ADDISON ICE LLC
475 S GRACE STREET
ADDISON IL 60101
USA

**Payment Terms:** Due net 10 days
**Delivery Terms:** FOB
**REMIT TO:**      Cimco Refrigeration Inc.
                  2502 Commercial Park Dr, Mobile AL 36606, USA

**SUPPLY AND REPLACE TWO BRINE FILTERS**
Service Reports ## 289867, 289868, 289869

| Item | Mat'l | Description | Quantity | | Net Amount |
|---|---|---|---|---|---|
| 10 | LG001 | Travel Charges | 10.000 | H | 1,250.00 |
| 20 | LG002 | Overtime Labour (TH), Inspect & Install | 4.000 | H | 750.00 |
| 30 | LG001 | Labour Charges, Inspect & Install | 11.000 | H | 1,375.00 |
| 40 | 1013789 | 1 1/2" SCWD SS BRINE FILTER | 2 | PC | 3,538.00 |
| 50 | 1013791 | 25 MICRON FILTER BAG 4 1/4"D x 13 1/2"L | 50 | PC | 252.62 |
| 60 | ET002 | Daily Truck Charge | 3.000 | H | 450.00 |
| 70 | EG003 | Hotel and Meals | 1 | EA | 275.00 |
| 80 | EG003 | Freight | 1 | EA | 151.68 |

| | |
|---|---|
| Item Total | |
| Net amount before Taxes | 8,042.30 |
| **Total Tax** | 8,042.30 |
| | 263.59 |
| **Invoice Amount** | |
| | 8,305.89 |

Continued on the next page



**Invoice** **90565133**

**Tax Status**

1 - Tax Extra - Standard

# CLAIM

# #

# 3



Addison Ice Arena
475 S. Grace St.
Addison, IL 60101
USA

**Service Location:**
Addison Ice Arena
475 S. Grace St.
Addison, IL 60101
USA

| Invoice | 90575908A |
|---|---|
| Invoice Date | 06/14/17 |
| Purchase Order | Jay Kermer |
| Service Order No. | 5132956 |
| Customer No. | 111038 |
| Currency | USD |
| Invoice Amount | **$652.05** |
| Inquiry Phone No. | 251-471-2426 |

**Payment Terms:** Due net 10 days
**Delivery Terms:** FOB
**Remit to:** CIMCO Refrigeration Inc.
2502 Commercial Park Drive, Mobile AL 36606, USA

Description:

| Item | Mat'l | Description | Quantity | Net Amount |
|---|---|---|---|---|
| 10 | | 25 MICRON FILTER BAG 4 1/4"D x 13 1/2"L | 100 | 500.00 |
| 20 | | FedEx - 6896 9832 1047 | 1 | 112.05 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| **Item Total** | $612.05 |
| Net amount before Taxes | $612.05 |
| Total Tax | $40.00 |
| **Total Invoice Amount** | **$652.05** |

Tax Status                    1- Tax Extra -Standard

# CLAIM

# #

# 4



115 School Street
Salix , PA 15952
Phone 814-244-1407

**Invoice Rink Floor Labor**
DATE: August 8, 2017
Progress Payment

**Bill To:**
Addison Ice LLC
475 S Grace Street
Addison, IL 60101
Attn: Leon Lekai

| | DESCRIPTION | | Amount Due |
|---|---|---|---|
| | Rink Floor Labor @ Addison Ice Rink | | |
| 1 | Rink Floor Labor Original Contract Amount (Agreed on June 19, 2017) | $72,000.00 | |
| | **Change Order #1**-Scope of work was to remove and replace concrete outside rink for pipe attachment to the rink system. Leon and I communicated about this and he approved. | $3,800.00 | |
| | **Change Order #2**- Labor and Equipment for cutting and installing new subsoil heat transmission lines from the edge of the rink to the mechanical room floor | $5,568.00 | |
| | **Change Order #3**- 9 Boxes of Ultra Pur Ice Paint ($972); High Def Line Kit ($306); 2 High Def Goal Crease ($150); Shipping of Paint ($414); Insulation and Jacketing for Glycol Piping ($873.91); Shipping of Insulation ($240) | $3,915.91 | |
| | | $85,283.91 | |
| 2 | Invoice #1- Rink Floor Labor 50% Due Now 06/19/2017 | $36,000.00 | |
| | Payment 07/11/2017 | $36,000.00 | |
| 3 | Invoice #2- Rink Floor Labor Progress Payment | $35,000.00 | $35,000.00 |
| | | | |
| | | $85,283.91 | $35,000.00 |

Balance Due Now

If you have any questions concerning this invoice, contact John Burley 888-543-0921 x108
**THANK YOU FOR YOUR BUSINESS!**

EI.6.INV.01182016.1

# CLAIM

# #

# 5

# FINAL AMOUNT TBD

# ESTIMATE INCLUDED

# WORK STILL IN PROGRESS

# CLAIM

# #

# 6

# FINAL AMOUNT TBD

# ESTIMATE INCLUDED

# WORK STILL IN PROGRESS

# CLAIM

# #

# 7

# FINAL AMOUNT TBD

# ESTIMATE INCLUDED

# WORK STILL IN PROGRESS

# CLAIM

# #

# 8

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

**FINAL WAIVER OF LIEN**

STATE OF ~~ILLINOIS~~ MN                                    Qty #

COUNTY OF ~~DUPAGE~~ Scott                              Escrow #

TO WHOM IT MAY CONCERN:
WHEREAS the undersigned has been employed by ADDISON ICE LLC
to furnish ___used dasherboards per RER Contract___
for the premises known as the Addison Ice Arena 475 S Grace Street Addison, IL 60101
of which ADDISON ICE LLC is the owner.

THE undersigned, for and in consideration of ___Sixty-two-thousand forty-one dollars . 64/100___
(\$ 62,041.64 ) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es)
hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics'
liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or
machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor,
services, material, fixtures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by the
undersigned for the above-described premises, INCLUDING EXTRAS.*                              LP
DATE 6-27-17 COMPANY NAME ___Becker Arena Products, Inc___    Upon receipt
                ADDRESS ___6611 W Hwy 13, Savage, MN 55378___
SIGNATURE AND TITLE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS BOTH ORAL AND WRITTEN, TO THE CONTRACT

**CONTRACTOR'S AFFIDAVIT**

STATE OF ~~ILLINOIS~~ MN

COUNTY OF ~~DUPAGE~~ Scott

TO WHOM IT MAY CONCERN:
THE UNDERSIGNED, (NAME) ___Laurie Preston___                 BEING DULY SWORN, DEPOSES
AND SAYS THAT HE OR SHE IS (POSITION) ___Vice President___                                OF
(COMPANY NAME) ___Becker Arena Products, Inc___                           WHO IS THE
CONTRACTOR FURNISHING ___used dasherboards per RER Contract___ WORK ON THE BUILDING
LOCATED AT ADDISON ICE ARENA 475 S Grace Street Addison, IL 60101
OWNED BY ADDISON ICE LLC
That the total amount of the contract including extras* is \$ ___113,811.96___ on which he or she has received payment of
\$ ___51,770.32___ prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that
there is no claim either legal or equitable to defeat the validity of said waivers. That the following are the names and addresses of all
parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific
portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the
items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES AND ADDRESSES | WHAT FOR | CONTRACT PRICE INCLUDING EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
| Becker Arena Products | Used dasher-boards | 113,811.96 | 51,770.32 | 62,041.64 | 0 |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE | | | | | |

That there are no other contracts for said work outstanding, and that there is nothing due on to become due to any person for material,
labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

DATE ___6-27-17___                 SIGNATURE: _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___27th___ DAY OF ___June___ , 2017

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE                              _____
ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT                              NOTARY PUBLIC

NANCY J GUSTINA
Notary Public
Minnesota
My Commission Expires January 31, 2021

F.3870 R5/96                 Provided by Chicago Title Insurance Company



## Sale Agreement for Equipment
## Rink Equipment Resource, Agent

This is a contract of sale between the party identified below ("Buyer") and a party ("Principal") that will be disclosed after execution of this Agreement. Signing on behalf of Principal is Becker Arena Products, Inc., d/b/a Rink Equipment Resource ("RER"), Principal's fully authorized agent.

Recitals (Background):

    A. RER has located certain equipment or items for sale and referenced below, all of which is currently owned by Principal (the "Equipment"), and RER has presented information on the Equipment on RER's website or otherwise made its availability known to Buyer;

    B. Principal has authorized RER to enter into this Agreement on Principal's behalf to sell the Equipment to Buyer; and

    C. Buyer had decided to purchase the Equipment from Principal by entering into this Agreement with Principal, to be signed by RER.

---

Buyer: Addison Ice Arena

Address: 475 S. Grace St., Addison IL 60101

Phone: 615-395-2000 (Leon cell)    Fax:    E-Mail: leonlekai@gmail.com

**Address for delivery:** 475 S. Grace St., Addison IL 60101

Item(s) to be purchased ("Equipment"), and price(s), including reference to display on Rink Equipment Resource's website: **Item # 1043 dasher board system (See Exhibit A).**

Additional charges (if any): **Freight (2 semi truckloads): $2,275.**

Total Price (prices and all additional charges): **$97,450 PLUS TAX based on all options chosen in Exhibit A and freight above. Payment terms are 50% down to secure product, 50% due 10 days prior to shipment.**

Sales taxes or other transaction-based taxes, freight and insurance charges will be added, if appropriate. Buyer will pay such taxes and charges, or reimburse RER or Principal for paying them, whenever charged, even after delivery of Equipment.

Shipment date(s) Requested by Buyer: **End of May 2017**

Shipment date(s) confirmed by RER (See Section 6):

**The terms and conditions of this Agreement include those shown in Paragraphs 1-14 of the Terms and Conditions attached hereto or printed on the back hereof, all of which additional Terms and Conditions Buyer acknowledges having read and accepted.**

| **Buyer** | **Principal**, by Agent, Rink Equipment Resource |
|---|---|
| Print Name: Leon A. Lekai | Print Name: |
| Sign: | Sign: |
| Title: PRESIDENT | Title: |
| Date: 5-1-17 | Date: |

---

## ADDITIONAL TERMS AND CONDITIONS

1. **AGREEMENT.** After a credit check and such other due diligence as RER in its sole discretion may consider appropriate, RER, if it signs this Agreement, will sign this Agreement on behalf of the Principal. The information above and these terms and conditions are the entire agreement between Principal and the party identified above as "Buyer," and they supersede all other agreements and understandings, whether written or oral, between Principal and Buyer with respect to the purchase of the items listed above. Principal's acceptance of Buyer's offer to purchase the Equipment is conditional upon Buyer's agreement to these terms and conditions hereof, and none of Buyer's additional or different terms and conditions will apply or will have any effect unless Principal explicitly agrees to them in writing. After Buyer has signed it, this Agreement becomes effective when RER signs it on behalf of Principal. However, Principal has no obligation to sign or otherwise accept the Agreement, even after signature by Buyer.

2. **RER NOT A PARTY.** Buyer will look only to Principal for fulfillment of obligations of Principal under this Agreement. Buyer recognizes that RER is not a party to this Agreement, and Buyer hereby releases RER from any and all liability in connection with the performance or nonperformance of this Agreement or any part of it by Principal.

3. **PRICE.** The price of the Equipment, or prices for various items of Equipment, are stated above. Unless otherwise explicitly agreed in writing by the parties, the prices stated exclude all taxes (whether national, state, local, or other) and all expenses of transportation and transportation insurance; all applicable taxes and all such expenses will be paid by Buyer.

4. **PAYMENT TERMS.** Unless otherwise explicitly accepted by the parties in writing, payment terms are: the entire purchase price payable before the projected date of shipment as stated above or provided later to Buyer by written notice. If the full amount required, including charges announced by RER for shipping and insurance, is not received by Principal by a date scheduled for shipment (or by a date rescheduled according to this Section 4), Principal may choose another date, notify Buyer, and delay shipment until the chosen date. If Principal has offered Buyer more favorable payment terms than payment in advance, and if Principal then has any doubt regarding Buyer's ability to pay the then remaining amount of the full amount with shipping charges and insurance, Principal may decline to deliver until Buyer adequately demonstrated its ability and willingness to pay the specified price(s) and other charges for the Equipment. In addition, if Principal agrees to deliver, and does deliver, the Equipment or any part of it before receiving payment in full, Principal retains a purchase money security interest in the Equipment until all payments due under this Agreement have been made, and Principal may file a UCC-1 form or similar document reserving or perfecting Principal's interest in the Equipment. If documentation of this sort requires Buyer's signature, Buyer will make the signed documentation available to Principal in a timely fashion or, if Buyer does not provide the documentation as required, Buyer hereby gives Principal the authority to sign on Buyer's behalf and file the documentation. Principal's rights under this Section and this Agreement will be in addition to all other rights and remedies available to Principal upon Buyer's default.

5. **FORCE MAJEURE.** Principal shall not be liable for any delays in the delivery of orders, due in whole or in part, directly or indirectly, to fire, act of God, strike, shortage of raw materials, supplies or components, retooling, upgrading of technology, delays by carriers, embargo, government order or directive, or any other circumstance beyond Principal's reasonable control.

6. **DELIVERY TERMS.** Principal will arrange for shipment and will arrange shipment with commercially reasonable promptness after payment terms are met. All risks of loss of or damage to the Equipment shift to Buyer, and delivery is complete, upon loading onto the common carrier at Principal's point of shipment. Principal will attempt to meet the Buyer's delivery request but shall be obligated only to the delivery schedule shown above as accepted by RER for Principal. Principal shall not be in default of performance due to a delay of reasonable duration resulting from any cause.

DOCS-#2026160-v5          Rink Equipment Resource, 6611 West Highway 13 Savage, MN 55378

7. **CANCELLATION OR RETURN FEES.** If Buyer refuses to accept shipment of the Equipment, revokes its acceptance of the Equipment, or otherwise cancels its order for the Equipment, Buyer shall pay to Principal a fee equal to $1,000 or 20% of the purchase price of the Equipment, whichever is greater. In no event shall Principal have any obligation to refund any portion of the charges incurred by Buyer for freight, duty, brokerage, insurance, or taxes relating to the transportation of the Equipment.

8. **INSPECTION AND ACCEPTANCE.** Buyer must inspect delivered Equipment and report claims for damages or shortages in writing within three (3) days of delivery or the Equipment shall be deemed irrevocably accepted and such claims shall be deemed waived. Claims against the transportation company or insurer are the responsibility of Buyer. In the event of any alleged damage or shortage, Buyer must permit RER to evaluate and review the Equipment. If a return of the Equipment is required, Buyer shall be responsible for packaging and insuring the Equipment so as to eliminate any damage to the Equipment during transit. Any freight, duty, brokerage, insurance, or taxes relating to the transportation of the Equipment to be paid by Buyer.

9. **NO WARRANTY.** Buyer has examined photographs of the Equipment and recognizes that the photographs will not show all irregularities and defects. Buyer has had the opportunity to inspect the Equipment and has either satisfied itself of the condition of the Equipment or declined to inspect the Equipment. The Equipment is being sold "as is," without warranty of any kind. In particular, but without limiting the foregoing sentence, the parties agree that the Equipment is subject to NO warranties of merchantability or of fitness for a particular purpose.

10. **LIMITATIONS ON WARRANTY. ATTENTION: THIS PROVISION LIMITS THE LIABILITY OF PRINCIPAL WITH RESPECT TO THE PRODUCT(S) COVERED BY THIS AGREEMENT.** Under no circumstances shall Principal be liable for any indirect, consequential, collateral, special or incidental damages (including, without limitation, loss of profits or goodwill) whether such claim is based on contract, negligence, strict tort, warranty or any other basis. In no case will Principal's liability be greater than Buyer's purchase price of the particular Equipment involved in any claim.

11. **LIMITATION OF ACTIONS.** Any actions or claims by Buyer under this Agreement must be brought within six (6) months after shipment of the Equipment covered by this Agreement.

12. **VALIDITY; AMENDMENT.** If any provision of this Agreement is found to be invalid or unenforceable in any respect, the validity and enforceability of the remaining provisions shall not be affected. After this Agreement has been accepted in writing by RER, it becomes binding on Principal and Buyer as accepted, and thereafter no amendment or cancellation of this Agreement is valid unless in writing and signed by both parties.

13. **GOVERNING LAW; DISPUTES.** This Agreement shall be governed by and construed in accordance with the internal laws (and not the laws of conflicts) of the State of Minnesota. For settlement of any and all claims that might arise by or against RER in connection with this Agreement, or disputes between RER and Buyer in connection with this Agreement, Buyer consents to the exclusive jurisdiction of the State Courts of the State of Minnesota located in Hennepin County, Minnesota. For settlement of any and all claims that might arise by or between Principal and Buyer in connection with this Agreement, Buyer and Principal consent to the exclusive jurisdiction of the State Courts of the State of Principal's domicile.

14. **MISCELLANEOUS.** Any notice required or permitted under this Agreement is valid if it is in writing, addressed to the Buyer's address shown above or Principal's address shown below, and sent by mail or nationally recognized commercial courier. Notices are effective upon receipt. All clerical errors are subject to correction. The failure of Principal to enforce at any time any of the provisions of this Agreement will not be construed to be a waiver of such provisions or of the right of Principal to enforce such provisions in the future in the same or different circumstances. Buyer may not assign any rights under this Agreement without the prior written consent of Principal. Buyer recognizes that Principal is not the manufacturer of the Equipment or parts.

## EXHIBIT "A"



**Item #:** 1043
**Make:** BAP
**Model:** 6.0
**Location:** Savage, MN
**Date New:** 2001
**Date Available:** Immediately
**Cosmetic Condition:** Good
**Operating Conditions:** Excellent
**Reason for Sale:** Rink Closed
**Operating Manual:** Drawings Included
**Warranty:** No
**Service Manual:** Drawings Included
**In Use Presently:** No

Only used for 10 years and then the rink closed!

- Official NHL size: 200' x 85' x 28'
- Galvanized Steel Frame
- (1) 10' Equipment / "Zamboni" Gate in Radius
- (2) 3' Access Gates
- (6) 2-1/2' Player Gates
- (1) 6' Access Gate
- 5/8" x 6' High Tempered Glass on Both Ends
- ½" x 6' High SEAMLESS Tempered Glass on Both Sides
- 12' High Netting for Entire Perimeter
- Full Players Boxes & Elevated Floors

New this set sells for over $125,000! We had both sets of dashers from this twin rink and already sold the one. We have the detailed drawings of this rink showing all gate placement etc. Packaged & ready for shipment. Rare opportunity for a used set of hockey dasher boards this new and in excellent condition!

(ZAMBONI is a registered trademark of Frank J. Zamboni & Co., Inc)

**OPTION #1: NEW, ADDITIONAL 10' EQUIPMENT GATE –**

**$5,500.00**
**Accept _____**

**OPTION #2:  INSTALLATION –** Becker Arena Products, Inc. will furnish the drilled in epoxy anchors for the ring of boards and boxes as well as a crew for the complete installation of the dasher system. Netting & backer install would be an additional expense.  Price includes installation labor **(Non-union/non-prevailing wage rate labor)** and a forklift for unloading and material handling.  To provide the best dasher board alignment, the refrigerated floor needs to be on, and room temperature should be between 40-60 degrees.
NOTE: Our production and install schedule fills up quickly for the year, therefore customers are encouraged to confirm dates as soon as possible for the best chance of securing your preferred dates.

**$25,425.00**
**Accept _____**

If Becker Arena Products, Inc. has not received your acceptance within 15 days from 4/7/17, this proposal shall automatically expire.  All items are first come first served and cannot be held until both a signed agreement and payment have been received.



CHANGE ORDER: 10002232          **Date:** June 7, 2017

**Job Name:** Addison Ice Arena          **Location:** Addison, Illinois

**Contact:** Mr. Leon Lekai          **Job Number:** 1005900-1-1

**We hereby agree to make the change(s) specified below:**
Change Order: Becker Arena Products will furnish the following items and features to the rink.

- Relocate gates G3 and G10 to opposite side of the rink. Panels are an 8'-0" for 8'-0" swap. Four (4) new pieces of 1/2" x 6'-0" tempered glass are required

- Modify four (4) existing panels to reconfigure the rink size to an overall dimension of 194' 9 ½" x 85'-0" from 200'-0" x 85'-0". Panels require modification and four (4) new pieces of 1/2" x 6'-0" tempered glass are required

- Modify gates G12 and G14 as well as panel #78 and panel #84 to an overall length of approximately 55" and eliminate back wall of players/penalty/timekeeper boxes. Gates and panels require modification and four (4) new pieces of 1/2" x 6'-0" tempered glass shielding

- Modify/rebuild (Cut down to size) all wood flooring in the players, penalty and timekeeper boxes to fit new inside box depth of approximately 55"

- Exchange 29'-0" ends of rink for each other to relocate the 6'-0" double access gate to the other side of the rink. Requires modifying rink layout and may require four (4) additional pieces of 5/8" x 6'-0" tempered glass shielding.

- Relocate existing radius equipment gate to opposite corner of rink. Will require relocating one corner for another and reconfiguring corner layout without panel modifications (cap rail will need to be modified). Four (4) new pieces of RinkShield™ at each side of gate (to be field cut).

- Site visit to determine final rink requirements

| | |
|---|---|
| **TOTAL ADD THIS CHANGE ORDER** | **$ 9,667.14** |
| SALES TAX | $ 604.20 |
| **TOTAL WITH TAX** | **$10,271.34** |
| | Accept_____ |

Confidential: This document contains proprietary and confidential information that is owned and is of significant value to Becker Arena Products, Inc. No unauthorized use, disclosure or reproduction of any of this information is permitted without the prior written consent of Becker Arena Products, Inc.



Note: This value does not include any other adds or deducts that have be presented through other change orders. All changes orders will be recorded before final invoicing.

Note: this change order becomes part of and in conformance with the existing contract
**WE AGREE hereby to make the change(s) specified above.**

Date_____

_____
BECKER ARENA PRODUCTS AUTHORIZED SIGNATURE

| | |
|---|---|
| **ACCEPTED-** The above prices and specifications of this Change Order are satisfactory and are hereby accepted. All work to be performed under same terms and conditions as specified in original contract unless otherwise stipulated. | **DATE:** _____<br><br>_____<br>AUTHORIZED SIGNATURE |

**PLEASE RETURN SIGNED WITHIN 24 HOURS TO ACCOMMODATE YOUR REQUESTED CHANGES.**

Confidential: This document contains proprietary and confidential information that is owned and is of significant value to Becker Arena Products, Inc. No unauthorized use, disclosure or reproduction of any of this information is permitted without the prior written consent of Becker Arena Products, Inc.



Leon Lekai
6-28-17

# CLAIM

# #

# 9



**AMS MECHANICAL SYSTEMS, INC.**
ONE VISION PROVEN SOLUTIONS™

140 E. Tower Drive, Burr Ridge, IL 60527 | TEL: 800.794.5033 | FAX: 630.887.0770 | amsmechanicalsystems.com

April 6, 2017

Blades Ice Arena
475 Grace St.
Addison IL. 60101

Re: Ice Rink Revision

Attn: Mr. Leon Lekai

Thank you for the opportunity to quote ion the work below:

**Floor Warm System – HX RR, System  Flushing & Under Floor Pump Replace**
- Removal of all calcium chloride in the sub-soil heating, and snow melt systems for both rinks will be done by Cimco.
- Cimco will pump into Totes outside of the building for disposal. Totes will be provided by AMS.
- Dispose of the contaminated brine by licensed waste hauler.
- Pump in Wet Solutions Ferrocleanse system cleaner with straight water and circulate for 3 days to clean the sediment and residual ammonia in the brine heating system.
- Flush all heating system lines to completely clean all ammonia contaminated brine and dirt from the system.
- Add temporary support to be able to cut steelwork that interferes with the heat exchanger removal.
- Cut support as needed and remove heat exchanger.
- Install the new heat exchanger.
- Connect brine and refrigeration piping.
- Install new control valves.
- Replace the Phillips float and relief valves for the ammonia side of heat exchanger.
- Install new isolation valves for the float and ammonia drain valves.
- Install brine drain valves and fittings.
- Install 2 thermometers and wells on the brine piping.
- Replace 2 relief valves on the heat exchanger. Valves provided by owner.
- Install one new underfloor heating pump rated at 300 GPM and 46 Ft TDH. Pump will be a TACO Model FI2508 with **SS Impeller** & 7.5 HP motor. The existing pump currently installed in the floor warming system is not capable of the duty required. The pump is not capable of providing the flow rate.
- Replace the existing starter for the pump with a new.
- Power wiring for the new pump.
- Revise the piping so the existing pump will tie into the snow pit piping and the new pump will be piped for the underfloor heating system.
- **Install triple duty valves on both pumps to balance systems after start up.**
- Replace 2 Honeywell T775 2000 controllers for the rink control. Temp sensor will be turned over to the owner for installation in the rink.
- Replace 2 relief valves on the Chiller. Valves provided by owner.
- Replace 6 relief valves on the Compressors. Valves provided by owner.

**AMS MECHANICAL SYSTEMS, INC.**

**Replace the Snow pit coil:**

- Melt all snow and ice in pit by others.
- Pump out the remaining water below stand pipe.
- Forklift rental for work included.
- Remove steel beams and wood planks.
- Cut supports of snow coil as necessary & remove.
- Clean out debris from pit.
- Install new **Stainless Steel** snow pit coil
- Anchor as necessary.
- Fab and reconnect the supply and return pipe connections to the new coil.
- Re-install I beams and planks.
- Pressure test piping.
- Fill of brine system is covered under the main project by others.

**Mycom Compressor work**

- Rebuild Compressor #1-one Mycom N6WB. Work includes the following:
- AMS Mechanical Systems Inc. will provide one (1) service technician to perform twelve thousand (12,000) hour inspection on one (1) Mycom compressor model N6WB.
- **Included**, labor to replace parts listed, necessary gaskets, suction and discharge valve plates with springs, shaft seal, piston pins and bushings, hone cylinder liners, replace piston rings, connecting rod bearing half's, clean oil strainer, clean suction strainer, clean crankcase, change customer supplied oil, inspect crank shaft, main bearing, cylinder sleeve, thrust bearing.
- If any other labor or parts that require replacement, a separate proposal with pricing will be provided.
- Start up and check controls.
- Perform oil changes on compressors 2 & 3.
- Supply (1) 55 gallon drum of refrigeration oil.

*AMS will start the refrigeration system for cool-down and ice formation. 24 hrs of service time is included for this work.*

*The cost for this work is :...............................................................................$99,150.00*

**Clarifications**

- Heat Exchanger lead time is 3 to 4 weeks from authorization.
- All work is to take place on a straight time basis.
- **No permits are included.**
- **Filling of brine systems, & purging of air is by the contractor installing the NHL Rink tubing.**
- No code upgrades have been included in the base project. A site servey must be completed to assess work required for this scope. This work will need to be completed prior to an Audit from OSHA or another government entity.
- No ammonia has been included.
- No other mechanical rebuild work is included besides what is stated above, ie- pump replacement , compressor rebuilds etc.

# AMS MECHANICAL SYSTEMS, INC.

- Terms- 30% down. Billings will be monthly and reflect the completion of work to date.

If you should have any questions or require clarifications, please do not hesitate to contact me at your earliest convenience.

Sincerely,
**AMS MECHANICAL SYSTEMS, INC.**

*Mark J. Sanchez*

Mark J. Sanchez
Project Manager
☎ Cellular: **630-688-9044**
☎ Office: **630-320-7740**
✎ Email: **msanchez@ams-pmt.com**

Addison Ice – 4 06 17 – Mechanical Room Work- FINAL

**ACCEPTANCE:** Addison Ice Arena

_____            Leon A. Lekai
**Authorized Signature**                  _____
                                           **Printed name**

5/2/2017
_____            _____
**Date**                                  **Purchase Order #**

# CLAIM

# #

# 10

**AMS MECHANICAL SYSTEMS, INC.**

An Employee Owned Company

9341 Adam Don Parkway  Woodridge, IL 60517 | TEL 800.794.5033 | FAX 630.887.0776 | amsmechanicalsystems.com

## ROUGH

| JOB # | 57263 ADDISON ICE ARENA |
|---|---|

### EXTRA TO CONTRACT

**Customer**

| | |
|---|---|
| Name | ADDISON ICE ARENA |
| Address | 475 GRACE ST |
| City | ADDISON  State IL  ZIP 60101 |
| Phone | |

**Misc**

| | |
|---|---|
| Date | 8/23/2017 |
| Order No. | |
| Rep | MARK J. SANCHEZ |
| FOB | |

| Qty | Description | Unit Price | TOTAL |
|---|---|---|---|
| 1 | EXTRA MYCOM #1 COMPRESSOR RBLD QUOTED 7/18 | $ 8,452.00 | $ 8,452.00 |
| 1 | PUMP WIRING & PANEL WORK QUOTED 7/18 | $ 5,500.00 | $ 5,500.00 |
| 1 | REMAN MYCOM COMP- EQUIPMENT ONLY QUOTED 8/3 | $ 21,545.00 | $ 21,545.00 |
| 1 | | | |
| 1 | MUNTERS DRIVE MOTOR | $ 330.00 | $ 330.00 |
| 1 | | $ - | $ - |
| 1 | COST TO DISPOSE HEAVY AMMONIATED BRINE - NO MU | $ 1,692.00 | $ 1,692.00 |
| 1 | PRESS TESTING- QUOTED 7/18 $ 6,600 | $ 5,484.00 | $ 5,484.00 |
| 1 | NHL - REVISE 3" WARM FLOOR PIPING IN ENG ROOM | $ 3,023.07 | $ 3,023.07 |
| 1 | NHL - RAISE COLD BRINE MAINS TO MEET NEW HEADERS | $ 3,127.55 | $ 3,127.55 |
| 1 | NHL - REPLACE SENSOR WIRE TO NORTH VALVE BOX & TIE IN | $ 831.36 | $ 831.36 |
| 1 | OLY- PUMP OUT WARM BRINE - QUOTED 7/18 $3,200 | $ 2,934.53 | $ 2,934.53 |
| 1 | REPLACE BUTTERFLY VALVE NHL COLD PUMP | $ 848.95 | $ 848.95 |
| 1 | FILL  & VENT ALL SYSTEMS | $ 12,459.43 | $ 12,459.43 |
| 1 | 3025 GALLON BRINE - 11 TOTES @ 2.70/gal + TAX | $ 8,902.58 | $ 8,902.58 |
| 1 | OLYMPIC UNDRFLOOR TEMP HEATER SYSTEM PIPING | $ 5,858.48 | $ 5,858.48 |
| 1 | OLYMPIC UNDERFLOOR REPAIRS | $ 5,777.38 | $ 5,777.38 |
| 1 | OVERTIME SNOW PIT COIL WORK- EXTRA COST ONLY | $ 1,911.83 | $ 1,911.83 |
| 1 | OVERTIME COMP 1 REBUILD WORK- EXTRA COST ONLY | $ 770.00 | $ 770.00 |
| 1 | | $ - | $ - |
| 1 | COMP 1 OIL ISSUE- DRAINED OIL AND CHECKED- FILTER FOULED | $ 1,841.16 | $ 1,841.16 |
| 1 | RENTAL EQUIP. - AIR COMP/LULL/ METL DETCTR/ AIR HAMMER | $ 2,840.00 | $ 2,840.00 |
| 1 | BRINE ADDITIVE & DEFOAMER | $ 801.49 | $ 801.49 |
| | | SubTotal | $ 94,930.81 |
| | | Shipping | |
| | | **TOTAL** | $ 94,930.81 |

Select One...

# CLAIM

# #

# 11

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515



140 E. Tower Drive, Burr Ridge, IL 60527 | TEL: 800.794.5033 | FAX: 630.887.0770 | amsmechanicalsystems.com

August 3, 2017

ADDISON ICE RINK
ATTN: LEON LEKAI

## Mycom Compressor Replacement

- New Mycom N6WBHE-BB from Torreence Ca.

**The cost for the new compressor is:..................................................$27,175.00**
Less shipping and installation.

**The cost for a remanufactured compressor is:..............................$21,545.00**
Less shipping and installation.

**Estimated costs to remove the old unit, and install new:.............................$8,850.00**
Labor only.
If controls or any other parts are required they will be added to the project after owner approval.

## Mycom Compressor Rebuild.
**The extra cost to start the rebuild of compressor 1 on Saturday is:...........$ 1,008.00**
This accounts for 2 techs at 12 hrs each, additional cost of overtime vs straight time only.

## Clarifications

- All work for compressor replacement is to take place on a straight time basis.

If you should have any questions or require clarifications, please do not hesitate to contact me at your earliest convenience.

Sincerely,
**AMS MECHANICAL SYSTEMS, INC.**

*Mark J. Sanchez*

Mark J. Sanchez
Project Manager
☎ Cellular: 630-688-9044
☎ Office: 630-320-7740
✉ Email: msanchez@ams-pmt.com

Addison Ice – Mycom Comp- 8 03 17

**AMS** MECHANICAL
SYSTEMS, INC.

**ACCEPTANCE:** Addison Ice Arena

_____
**Authorized Signature**

_____ Leon A Lekai _____
**Printed name**

_____ 8-3-17 _____
**Date**

_____
**Purchase Order #**

# CLAIM

# #

# 12



**AMS MECHANICAL SYSTEMS, INC.**
ONE VISION. PROVEN SOLUTIONS.℠

140 E. Tower Drive, Burr Ridge, IL 60527 | TEL: 800.794.5033 | FAX: 630.887.0770 | amsmechanicalsystems.com

November 15, 2017

ADDISON ICE RINK
475 Grace St.
Addison IL. 60101

ATTN: LEON LEKAI


## ICE RINK – OIL POT INSTALLATION

As you are aware the ammonia system has contamination that continues to clog the oil system on the compressors.
The chiller has old oil and contaminants in the bottom that needs to be removed.
The Oil pot quoted in this proposal will allow the oil to drain from the bottom of the chiller into a separate vessel which can be isolated and drained periodically to clean the chiller shell.

### The Scope of Work Includes

- Install a 12" diameter x 20" vertical oil pot by the control panel.
- Pump down the refrigeration systems and store the refrigerant in the condenser.
- Tie in the vent of the oil pot to the 1" line off the top of the chiller surge drum.
- Remove the bushing and drain valve on the bottom the chiller oil drain.
- Increase the size to full size 1-1/4" to drain to the oil pot.
- Install relief piping from the pot to the outside.
- Install a drain valve and a "deadman" valve for the oi drain from the pot.
- Restart the system and instruct operation.

**The cost for this work is:…………………………….……………………………...$ 10,854.00**


### Clarifications

- All work is to take place on a straight time basis.
- The oil pot will take a few weeks to have fabricated.
- No painting of piping is included.
- No concrete pad is included. The oil pot will be installed on legs that will be anchored to the floor immediately by the existing oil drain.

# AMS MECHANICAL SYSTEMS, INC.

If you should have any questions or require clarifications, please do not hesitate to contact me at your earliest convenience.

Sincerely,
**AMS MECHANICAL SYSTEMS, INC.**

*Mark J. Sanchez*

Mark J. Sanchez
Project Manager
☎ Cellular: 630-688-9044
☎ Office: 630-320-7740
✉ Email: msanchez@ams-pmt.com

**Addison Ice – Oil Pot Installation- 11 15 17**

**ACCEPTANCE:** Addison Ice Arena

_____          _____
**Authorized Signature**          Leon A. Lekai
                                  **Printed name**

_____          _____
11-17-17
**Date**                          **Purchase Order #**

# CLAIM

# #

# 13



**AMS MECHANICAL SYSTEMS, INC.**
ONE VISION PROVEN SOLUTIONS℠

140 E. Tower Drive, Burr Ridge, IL 60527 | TEL: 800.794.5033 | FAX: 630.887.0770 | amsmechanicalsystems.com

November 15, 2017

ADDISON ICE RINK
475 Grace St.
Addison IL. 60101

ATTN: LEON LEKAI

### ICE RINK – CHILLER LIQUID FEED ASSEMBLY

While checking operation of the system last night it was found that the Phillips liquid feed float and valve are operating erratically and are in need of rebuilding.

#### The Scope of Work Includes

- Isolate the float and liquid feed valve.
- Operate the chiller with the bypass hand expansion valve is required.
- Replace the float assembly within the housing.
- Rebuild the liquid feed valve, replacing the seat and plug and seals.
- Replace the rusted ¼" steel tubing with stainless steel.
- Restart the system and check operation.

**The cost for this work is:**......................................................................**$ 1,850.00**

#### Clarifications

- All work is to take place on a straight time basis.
- The valve parts are available; once the work is approved AMS can put the parts on order and pick up.

If you should have any questions or require clarifications, please do not hesitate to contact me at your earliest convenience.

Sincerely,
**AMS MECHANICAL SYSTEMS, INC.**

*Mark J. Sanchez*

Mark J. Sanchez
Project Manager
☎ Cellular: **630-688-9044**
☎ Office: **630-320-7740**
✉ Email: msanchez@ams-pmt.com

**AMS MECHANICAL SYSTEMS, INC.**

**Addison Ice – Phillips Liq feed rebuild- 11 15 17**

**ACCEPTANCE:** Addison Ice Arena

_____          Leon A. Lekai
**Authorized Signature**                  _____
                                          **Printed name**

_____11-17-17_____          _____
**Date**                                  **Purchase Order #**

# CLAIM

# #

# 14


**WAZ CONSTRUCTION, INC.**

405 Avebury Court Roselle, IL 60172

**BILL TO**

Addison Ice Rink
Leon Lakai
475 S. Grace St.
Addison IL 60101

# Invoice

| DATE | INVOICE # |
|---|---|
| 5/25/2017 | 1945 |

| PROJECT | TERMS |
|---|---|
| Electrical Item 4-5 2017 | Due on receipt |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| ELECTRICAL ITEMS: PARKING LOT LIGHTS, DISCONNECT ELECTRIC AT THE NHL SCORE BOX, TRACE LINES IN THE RINK AND REMOVE | | | |
| Waz Construction Inc. has completed the following; | 1 | 2,475.00 | 2,475.00 |
| PARKING LOT LIGHTS <br> • Investigate and determine failure mode for the parking lot lights <br> • Upon completion of the investigation a couple items were found <br> • The timer for the parking lot lights was not working, this was replaced <br> • The wiring and feed to the North most light was severed at the junction box <br> • This was repaired and required some rewiring to replace the severed wires | | | |
| NHL SCORE BOARD ELECTRICAL DISCONNECT <br> • Disconnect the items from the NHL score board (Outlets and switches) <br> • Items were placed on the side to be installed at a later date. | | | |
| MAIN POWER RUNS UNDER THE NHL RINK <br> • Two main power runs were found running under the NHL rink <br> • These were traced, identified, and removed. <br> • One set of power cables were terminated at the junction box in the Olympic rink <br> • The other set was traced to the main electrical panel in the basement closet. <br> • These items were disconnected and labeled. <br> • Remove the conduit and wires from the rink | | | |
| EMERGENCY LIGHT IN THE 2ND FLOOR STAIRWELL <br> • Supply electrical material required to power and install an emergency light <br> • Emergency light provided by the customer <br> • Verify operation | | | |
| MANUFACTURE A COVER EXTENSION FOR THE J BOX IN THE COMPRESSOR ROOM <br> • SUPPLY LABOR AND MATERIAL TO FABRICATE AN EXTENSION FOR THE J BOX <br> • Requested by the fire inspector | | | |

**Total**

Phone: 630-973-6777
Fax:    630-980-1488
Page 1



**WAZ** CONSTRUCTION, INC.

| 405 Avebury Court Roselle, IL 60172 |
|---|

**BILL TO**

Addison Ice Rink
Leon Lakai
475 S. Grace St.
Addison IL 60101

# Invoice

| DATE | INVOICE # |
|---|---|
| 5/25/2017 | 1945 |

| PROJECT | TERMS |
|---|---|
| Electrical Item 4-5 2017 | Due on receipt |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| PATCHING OF THE WALL IN THE BATHROOM | 1 | 350.00 | 350.00 |
| • Supply material and labor to patch the hole in the wall. | | | |
| • A piece of plywood was placed in the wall in order to secure the stall wall to it | | | |
| • Install drywall, tape and sand to a finish suitable for painting. | | | |
| • Supply and install new hardware for the stall wall and secure in place. | | | |
| SUPPLY AND INSTALL ONE EJECTOR PUMP AND ONE SUMP PUMP | 1 | 1,475.00 | 1,475.00 |
| SUMP PUMP | | | |
| • Supply one Zoeller M53 Sump pump for under the stairs in the work out area | | | |
| • Supply a new check valve and shut off assembly for the sump pump | | | |
| • Supply and install 4" PVC to extend the drain to the front of the building | | | |
| • Secure and pitch the PVC so that it doesn't bow and flex | | | |
| • Currently the water would come out of the building and drop on the ground and simply recirculate to the pump | | | |
| EJECTOR PUMP | | | |
| • Supply and install a new Zoeller ejector pump for the grease pit in the mechanical room | | | |
| • Remove the old pump and install the new Zoeller M267 Pump | | | |
| • Supply and install a new check valve shut off assembly | | | |
| • Verify operation | | | |

| | Total | $4,300.00 |
|---|---|---|

| | Phone: 630-973-6777 |
|---|---|
| | Fax:   630-980-1488 |
| | Page 2 |

# CLAIM

# #

# 15



405 Avebury Court Roselle, IL 60172

BILL TO

Addison Ice Rink
Leon Lakai
475 S. Grace St.
Addison IL 60101

# Invoice

| DATE | INVOICE # |
|---|---|
| 10/4/2017 | 2013 |

| PROJECT | TERMS |
|---|---|
| August 2017 ITEMS | Due on receipt |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| ITEMS COMPLETED IN THE RINK AUGUST / SEPTEMBER 2017 | | | |
| Waz Construction Inc. has completed the following; | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total | |

Phone: 630-973-6777
Fax: 630-980-1488
Page 1



405 Avebury Court Roselle, IL 60172

**BILL TO**

Addison Ice Rink
Leon Lakai
475 S. Grace St.
Addison IL 60101

# Invoice

| DATE | INVOICE # |
|---|---|
| 10/4/2017 | 2013 |

| PROJECT | TERMS |
|---|---|
| August 2017 ITEMS | Due on receipt |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| ITEMS COMPLETED IN THE RINK - AUGUST / SEPTEMBER 2017 | 1 | 24,130.00 | 24,130.00 |
| THE FOLLOWING ITEMS HAVE BEEN COMPLETED | | | |
| • FLOOR SCRUBBER - Rental, delivery, and pickup | | | |
| • FLOOR SCRUBBER - From home depot | | | |
| • TENSION CABLES - Supply tension cables and clamps and install where required in the NHL RINK | | | |
| • LIFT RENTAL - Supply scissor lift for work completed in the NHL and OLYMPIC rinks | | | |
| • RUBBER ON BACK STAIRS - Glue rubber on the back stair case leading to the lobby | | | |
| • PLASTIC BEHIND BENCHES - Install customer supplied plastic behind the benches | | | |
| • Supply a pump for the ice melt pit | | | |
| • DOUBLE DOOR FOR COMPRESSOR ROOM | | | |
|    - Remove block where the new door needs to be installed | | | |
|    - Supply and install new steel for the new door opening | | | |
|    - Supply and install a new lockset, hinges, door frame, and door. | | | |
|    - Secure door in the opening and verify door operation. | | | |
| • Supply toilet and install in locker room 3 in the NHL rink. | | | |
| FIX OUTLETS | | | |
| • Outlet for Sump pump in storage area closet - HOT ICE AREA | | | |
| • Outlet for the Ejector pump in the mechanical room | | | |
| • Complete score clock wiring - NHL rink | | | |
| • MASON OPENINGS IN CONCESSION AREA, AND RINK WALK THROUGH | | | |
|    - Supply labor and material to close the two openings to the concession stand | | | |
|    - Supply labor and material to open create an opening from the Olympic to the NHL rink | | | |
|    - Supply and install steel angle for the new rink opening | | | |
|    - Weld the angle to the main beam with cleats underneath | | | |
|    - Prime Steel to be painted at a later date | | | |
| • SUPPLY Pipe, rod, cable, hanger wire, and customer supplied netting | | | |
|    - Form conduit to the shape of the rink and suspend from the rod | | | |
|    - Suspend the net from the conduit and attach to steel cable at the bottom | | | |
|    - Form net around the perimeter of the rink | | | |
| • PIT FOR OLYMPIC RINK DRAINAGE | | | |
|    - Supply and install an extra deep basin in the Olympic rink | | | |
|    - Dig out the hole so the pit can be installed | | | |
|    - Install pit, and secure in the floor for concrete | | | |
|    - Upon completion of the concrete a pump, cover and plumbing were installed | | | |
|    - Supply labor and material to install an outlet for the pump | | | |

**Total**

Phone: 630-973-6777
Fax: 630-980-1488
Page 2



405 Avebury Court Roselle, IL 60172

**BILL TO**

Addison Ice Rink
Leon Lakai
475 S. Grace St.
Addison IL 60101

# Invoice

| DATE | INVOICE # |
|---|---|
| 10/4/2017 | 2013 |

| | PROJECT | TERMS |
|---|---|---|
| | August 2017 ITEMS | Due on receipt |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| • STAIRS, AND LOWER LEVEL LOCKER ROOM RUBBER AND CARPET<br> - Remove old carpet and rubber on the stairs and locker rooms on the lower level<br> - Supply and install rubber in the locker rooms on the lower level<br> - Supply and install carpet in the locker rooms on the lower level<br> - Supply and install rubber and edging on the stair case from the lower level to the main level | 1 | 15,235.00 | 15,235.00 |
| GIRLS LOCKER ROOM<br>• Remove the block partition wall between the two rooms<br>• Plumbing was located in this wall, that plumbing was relocated into the block<br>• Build a partition wall around the electrical panel<br>• Drywall, tape, and sand to a surface suitable for painting<br>• Supply and install steel to support the remaining block above<br>• Supply and install new ceiling tiles for the locker room<br>• Supply and install light fixtures in the locker room<br>• Prime and paint the walls<br>• Install customer supplied benches around the perimeter of the room<br>• Relocate the sprinkler head in the locker to center it,<br>• Add another head in the electrical closet | 1 | 7,475.00 | 7,475.00 |
| PLUMBING LEAKS - BLUE LINE<br><br>• One leak was found behind the 3 compartment sink<br>• The sink was pulled away from the wall and the connection to the faucet was rebuilt<br>• New connections were installed from the angle stops to the faucet<br>• The compression fittings and copper tubing were replaced<br>• Wall was opened and it was discovered there was a leak on a fitting<br>• Fitting was repaired and the wall was closed back up. | 1 | 890.00 | 890.00 |
| DEPOSIT PAID - This amount has already been paid<br>BALANCE TO BE PAID FROM INSURANCE CLAIM - $4,115.66<br><br>TOTAL BALANCE DUE UPON RECEIPT OF $4115.66 IS $25475.18<br><br>THIS NUMBER REPRESENTS TOTAL WORK COMPLETED, NOT SURE WHICH BUCKET THE AMOUNTS ABOVE ARE COMING OUT OF. | -1 | 18,139.16 | -18,139.16 |

| Total | $29,590.84 |
|---|---|

Phone: 630-973-6777
Fax: 630-980-1488
Page 3

# CLAIM

# #

# 16

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

**TARP SUPPLY, INC.**

TARP SUPPLY INC.™
*For All Your Tarp Needs* ™

266 Eisenhower Lane N.
Lombard, IL 60148
Tel: 1-630-953-4700
www.tarpsupply.com

# QUOTATION

| Date | Quote No. |
|------|-----------|
| 5/22/2017 | 472 |

| Name / Address | Ship To |
|----------------|---------|
| Leon Lekai<br>The Addison Ice Arena<br>475 South Grace St.<br>Addison, IL 60101 | Leon Lekai<br>Customer pick-up |

| Shipping Terms | Sales Rep | Payment Terms | Due Date |
|----------------|-----------|---------------|----------|
| Due on receipt | BD30 | | 5/22/2017 |

| Item | Description | Qty | Unit P... | Total |
|------|-------------|-----|-----------|-------|
| PB100100K | 100'x100' Blue Poly Tarp with grommets<br>PICK-UP | 2 | 485.99 | 971.98T |
| | IL Sales Tax | | 8.25% | 80.19 |

Thank you for your inquiry. If you have any questions, please contact us
1-630-953-4700 or email orders@tarpsupplyl.com

**Total** $1,052.17

# CLAIM

# #

# 17

**JKS VENTURES, INC**
5521 N. Cumberland Ave.  Suite 1106
Chicago, IL  60656
Office: (773) 775-6910
Fax: (773) 775-6915
Yard: (708) 338-3408

# INVOICE

| | |
|---|---|
| INVOICE NO. | 189219 |
| PAGE | 1 |
| DATE | Jul-10-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

SOLD TO:

ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL  60101

| DATE | DESCRIPTION | REFERENCE | RATE | QTY. | | AMOUNT |
|---|---|---|---|---|---|---|
| 10 - Jul | DELIVERY CHARGE | LS-335199 | $100.00/LD | 1.00 | LD | $100.00 |
| 10 - Jul | MASONARY SAND | LS-335199 | $22.00/TN | 20.00 | TN | $440.00 |
| 10 - Jul | DELIVERY CHARGE | LS-335204 | $100.00/LD | 1.00 | LD | $100.00 |
| 10 - Jul | MASONARY SAND | LS-335204 | $22.00/TN | 20.00 | TN | $440.00 |
| 10 - Jul | Sales Tax at 10.500% | | | | | $92.40 |

**Terms Net 30 Days.**

| | |
|---|---|
| TOTAL THIS INVOICE | $1,172.40 |

| CURRENT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 1,172.40 | $ 0.00 | $ 0.00 | $ 0.00 |

| | |
|---|---|
| INVOICE NO. | 189219 |
| PAGE | 1 |
| DATE | Jul-10-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

**Please Remit Payments to:**

**JKS VENTURES, INC**
5521 N. Cumberland Ave.  Suite 1106
Chicago, IL  60656

AMOUNT OF
REMITTANCE  $_____

# CLAIM

# #

# 18

**JKS VENTURES, INC**
5521 N. Cumberland Ave.  Suite 1106
Chicago, IL  60656
Office: (773) 775-6910
Fax: (773) 775-6915
Yard: (708) 338-3408



| INVOICE NO. | 189377 |
|---|---|
| PAGE | 1 |
| DATE | Jul-24-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

SOLD TO:

ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL  60101

| DATE | DESCRIPTION | REFERENCE | RATE | QTY. | AMOUNT |
|---|---|---|---|---|---|
| 21 - Jul | DELIVERY CHARGE | LS-337354 | $100.00/LD | 1.00 LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337354 | $22.00/TN | 18.00 TN | $396.00 |
| 21 - Jul | DELIVERY CHARGE | LS-337374 | $100.00/LD | 1.00 LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337374 | $22.00/TN | 18.84 TN | $414.48 |
| 21 - Jul | DELIVERY CHARGE | LS-337396 | $100.00/LD | 1.00 LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337396 | $22.00/TN | 18.50 TN | $407.00 |
| 21 - Jul | DELIVERY CHARGE | LS-337412 | $100.00/LD | 1.00 LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337412 | $22.00/TN | 19.40 TN | $426.80 |
| 21 - Jul | DELIVERY CHARGE | LS-337431 | $100.00/LD | 1.00 LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337431 | $22.00/TN | 18.50 TN | $407.00 |
| 21 - Jul | DELIVERY CHARGE | LS-337453 | $100.00/LD | 1.00 LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337453 | $22.00/TN | 19.03 TN | $418.66 |
| 21 - Jul | DELIVERY CHARGE | LS-337474 | $100.00/LD | 1.00 LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337474 | $22.00/TN | 19.00 TN | $418.00 |
| 21 - Jul | Sales Tax at 10.500% | | | | $303.24 |

**Terms Net 30 Days.**

| | TOTAL THIS INVOICE | $3,891.18 |
|---|---|---|

| CURRENT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 5,063.58 | $ 0.00 | $ 0.00 | $ 0.00 |

| INVOICE NO. | 189377 |
|---|---|
| PAGE | 1 |
| DATE | Jul-24-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

**Please Remit Payments to:**

**JKS VENTURES, INC**
5521 N. Cumberland Ave.  Suite 1106
Chicago, IL  60656

AMOUNT OF
REMITTANCE  $_____

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656
Office: (773) 775-6910
Fax: (773) 775-6915
Yard: (708) 338-3408



**INVOICE**

| | |
|---|---|
| INVOICE NO. | 189219 |
| PAGE | 1 |
| DATE | Jul-10-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

SOLD TO:

ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL 60101

| DATE | DESCRIPTION | REFERENCE | RATE | QTY. | | AMOUNT |
|---|---|---|---|---|---|---|
| 10 - Jul | DELIVERY CHARGE | LS-335199 | $100.00/LD | 1.00 | LD | $100.00 |
| 10 - Jul | MASONARY SAND | LS-335199 | $22.00/TN | 20.00 | TN | $440.00 |
| 10 - Jul | DELIVERY CHARGE | LS-335204 | $100.00/LD | 1.00 | LD | $100.00 |
| 10 - Jul | MASONARY SAND | LS-335204 | $22.00/TN | 20.00 | TN | $440.00 |
| 10 - Jul | Sales Tax at 10.500% | | | | | $92.40 |

**Terms Net 30 Days.**

| | |
|---|---|
| TOTAL THIS INVOICE | $1,172.40 |

| CURRENT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 1,172.40 | $ 0.00 | $ 0.00 | $ 0.00 |

| | |
|---|---|
| INVOICE NO. | 189219 |
| PAGE | 1 |
| DATE | Jul-10-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

**Please Remit Payments to:**

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656

**AMOUNT OF**
**REMITTANCE** $_____

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656
Office: (773) 775-6910
Fax: (773) 775-6915
Yard: (708) 338-3408



| INVOICE NO. | 189459 |
|---|---|
| PAGE | 1 |
| DATE | Jul-31-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

SOLD TO:

ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL 60101

| DATE | DESCRIPTION | REFERENCE | RATE | QTY. | AMOUNT |
|---|---|---|---|---|---|
| 27 - Jul | DELIVERY CHARGE | LS-338593 | $100.00/LD | 1.00 LD | $100.00 |
| 27 - Jul | MASONARY SAND | LS-338593 | $22.00/TN | 20.00 TN | $440.00 |
| 27 - Jul | Sales Tax at 10.500% | | | | $46.20 |

**Terms Net 30 Days.**

**TOTAL THIS INVOICE** $586.20

| CURRENT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 5,649.78 | $ 0.00 | $ 0.00 | $ 0.00 |

| INVOICE NO. | 189459 |
|---|---|
| PAGE | 1 |
| DATE | Jul-31-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

**Please Remit Payments to:**

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656

**AMOUNT OF
REMITTANCE $**_____

# CLAIM

# #

# 19

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656
Office: (773) 775-6910
Fax: (773) 775-6915
**Yard:** (708) 338-3408

# STATEMENT

| | |
|---|---|
| **DATE** | 31-Jul-2017 |
| **CUSTOMER NO.** | 1789 |
| **PAGE** | 1 |

**TO:** ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL 60101

| DATE | DUE DATE | INVOICE # | AMOUNT | BALANCE |
|---|---|---|---|---|
| 10-Jul-2017 | 9-Aug-2017 | 189219 | $1,172.40 | $1,172.40 |
| 24-Jul-2017 | 23-Aug-2017 | 189377 | $3,891.18 | $5,063.58 |
| 31-Jul-2017 | 30-Aug-2017 | 189459 | $586.20 | $5,649.78 |

| CURRENT AMOUNT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 5,649.78 | $ 0.00 | $ 0.00 | $ 0.00 |

| **AMOUNT DUE:** | $5,649.78 |
|---|---|

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656
Office: (773) 775-6910
Fax: (773) 775-6915
Yard: (708) 338-3408



| INVOICE NO. | 189377 |
|---|---|
| PAGE | 1 |
| DATE | Jul-24-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

SOLD TO:

ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL 60101

| DATE | DESCRIPTION | REFERENCE | RATE | QTY. | | AMOUNT |
|---|---|---|---|---|---|---|
| 21 - Jul | DELIVERY CHARGE | LS-337354 | $100.00/LD | 1.00 | LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337354 | $22.00/TN | 18.00 | TN | $396.00 |
| 21 - Jul | DELIVERY CHARGE | LS-337374 | $100.00/LD | 1.00 | LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337374 | $22.00/TN | 18.84 | TN | $414.48 |
| 21 - Jul | DELIVERY CHARGE | LS-337396 | $100.00/LD | 1.00 | LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337396 | $22.00/TN | 18.50 | TN | $407.00 |
| 21 - Jul | DELIVERY CHARGE | LS-337412 | $100.00/LD | 1.00 | LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337412 | $22.00/TN | 19.40 | TN | $426.80 |
| 21 - Jul | DELIVERY CHARGE | LS-337431 | $100.00/LD | 1.00 | LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337431 | $22.00/TN | 18.50 | TN | $407.00 |
| 21 - Jul | DELIVERY CHARGE | LS-337453 | $100.00/LD | 1.00 | LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337453 | $22.00/TN | 19.03 | TN | $418.66 |
| 21 - Jul | DELIVERY CHARGE | LS-337474 | $100.00/LD | 1.00 | LD | $100.00 |
| 21 - Jul | MASONARY SAND | LS-337474 | $22.00/TN | 19.00 | TN | $418.00 |
| 21 - Jul | Sales Tax at 10.500% | | | | | $303.24 |

**Terms Net 30 Days.**

**TOTAL THIS INVOICE** $3,891.18

| CURRENT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 5,063.58 | $ 0.00 | $ 0.00 | $ 0.00 |

| INVOICE NO. | 189377 |
|---|---|
| PAGE | 1 |
| DATE | Jul-24-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

Please Remit Payments to:

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656

**AMOUNT OF REMITTANCE** $_____

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656
Office: (773) 775-6910
Fax: (773) 775-6915
Yard: (708) 338-3408


INVOICE

| INVOICE NO. | 189219 |
| PAGE | 1 |
| DATE | Jul-10-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

SOLD TO:

ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL 60101

| DATE | DESCRIPTION | REFERENCE | RATE | QTY. | | AMOUNT |
|---|---|---|---|---|---|---|
| 10 - Jul | DELIVERY CHARGE | LS-335199 | $100.00/LD | 1.00 | LD | $100.00 |
| 10 - Jul | MASONARY SAND | LS-335199 | $22.00/TN | 20.00 | TN | $440.00 |
| 10 - Jul | DELIVERY CHARGE | LS-335204 | $100.00/LD | 1.00 | LD | $100.00 |
| 10 - Jul | MASONARY SAND | LS-335204 | $22.00/TN | 20.00 | TN | $440.00 |
| 10 - Jul | Sales Tax at 10.500% | | | | | $92.40 |

**Terms Net 30 Days.**

**TOTAL THIS INVOICE**    $1,172.40

| CURRENT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 1,172.40 | $ 0.00 | $ 0.00 | $ 0.00 |

| INVOICE NO. | 189219 |
| PAGE | 1 |
| DATE | Jul-10-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

**Please Remit Payments to:**

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656

**AMOUNT OF REMITTANCE** $_____

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656
Office: (773) 775-6910
Fax: (773) 775-6915
Yard: (708) 338-3408

# INVOICE

| | |
|---|---|
| INVOICE NO. | 189459 |
| PAGE | 1 |
| DATE | Jul-31-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

SOLD TO:

ADDISON ICE ARENA
475 GRACE ST
ADDISON, IL 60101

| DATE | DESCRIPTION | REFERENCE | RATE | QTY. | | AMOUNT |
|---|---|---|---|---|---|---|
| 27 - Jul | DELIVERY CHARGE | LS-338593 | $100.00/LD | 1.00 | LD | $100.00 |
| 27 - Jul | MASONARY SAND | LS-338593 | $22.00/TN | 20.00 | TN | $440.00 |
| 27 - Jul | Sales Tax at 10.500% | | | | | $46.20 |

Terms Net 30 Days.

| | |
|---|---|
| TOTAL THIS INVOICE | $586.20 |

| CURRENT | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|
| $ 5,649.78 | $ 0.00 | $ 0.00 | $ 0.00 |

| | |
|---|---|
| INVOICE NO. | 189459 |
| PAGE | 1 |
| DATE | Jul-31-17 |
| CUSTOMER NO. | 1789 |
| REFERENCE | |

Please Remit Payments to:

**JKS VENTURES, INC**
5521 N. Cumberland Ave. Suite 1106
Chicago, IL 60656

AMOUNT OF
REMITTANCE $_____

# CLAIM

# #

# 20



# Groh Works Landscaping

*1700 Callahan Road*
*Wauconda, IL 60084-3129*
*(847) 526-7298  Fax (847) 526-7299*
*www.grohworks.com*

# Invoice

*10787*

*6/28/2017*

**ADDISON ICE ARENA**
**475 S. GRACE STREET**
**ADDISON, IL  60101**

| | Terms |
|---|---|
| | Due on receipt |

## Scope of Work

*Install drainage system under ice rink. Install perforated 4"*      *19,000.00*
*draintile in trench and fill trench with river rock, tie all lines*
*together and run into storm drain. Trench approximately 3ft below*
*current surface with slope grade. Install approximately 900 ft of*
*perforated 4" drain tile. (main run 200ft and 9 additional runs of*
*80 ft each). Install sleeve over perforated 4" drain tile.*

*EXTRA-Install 1 additional line-hand dig only and 10 tons of river*      *1,700.00*
*rock.*

| | |
|---|---|
| **Invoice Total:** | **$20,700.00** |
| **Payments/Credits** | **-$7,500.00** |
| **Balance Due** | **$13,200.00** |

**Thank you for your business!**

# CLAIM

# #

# 21



# Groh Works Landscaping

1700 Callahan Road
Wauconda, IL 60084-3129
(847) 526-7298  Fax (847) 526-7299
www.grohworks.com

### Invoice

*10841*

*9/2/2017*

*ADDISON ICE ARENA*
*475 S. GRACE STREET*
*ADDISON, IL  60101*

| | Terms |
| --- | --- |
| | Due on receipt |

## Scope of Work

| | |
| --- | --- |
| Fix hole with river rock and clay, and clean up. Also clean parking lot. | 1,410.00 |
| Property Maintenance, Weed Control/Fertilization, Grub Treatment | 1,062.00 |
| Removal of 2 dead trees. | 600.00 |

*Thank you for your business!*

| | |
| --- | --- |
| **Invoice Total:** | **$3,072.00** |
| **Payments/Credits** | **$0.00** |
| **Balance Due** | **$3,072.00** |

# CLAIM

# #

# 22



**REPUBLIC**
SERVICES

5050 W. Lake Street
Melrose Park IL 60160-276666

**A division of REPUBLIC SERVICES**

**Account Summary**

| | |
|---|---|
| Account Number | 3-0551-0005090 |
| Invoice Date | May 31, 2017 |
| Invoice Number | 0551-013501801 |
| Previous Balance | $394.37 |
| Payments/Adjustments | -$394.37 |
| Unpaid Balance | $0.00 |
| Current Invoice Charges | $8,536.00 |

**Pay This Amount**

**$8,536.00**

**Due By: 06/25/17**

**Contact Information**

| | |
|---|---|
| Customer Service | (708) 345-7050 |

**Important Information**

Manage your account online 24/7,
on any device with My Resource.
Visit republiconline.com
to get started.

---

**ADDISON ICE**         **Invoice**

Managing your account is now easier than ever with the My Resource App. Free download on the App Store or Google Play.    Page 1 of 3

**Payments/Adjustments**

| Date | Description | Reference | Amount |
|---|---|---|---|
| 05/15 | Payment - Thank You | 6794 | -$394.37 |

**Current Invoice Charges**

Addison Ice    551   475 S Grace St (L1) CSA C90324
Addison, IL

Contract: 10055 (C3)

1 - Waste Container 6 Cu Yd Scheduled Service (S7)

| Date | Description | Reference | Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 05/31 | Administrative Fee 06/01/17-06/30/17 | | | $0.95 | $0.95 |
| 05/31 | Pickup Service 06/01/17-06/30/17 | | | $393.42 | $393.42 |

4 - Waste Container 30 Cu Yd On Call Service (S16)

| Date | Description | Reference | Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 05/08 | Extra Tonnage | 1120935 | 3.2200Tons | $64.62 | $208.08 |
| | Receipt Number 3693 | | | | |
| 05/08 | Extra Tonnage | 1120961 | .5100Ton | $64.62 | $32.96 |
| | Receipt Number 3694 | | | | |
| 05/08 | Pickup Service | Pat | 1.0000 | $390.21 | $390.21 |
| | Receipt Number 3693 | | | | |
| 05/08 | Pickup Service | Pat | 1.0000 | $390.21 | $390.21 |
| | Receipt Number 3694 | | | | |
| 05/09 | Extra Tonnage | 778057 | 2.0700Tons | $64.62 | $133.76 |
| | Receipt Number 3696 | | | | |
| 05/09 | Extra Tonnage | 1121080 | 4.0300Tons | $64.62 | $260.42 |
| | Receipt Number 2118 | | | | |
| 05/09 | Extra Tonnage | 1121103 | 3.0700Tons | $64.62 | $198.38 |
| | Receipt Number 2119 | | | | |
| 05/09 | Extra Tonnage | 1121149 | 3.5600Tons | $64.62 | $230.05 |
| | Receipt Number 2121 | | | | |
| 05/09 | Extra Tonnage | 1121124 | 3.6300Tons | $64.62 | $234.57 |
| | Receipt Number 2126 | | | | |
| 05/09 | Pickup Service | Csr Cat | 1.0000 | $390.21 | $390.21 |
| | Receipt Number 3696 | | | | |
| 05/09 | Pickup Service | Pat | 1.0000 | $390.21 | $390.21 |

*Regular Pick up $394.37?*

| CURRENT | 30 DAYS | 60 DAYS | 90+ DAYS |
|---|---|---|---|
| 8,536.00 | 0.00 | 0.00 | 0.00 |

D A
* With My Resource you can schedule a pickup, pay your bill and discover new services - all with a touch of a button. Visit republiconline.com to get started.
* Please see reverse side for terms and conditions.

---

**REPUBLIC**
SERVICES

5050 W. Lake Street
Melrose Park IL 60160-276666

Return Service Requested

Please Return This
Portion With Payment

**Total Enclosed**

☐ For Billing Address Changes,
Check Box and Complete Reverse.

| | |
|---|---|
| Pay This Amount | $8,536.00 |
| Account Number | 3-0551-0005090 |
| Invoice Date | May 31, 2017 |
| Invoice Number | 0551-013501801 |
| Payment Due Date | June 25, 2017 |

Make Checks Payable To:

REPUBLIC SERVICES #551
PO BOX 9001154
LOUISVILLE KY 40290-1154

ADDISON ICE
ATTN: ACCOUNTS PAYABLE
475 S GRACE ST
ADDISON IL 60101-4345

30551000509000001350180100085360000085360000

*$ 8141.63 Due For NHL Rink Proset*



| | ADDISON ICE | | Republic Services #551 |
|---|---|---|---|
| Account Number | | 3-0551-0005090 | 5050 W. Lake Street |
| Invoice Date | | May 31, 2017 | Melrose Park IL 60160-276666 |
| Invoice Number | | 0551-013501801 | |

## Current Invoice Charges

| Date | Description | | Reference | Quantity | Unit Price | Amount |
|---|---|---|---|---|---|---|
| | Receipt Number | 2118 | | | | |
| 05/09 | Pickup Service | | Pat | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 2119 | | | | |
| 05/09 | Pickup Service | | Pat | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 2121 | | | | |
| 05/09 | Pickup Service | | Pat | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 2126 | | | | |
| 05/12 | Extra Tonnage | | 1121869 | 8.3900Tons | $64.62 | $542.16 |
| | Receipt Number | 95714 | | | | |
| 05/12 | Extra Tonnage | | 779086 | 5.0800Tons | $64.62 | $328.27 |
| | Receipt Number | 95716 | | | | |
| 05/12 | Extra Tonnage | | 1121850 | 6.0300Tons | $64.62 | $389.66 |
| | Receipt Number | 86926 | | | | |
| 05/12 | Pickup Service | | | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 95714 | | | | |
| 05/12 | Pickup Service | | | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 95716 | | | | |
| 05/12 | Pickup Service | | | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 86926 | | | | |
| 05/15 | Extra Tonnage | | 1122046 | 6.7900Tons | $64.62 | $438.77 |
| | Receipt Number | 95859 | | | | |
| 05/15 | Pickup Service | | | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 95859 | | | | |
| 05/16 | Extra Tonnage | | 779703 | 7.1500Tons | $64.62 | $462.03 |
| | Receipt Number | 96975 | | | | |
| 05/16 | Pickup Service | | Jay | 1.0000 | $390.21 | $390.21 |
| | Receipt Number | 96975 | | | | |
| | **Current Invoice Charges** | | | | | **$6,536.00** |

# CLAIM

# #

# 23


**REPUBLIC** SERVICES

5050 W. Lake Street
Melrose Park IL 60160-276666

**Customer Service**  (708) 345-7050

| Account Number | 3-0551-0005090 |
|---|---|
| Invoice Number | 0551-013725253 |
| Invoice Date | August 31, 2017 |
| Previous Balance | $9,519.61 |
| Payments/Adjustments | -$8,536.00 |
| **Current Invoice Charges** | **$1,596.11** |

| Total Amount Due | Payment Due Date |
|---|---|
| **$2,579.72** | **Past Due** |

**PAYMENTS/ADJUSTMENTS**

| Description | Reference | Amount |
|---|---|---|
| Payment - Thank You 08/04 | 6861 | -$394.37 |
| Payment - Thank You 08/18 | 60552 | -$8,141.63 |

**CURRENT INVOICE CHARGES**

| Description | Reference | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| **Addison Ice        551  475 S Grace St CSA C90324** | | | | |
| **Addison, IL Contract: 10055 (C3)** | | | | |
| **1 Waste Container 6 Cu Yd, 2 Lifts Per Week** | | | | |
| Administrative Fee  09/01-09/30 | | | $0.95 | $0.95 |
| Pickup Service  09/01-09/30 | | | $393.42 | $393.42 |
| **2 Waste Container 30 Cu Yd, On Call Service Construction/Demolition Debris** | | | | |
| Extra Tonnage 08/29 | 800547 | 4.7600 Tons | $64.62 | $307.59 |
| Receipt Number      14230 | | | | |
| Pickup Service 08/29 | Jay | 1.0000 | $390.21 | $390.21 |
| Receipt Number      14230 | | | | |
| Extra Tonnage 08/30 | 1139114 | 1.7600 Tons | $64.62 | $113.73 |
| Receipt Number      4938 | | | | |
| Pickup Service 08/30 | Jay | 1.0000 | $390.21 | $390.21 |
| Receipt Number      4938 | | | | |
| **CURRENT INVOICE CHARGES, Due by September 25, 2017** | | | | **$1,596.11** |

MY RESOURCE℠: ONE APP. MANY FUNCTIONS
Pay your bill, schedule a pickup, and much more with My Resource.
RepublicServices.com/MyAccount



| Past Due | 30 Days | 60 Days | 90+ Days |
|---|---|---|---|
| | $983.61 | $0.00 | $0.00 |


**REPUBLIC** SERVICES

**5050 W. Lake Street**
**Melrose Park IL 60160-276666**

Please Return This
Portion With Payment

**Return Service Requested**

**Total Enclosed**

| Total Amount Due | $2,579.72 |
|---|---|
| Payment Due Date | **Past Due** |
| Account Number | 3-0551-0005090 |
| Invoice Number | 0551-013725253 |

For Billing Address Changes,
Check Box and Complete Reverse

Make Checks Payable To:

ADDISON ICE
ATTN:  ACCOUNTS PAYABLE
475 S GRACE ST
ADDISON IL 60101-4345

REPUBLIC SERVICES #551
PO BOX 9001154
LOUISVILLE KY 40290-1154

30551000509000000013725253000159611000257972O



**UNDERSTANDING YOUR BILL**
Visit RepublicServices.com/MyBill

**Check Processing**
When you provide a check as payment, you authorize us to use information from your check to make a one-time electronic fund transfer from your account. When we make an electronic transfer, funds may be withdrawn from your account the same day we receive your payment or check and you will not receive your check back from your financial institution.

**Cancellation & Payment Policy**
Unless prohibited by applicable law, regulation, or franchise or other agreement: (1) we reserve the right to require that payment for services be made only by check, credit card or money order; and (2) if service is canceled during a billing cycle, you will remain responsible for all charges, fees and taxes through the end of the billing cycle. You will not be entitled to proration of billing or a refund for the period between the notice of termination and the end of the current billing cycle.

**Fuel, Environmental & Admin Fee Explanations**
Visit RepublicServices.com/Fees

Please fill out the form below if your billing address has changed and return this portion of your statement to us using the envelope enclosed. Thank you!

**BILLING ADDRESS CHANGE**

| Address | | |
|---|---|---|
| City | State | Zip Code |
| Phone | Alternate Phone | |

# CLAIM

# #

# 24



9947 Express Drive Highland, IN 46322
Phone: 219-922-9399    Fax: 219-922-9903

# *Invoice*

| Invoice # | 4551 |
|---|---|
| Date | 9/12/2017 |
| P.O. | Jay Kermer |

**Bill To**
Addison Ice Rink
475 South Grace
Addison, IL 60106

| Terms | Ship Via | Job # |
|---|---|---|
| Due on receipt | PPM Truck | 17-4551 |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | Overhaul NHL pump<br>• Remove pump. Deliver to shop<br>• Disassemble, clean and inspect<br>• Provide new bearings<br>• Provide new seal sleeve<br>• Provide new mechanical seal<br>• Provide new case gasket<br>• Install, laser align and provide startup support | 2,140.00 | 2,140.00 |
| 1 | Overhaul NHL back up pump<br>• Remove pump. Deliver to shop<br>• Disassemble, clean and inspect<br>• Provide new bearings<br>• Provide new seal sleeve<br>• Provide new mechanical seal<br>• Provide new case gasket<br>• Install, laser align and provide startup support | 2,140.00 | 2,140.00 |

## Total

Page 1



# Invoice

9947 Express Drive Highland, IN 46322
Phone: 219-922-9399    Fax: 219-922-9903

| Invoice # | 4551 |
|---|---|
| Date | 9/12/2017 |
| P.O. | Jay Kermer |

**Bill To**
Addison Ice Rink
475 South Grace
Addison, IL 60106

| Terms | Ship Via | Job # |
|---|---|---|
| Due on receipt | PPM Truck | 17-4551 |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | Overhaul Olympic pump<br>• Remove pump. Deliver to shop<br>• Disassemble, clean and inspect<br>• Provide new bearings<br>• Provide new seal sleeve<br>• Provide new mechanical seal<br>• Provide new case gasket<br>• Install, laser align and provide startup support | 2,140.00 | 2,140.00 |
| | Sales Tax | 7.00% | 0.00 |

| | **Total** | **$6,420.00** |
|---|---|---|

Page 2

# CLAIM

# #

# 25



# Pegasus

ENVIRONMENTAL COMPANY
P.O. Box #4
SPENCERPORT, NEW YORK 14559

PEGASUSENVIRONMENTAL.COM

FAA Airman's Certification, #2206884. Exemption # 14997   *EXPIRED 02/04/17*

Ground Penetrating Radar Certified

DATE: *02/03/17*

CLIENT: *ADDISON ICE RINK*

INVOICE: # *23702 0117*

AMOUNT: *2950.00*

SURVEY: *ADDISON ICE RINK*

ORDER APPROVAL: *ZKy*

__ STRUCTURAL: _____

__CONCRETE IMAGING: _____

__AERIAL IMAGING: _____

__ICE RINK: _____

__GEOLOGICAL: _____

__UTILITY LOCATING: _____

For a menu of qualifications, please visit our website, "pegasusenvironmental.com"

We at Pegasus Environmental Company appreciate working with you on this project and thank you for the opportunity to do so.

Sincerely,

Zeke Hurd

Pegasus Environmental Company

(585) 278-0103                                    zhurd@rochester.rr.com

# CLAIM

# #

# 26

CHEM-TAINER INDUSTRIES, INC

361 NEPTUNE AVE.
WEST BABYLON, NY 11704

PRO-FORMA INVOICE

Date      Page
5/05/17

Order Number
42990-000
Acct # 110994
Bill To:    CGD ACCOUNT-ILLINOIS FACILITY
            LOMBARD,IL 60148

Ship To:   ADDISON ICE ARENA
           JAY JERMWER
           CUSTOMER PICKUP
           630-301-9836
           LOMBARD,IL 60148

Ship via..: CUSTOMER PICK UP
Ship Terms.: N/C
Terms......: CREDIT CARD

Ordered..: 5/05/17     Cust P.O.#..: JAY050517
Ship by..: 5/05/17     Order Taker.: DAVID WENZEL
                       Placed by...:

| Line | Qty Ord | Qty Ship | Qty B/O | D.C. | Item # Description | Unit | Disc | Price | Extension |
|------|---------|----------|---------|------|--------------------|------|------|-------|-----------|
| 1 | 2 | 2 | 0 | 0149 9 | TC3558IA-GRANITE | EA | | 112.0000 | 224.00 |
| 2 | | | | | CLEARANCE TANK | | | | |
| 3 | | | | | SOLD AS IS | | | | |
| 4 | | | | | NO WARRANTY/RETURNS | | | | |

Material Total:    224.00
Tax:                17.92
Deposits:          241.92
Balance Due:          .00

Toks to take Brine out of cold Floor / NHL

# CLAIM

# #

# 27

# PORTER PIPE & SUPPLY CO.

Industrial Pipe ▪ Valves ▪ Fittings
Hydronic Heating ▪ Specialties

**OUR LOCATIONS**

Addison, Illinois    Phone: 630-543-8145    Fax: 630-543-6830
Chicago, Illinois    Phone: 312-347-1600    Fax: 312-347-0255
Hammond, Indiana    Phone: 219-844-1900    Fax: 219-844-9045

## PACKING SLIP

| ORDER NO. | PICK DATE | PAGE NO. |
|---|---|---|
| 11562311-00 | 02/13/17 | 1 |

| CUSTOMER NO. | PROMISE DATE | REQSHIP DATE | | | | |
|---|---|---|---|---|---|---|
| 3226 | 02/13/17 | 02/14/17 | ERM | E1idia Martinez | | |

CUSTOMER P.O. NUMBER    PLACED BY
CASH SALE 3    JASON

ADDISON ICE-ARENA

| SLSREP IN | HSE | REFERENCE | SLSREP OUT | TIME PRINTED | SHIP VIA | # PRINTED |
|---|---|---|---|---|---|---|
| S H P T O | | ADDISON ICE ARENA<br>JASON 630 301 9836<br>401 Addison · Porter Pipe | 16:00 | Will Call | 1 |

SHIPPING LOCATION: Porter Pipe
ROUTE/DAY/STOP: 1    MTR REQUIRED: NO
INSTRUCTIONS: W/C TODAY

| ORDERED | SHIPPED | B/O | DESCRIPTION | UNIT | LTHS | PRODUCT NUMBER | LOC | NET PRICE | WEIGHT |
|---|---|---|---|---|---|---|---|---|---|
| 6 | 6 | 0 | 1-1/4" GALV 150# 90 ELL | EA | | 114G90 | B010BCQ4 | 46.28 | 5.82 |
| 3 | 3 | 0 | 3/4" 485B #150 SWT MLLW FP B/V | EA | | 34485B | B0309BB2 | 56.21 | 2.76 |
| 3 | 3 | 0 | 1-1/4 475B #150 IPS MLLW FP BV | EA | | 114475B | B0309DB5 | 50.83 | 2.10 |
| 3 | 3 | 0 | 1-1/4 CL-6 GALV NIPPLES | EA | | 114C6GN | B0327AR3 | 115.63 | 18.17 |
| 2 | 2 | 0 | 1/4X3 STD GALV NIPPLE | EA | | 568206-00580 | B0905C01 | 4.07 | 0.21 |
| 4 | 4 | 0 | 3/4X4 STD GALV NIPPLE | EA | | 568206-02020 | B1002DD1 | 6.60 | 1.02 |
| 3 | 3 | 0 | 1-1/4" GALV 150# UNION | EA | | 114GU | B1302D02 | 43.01 | 3.48 |
| 2 | 2 | 0 | 1-1/2X1.1/4" GALV HEX BUSHING | EA | | 1121146B | B1310CU4 | 32.24 | 1.20 |
| 3 | 3 | 0 | 1-1/4" GALV 150# TEE | EA | | 114GT | B1310DD1 | 23.52 | 2.62 |
| 2 | 2 | 0 | 1-1/4X3/4" GALV HEX BUSHING | EA | | 11434GB | B1314CU4 | 20.05 | 1.17 |
| 2 | 2 | 0 | 2-1/2" 0-60 PRESSURE GAUGE | EA | | KC1012560 | B16D2DD1 | 15.00 | 0.00 |

***MUST SHOW PROOF OF PURCHASE FOR MATERIAL RETURNED***
*All return merchandise will be subject to a re-stocking charge
of 20% or more, and will be issued within 10 days of
return.
*All Warranty/Defective Material returns subject to
manufacturer approvals before credits are issued.

| | | | | |
|---|---|---|---|---|
| Total | | | | 413.44 |
| Taxes | | | | 33.08 |
| INVOICE TOTAL: | | | | 446.52 |

TOTAL WEIGHT: 38.55

RECEIVED BY    DELV BY    PB    OTHER    CB    BOXES    BAGS    LOOSE    BUNDLES

Last Page

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515



# CLAIM

# #

# 28



**HALOGEN**
**SUPPLY COMPANY, INC.**
*"Almost Anything for the Swimming Pool"*



4653 W. Lawrence Ave • Chicago, IL 60630-2588

Phone (773) 286-6300
(800) 777-SWIM (7946)
Fax (773) 286-1024
E-Mail: info@halogensupply.com

# QUOTATION

TO:  **ADDISON ICE ARENA**
     **attn: Leon**
     leonlekai@gmail.com

| | |
|---|---|
| **QUOTE #** | QPH82616 |
| **DATE** | 8.26.16 |
| **CUSTOMER ID** | |
| **EXP DATE** | 30 DAYS |

| SALESPERSON | JOB | SHIPPING METHOD | SHIPPING TERMS | DELIVERY DATE | DUE DATE |
|---|---|---|---|---|---|
| PH | | PPD & ADD | | | |

| QTY | ITEM # | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1.00 | 34857PHS-CU | 57KW 480VOLT THREE PHASE COATES ELECTRIC HEATER WITH COPPERNICKEL TANK & TITANIUM ELEMENT | 3,745.00 | $ 3,745.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Halogen Supply Company, Inc. is not responsible for obtaining any permits. Permits of any kind, if required, are solely the responsibility of the owner**

| | | |
|---|---|---|
| SUBTOTAL | $ | 3,745.00 |
| TAX | $ | 383.86 |
| FREIGHT | | 100.00 |
| TOTAL | $ | 4,228.86 |

THANK YOU FOR YOUR BUSINESS!

# CLAIM

# #

# 29

9/6/2017                                          Re: Ground Heater Rental - leonlekai@gmail.com - Gmail

smaas@ccs-ces.com

## Gmail

| | Move to Inbox | More |

COMPOSE

### Re: Ground Heater Rental    Inbox    x

**Inbox (5)**

Starred

Important

Sent Mail

**Drafts (2)**

All Mail

**Spam (1)**

Trash

[Gmail]

Sent Messages

**smaas@ccs-ces.com**
to me

Apr 7

I did receive your email, like I said on the phone we do not do any refueling you would have to call feece oil or osco fuel to set that up the machine burns roughly 180 gal of diesel per 24hrs

Sent from my iPhone

On Apr 7, 2017, at 2:40 PM, Leon Lekai <leonlekai@gmail.com> wrote:

L  Leon            +

R  Rob Lekai
   https://www.siriusxm.com

Thanks for you help. Please confirm you have received this email.

here is my credit card and drivers license.

I will also have a cashiers check available for you Monday morning for the weeks rental rate of $2,000.00 (excludes fuel unless you have a quote with an estimated fuel charge - then I can include that in the first cashiers check as well. Maybe include what you think it would be. I just need a quote or invoice sent to me at the below address.

the location is as follows:

Addison Ice Arena
475 S Grace Street
Addison, IL 60101

Thanks again for you help.

Leon Lekai
847-921-1114
leon.lekai@the11group.com

<image.png>

<image.png>
<image.png>
<image.png>

https://mail.google.com/mail/u/0/#search/smaas%40ccs-ces.com/15b4ae98bd25059d                                          1/1

# CLAIM

# #

# 30

DELIVERY ADDRESS
Same as Bill To

REFER TO NOTE ON BACK IF CHECKED ☐

Dyed Diesel Fuel,
Non-Taxable Use Only
Penalty For Taxable Use
15 PPM Sulfur Max

DID - Leon 815-355-2000
See Ateka for $$$ on Delivery
DELIVER ON: 04/11/17

Price Per Unit  0.0000

PAID CK#6763

| TANK NO | TANK SIZE | TANK LOCATION | ROUTE | PROD | PAY TYPE |
|---------|-----------|---------------|-------|------|----------|
| 22 | 12000 | | BATAVI | 22 | COD-DUE UPON R |

| CALL TYPE | DD SPAN | LAST K | PROJ DD | RUN OUT DC | LAST DD |
|-----------|---------|--------|---------|------------|---------|
| MD | | 0.00 | 0.00 | NEW | 0 |

**FEECE OIL CO.**
www.feeceoil.com
517 TWIN RAIL DRIVE • MINOOKA, IL 60447
(888) 879-1911 • (815) 521-0191

GALLONS:
PRICE  2.28 All tax
FREIGHT. # 53.13
TOTAL  215.01

| BILL TO | | ACCOUNT NO |
|---------|---|-----------|
| Addison Ice | | A73928 |
| 475 S Grace Street | SUB TYPE: | |
| Addison IL 60101 | CLASS : ALL | |
| | MAP : | |
| Products: Off-Road Diesel | | 3472289 |



DELIVERY ADDRESS
Same as Bill To

REFER TO NOTE ON
BACK IF CHECKED ☐

Dyed Diesel Fuel,
Non-Taxable Use Only
Penalty For Taxable Use
15 PPM Sulfur Max

COD - Leon 815-295-2994
See Ateka for $$$ on Delivery
DELIVER ON: 04/17/17

Price Per Unit  0.0000

| TANK NO | TANK SIZE | TANK LOCATION | ROUTE | PROD | PAY TYPE |
|---------|-----------|---------------|-------|------|----------|
| 22 | 12000 | | BATAVI | 22 | COD-DUE UPON R |

| CALL TYPE | DD SPAN | LAST K | PROJ DD | RUN OUT DD | LAST DD |
|-----------|---------|--------|---------|------------|---------|
| WC | 5 | 0.00 | 0.00 | | 270 |

**FEECE OIL CO.**
www.feeceoil.com
512 TWIN RAIL DRIVE • MINOOKA, IL 60447
(888) 879-1811 • (815) 521-0191

GALLONS: 101
PRICE: 2.50 Inc tax
FREIGHT: $50
TOTAL: 302.50

BILL TO
Addison Ice
675 S Grace Street
Addison IL 60101

ACCOUNT NO  472920

SUB TYPE:
CLASS    : ALL
MAP      :
          3473247

Product: Off-Road Diesel

# CLAIM

# #

# 31



# CLAIM

# #

# 32



# CLAIM

# #

# 33

# CRS Industries Inc.

**INVOICE**

12543 S. 74th Ave.
Palos Heights, IL 60463
Phone #   708-415-1803

Email   crsindustriesinc@gmail.com

| Date | Invoice # |
|------|-----------|
| 7/2/2017 | 209 |

**BILL TO:**

Addison Ice Arena
ATTN: Republic Bank
475 S. Grace Street
Addison, IL 60101

| Customer Phone | Customer E-mail | Proposal No. | Proposal Date | Terms | Project |
|----------------|-----------------|--------------|---------------|-------|---------|
| | nhalikias@icred.com | | | Net 30 | Addison Ice Arena |

| QTY | Description | Amount |
|-----|-------------|--------|
| | Labor and material for the installation of two 4" p-traps connected to three 4" draintile laterals and connected to 6" sanitary sewer with three 4" clean outs installed on each riser. | 1,689.00 |
| | **Total** | **$1,689.00** |

# CLAIM

# #

# 34

# FINAL AMOUNT TBD

# ESTIMATE INCLUDED

# WORK STILL IN PROGRESS

# CLAIM

# #

# 35

Loader's Unloaders Labor Inc.
PH:708-983-4834

Days Hours

"Document Receipt Of Services"

Name Of Client: Addison Ice Anna     Cell#     Moving Date: Aug 23, 2017

From Address: 475 Grace     To Address:

City: Addison IL     State     City     State

Start Time: 8:00am     End time: 2:00pm     Number Of Total Hours: 6  X  Rate $ 50 = 300  Dollars

Acct.     Paid     Due     Paid By | Money Order | | Check
Customer Email                              | Credit Card | | Cash
                                                          Fax

Notes: Labor Work

Customer Signature: Adam Grill     Pinnacle Rep

Thank You For Your Business

2 Laborers
6 hrs

© 2012 Loaders--Unloaders--Labor Inc.

www.loadersunloaderslaborinc.com

---

ADDISON ICE LLC

Cash                                                              6883

                                    8/23/2017

                                                              47.00

Cash paid to 2 laborers to fulfill
$300 owed for labor work done on 8/23/17

$218- Cash From 8/19/17 Daily Cash Revenues
$ 27- Cash From 8/20/17 Daily Cash Revenues
$ 8- Cash From 8/21/17 Daily Cash Revenues
    + $47.00 From Check 6883 Cashed at bank

ublic Bank - Oper          total paid to Raul & Garret
                                    Was $300 @ $150 each.

                                                              47.00

# Loaders Unloaders Labor Inc.
## PH:708-983-4834

## "Document Receipt Of Services"

| Name Of Client | Cell# | Moving Date |
|---|---|---|
| Addison Ice Arena | 630-543-800 | Aug 24/2017 |

| From Address | To Address |
|---|---|
| 475 S Graer | |

| City | State | City | State |
|---|---|---|---|
| Addison | IL | | |

| Start Time | End time | Number Of Total Hours | Rate | $ |
|---|---|---|---|---|
| 11:30 | 2:30 pm | 3 | X 50 | = 150 |

One hundred Fifty dollars  Each  **Dollars**

| Acct. | Paid | Due |
|---|---|---|
| | | |

Paid By:  | |Money Order | |Check
| |Credit Card  |✓|Cash

Customer Email

Fax

Notes

Labor work - glass-trav

Customer Signature

Pinnacle Rep
David R Parker

## Thank You For Your Business

# Loaders Unloaders Labor Inc.
PH-708-002-4934

## "Document Receipt Of Services"

| Name Of Client | Cell# | Moving Date |
|---|---|---|
| Addison Ice Arena | 630-343-1100 | Aug 28, 2017 |

| From Address | To Address |
|---|---|
| 475 S Grace | |

| City | State | City | State |
|---|---|---|---|
| Addison | IL | | |

| Start Time | End time | Number Of Total Hours | Rate $ |
|---|---|---|---|
| 8 | 1 | 16 X 50 = 300 |

**Dollars**

| Acct. | Paid | Due | Paid By | |Money Order | |Check |
|---|---|---|---|---|---|
| Customer Email | | | | |Credit Card | ✓|Cash |
| | | | Fax | | |

Notes

Labor work in Arena

| Customer Signature | Pinnacle Rep |
|---|---|

*Thank You For Your Business*

© 2012 Loaders--Unloaders--Labor Inc.

www.loadersunloaderslaborinc.com

Loaders Unloaders Labor Inc.
PH:708-983-4834

"Document Receipt Of Services"

| Name Of Client | | Cell# | | Moving Date |
|---|---|---|---|---|
| Addison le | | 630 5439200 | | 8/29/17 |

| From Address | 475 Grace | | To Address | |

| City | Addison | State | IL | City | | State |

| Start Time | End time | Number Of Total Hours | | Rate | $ |
|---|---|---|---|---|---|
| 8am | 2:30 | 6 | X | 50 | = 300~ |

w/ 1/2 hour lunch off

Dollars

| Acct. | Paid | Due | Paid By | |Money Order| |Check |
|---|---|---|---|---|---|
| | | | | |Credit Card| (Cash) |

Customer Email                    Fax

Notes     Labor Work in Arena

Customer Signature     Pinnacle Rep
Ata Snell     Raul and Garret
                    Lina Reyer

Thank You For Your Business

© 2012 Loaders--Unloaders--Labor Inc.

www.loadersunloaderslaborinc.com

**Loaders--Unloaders--Labor Inc.**

PH: 708-983-4834

## "Document Receipt Of Services"

| Name Of Client | Cell # | Moving Date |
|---|---|---|
| Addison Ice Arena | 630-543-4900 | Aug 3rd 17 |

| Home Address | Address |
|---|---|
| 475 S Grace | |

| City | State | City | State |
|---|---|---|---|
| Addison | IL | | |

| Start Time | End Time | Number Of Total Hours | Rate | # |
|---|---|---|---|---|
| 10 30 | 2 30 | 4 | x 15p | = 100 |

One hundred

| | | | | | | Dollars |
|---|---|---|---|---|---|---|

| Amt. | Paid | Due | Paid By | Money Order | Check |
|---|---|---|---|---|---|
| | | | | Credit Card | N Cash |

Customer Date

Notes

Labor work

Customer Signature _____ Pinnacle Rep _____

*Thank You For Your Business*

© 2012 Loaders--Unloaders--Labor Inc.

www.loadersunloaderslaborinc.com

Loaders Unloaders Labor Inc.
PH:708-983-4834

"Document Receipt Of Services"

Name Of Client    Cell#    Moving Date

Addison Ice Arena    630-543-9200    Aug 31, 2017

From Address 475 S Grace    To Address

City Addison    State IL    City    State

Start Time 8 A.m    End time 1 Pm    Number Of Total Hours    Rate $

15 | X | 50 | = 250

two hundred fifty    00    Dollars

Acct.    Paid    Due    Paid By    [ ] Money Order [ ] Check [ ] Credit Card [✓] Cash

Customer Email    Fax

Notes    Labor work - basic cleaning

Customer Signature    Pinnacle Rep David Reuter

Thank You For Your Business

© 2012 Loaders--Unloaders--Labor Inc.

www.loadersunloaderslaborinc.com

2 Workers
Garrett Reuter + Martin Nicosio

Loaders Unloaders Labor Inc.
PH:708-983-4834

"Document Receipt Of Services"

Name Of Client: Addison Ice Arena    Cell#: 630-543-9200    Moving Date: Sept 1 2011

From Address: 475 S Grove    To Address:

City: Addison    State: IL    City:    State:

Start Time: 8 Am    End time: 11:30    Number Of Total Hours: 14    Rate $: x 15 = 200

two hundred    00    Dollars

Acct.    Paid    Due: Sept 1    Paid By    | Money Order | Check
                                            | Credit Card | Cash

Customer Email:    Fax:

Notes: Labor Work - base Cleaning

Customer/Signature:    Pinnacle Rep: David R Leite

*Thank You For Your Business*

© 2012 Loaders--Unloaders--Labor Inc.

www.loadersunloaderslaborinc.com

# CLAIM

# #

# 36

7:33 PM
09/06/17
Accrual Basis

## Addison Ice L.L.C.
## Profit & Loss
### March 15 through August 18, 2017

| | Mar 15 - Aug 18, 17 | Mar 15 - Aug 18, 16 | $ Change | % Change |
|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| 4000 · CONCESSION REVENUES | (286.81) | 0.00 | (286.81) | (100.0)% |
| Figure Skating | 63,328.65 | 95,849.14 | (32,520.49) | (33.9)% |
| HOCKEY | 51,078.00 | 70,865.00 | (19,787.00) | (27.9)% |
| LEASED ICE SALES | 235,080.28 | 432,795.76 | (197,715.48) | (45.7)% |
| PUBLIC SKATING | 4,704.00 | 12,159.00 | (7,455.00) | (61.3)% |
| RENTAL/LEASED SPACE INCOME | 26,070.41 | 54,024.73 | (27,954.32) | (51.7)% |
| OTHER REVENUE | 2,575.00 | (316.44) | 2,891.44 | 913.7% |
| 5880 · VENDING | 1,148.92 | 1,276.77 | (127.85) | (10.0)% |
| **Total Income** | 383,698.45 | 666,653.96 | (282,955.51) | (42.4)% |
| **Gross Profit** | 383,698.45 | 666,653.96 | (282,955.51) | (42.4)% |
| **Expense** | | | | |
| BANK SERVICE CHARGES | 4,452.03 | 14,654.24 | (10,202.21) | (69.6)% |
| COMMUNICATIONS & TELEPHONES | 1,775.35 | 1,803.94 | (28.59) | (1.6)% |
| DATA PROCESSING EXPENSE | 551.76 | 0.00 | 551.76 | 100.0% |
| EQUIPMENT RENTAL | 397.00 | 198.50 | 198.50 | 100.0% |
| INSURANCE GENERAL | 24,760.44 | 22,014.36 | 2,746.08 | 12.5% |
| LICENSES & PERMITS | 1,647.94 | 0.00 | 1,647.94 | 100.0% |
| MISCELLANEOUS EXPENSE | (3,999.97) | 0.00 | (3,999.97) | (100.0)% |
| OFFICE SUPPLIES & EXPENSES | 436.35 | 375.43 | 60.92 | 16.2% |
| PAYROLL & ASSOCIATED COSTS | 124,772.43 | 133,672.80 | (8,900.37) | (6.7)% |
| POSTAGE & DELIVERY | 277.02 | 49.53 | 227.49 | 459.3% |
| PRINTING & REPRODUCTION | 52.88 | 51.32 | 1.56 | 3.0% |
| 6240 · PROFESSIONAL FEES | 1,404.75 | 280.95 | 1,123.80 | 400.0% |
| PROGRAM RELATED COSTS | 11,942.00 | 19,062.26 | (7,120.26) | (37.4)% |
| REPAIRS & MANITENANCE | 26,297.48 | 17,324.78 | 8,972.70 | 51.8% |
| TAXES | 33,500.00 | 33,500.00 | 0.00 | 0.0% |
| TRAVEL | 44.75 | 0.00 | 44.75 | 100.0% |
| UTILITIES | 63,120.69 | 74,928.25 | (11,807.56) | (15.8)% |
| UNKNOWN | (831.86) | 1,437.92 | (2,269.78) | (157.9)% |
| **Total Expense** | 290,601.04 | 319,354.28 | (28,753.24) | (9.0)% |
| **Net Ordinary Income** | 93,097.41 | 347,299.68 | (254,202.27) | (73.2)% |
| **Net Income** | 93,097.41 | 347,299.68 | (254,202.27) | (73.2)% |

Page 1



January 11, 2018

<u>Via Electronic Mail & U.S. Mail</u>

Leon Lekai
President
Addison Ice Arena
475 South Grace Street
Addison, IL 60101
E-mail: leonlekai@gmail.com

| Re: | Insured: | Addison Ice Arena |
|-----|----------|-------------------|
| | Policy No.: | RPP5435093-01 |
| | Reported Date of Loss: | January 10, 2017 |
| | Loss Location: | 475 South Grace Street, Addison, IL 60101 |
| | NARS Claim No.: | RPIH17020004 |

Dear Mr. Lekai:

We write at the direction of Indian Harbor Insurance Company ("Indian Harbor") to further address the loss your Company, Addison Ice Arena ("Addison"), reported to Indian Harbor under insurance policy number RPP5435093-01, which was issued to Addison and was effective during the period July 22, 2016 through July 22, 2017. Since we will make mention of this policy throughout this letter, we will refer to it in short as "the Policy." We also wish to acknowledge receipt of the partial Proof of Loss your attorney submitted on December 5, 2017, which we are also addressing with this letter and will be referred to herein as "the Proof."

As you are aware, Indian Harbor, with the involvement and assistance of its equipment breakdown coverage reinsurer, The Hartford Steam Boiler Inspection and Insurance Company ("HSB"), the consulting engineering firm, Engineering Systems Inc. ("ESi"), and us as third-party claims administrator, North American Risk Services ("NARS"), has been investigating Addison's loss. Based on the results of the investigation conducted to this point, questions exist concerning whether the Policy provides coverage for the loss or the amounts claimed by Addison, including the amounts claimed in the Proof. This letter will serve to notify you of the specific terms, conditions and exclusions that may apply to Addison's loss and may preclude coverage under the Policy for the amounts claimed by Addison, including those in the Proof.

While you are considering the facts, findings, policy language and coverage issues identified and discussed below and the investigation or assessment here continues, Indian Harbor is reserving all rights and defenses under the Policy or otherwise under the law.

---

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

## Timeline and Summary of Facts Developed to Date

Based on the investigation performed to date, Indian Harbor and HSB have developed the following chronology of events and summary of facts developed to date.

Addison's facility consists of two ice rinks, the NHL (or south) rink and the Olympic (north) rink. These rinks were built by CIMCO in 1996, and purchased approximately four years later in 2000 by Addison. Thus, at the time Addison reported its loss to Indian Harbor on February 28, 2017, the rinks had been in operation and use for twenty (20) years.

Both rinks are serviced by a single vapor compression refrigeration system that uses ammonia as the refrigerant. Cold-floor brine for maintaining the ice sheets is chilled in the system's flooded evaporator, and brine in a separate circulating loop for warming or heating the sub-soil beneath the rinks is heated by hot, high-pressure ammonia gas in a shell and tube heat exchanger. The heat exchanger and associated piping, including underground piping that is a part of the below ice, sub-soil heating system (referred to hereinafter as the "sub-soil heating system"), were installed as part of the original construction in 1996 as well, and were also 20 years old at the time the loss at issue was reported to Indian Harbor.

Lying between the ice sheets and sub-soil heating system is a layer of expanded polystyrene foam insulation also installed in 1996. This insulation layer separates the cold-floor system for the ice surfaces above from the sub-soil heating system below, including the sand sub-base in which the underground piping is contained. This insulation layer is also protected from the ice above by a plastic vapor or moisture barrier that lies on top of the insulation, but was unsealed.

On February 28, 2017, Addison's insurance agent submitted notice of a loss, describing the damage being claimed as follows: "Insureds ice rink heating/refrigeration system has had a major failure. The rink continues to operate, there is visual evidence of damage which is expected to worsen over time. The extent of damage and cause for this failure is under investigation by industry experts we [Addison] have engaged." The date and time of this reported loss was stated to be "1/10/2017 | 12:00 AM."

Subsequently, during a March 3, 2017 telephone call with HSB, you described the damage as "[r]efrigeration system that controls ice rink stopped operating properly. Started noticing everything in October," meaning October 2016. During this call, HSB specifically asked if the date of loss reported was correct, and you answered "No, Mid October will get back with the date." These same questions were posed to you again on March 14, 2017 during HSB's and ESi's on-site inspection, but the answer provided at that time was the reported loss date was correct.

Also during HSB's and ESi's March 14th on-site inspection, Addison explained that the ice in both rinks was heaving and pushing up against the dasher boards, and in fact HSB and ESi observed first-hand and documented during the inspection the upward heaving of the ice and disarrangement of the dasher boards along the perimeter of the ice rinks.

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

At the time of HSB's and ESi's inspection, Addison was still hosting leagues and using the ice. In fact, at the time of our inspection in mid-March 2017, no ice had been melted and the heat exchanger was still in service. Subsequently, in April 2017, the NHL ice rink was melted, and it was not until May 15, 2017 that Addison's contractor had completed the demolition of the underground piping forming a part of the sub-soil heating system for the NHL rink so that inspection of such piping and other parts of the sub-soil heating system could begin.

During the course of the NHL rink demolition effort, ESi performed a second inspection on May 6, 2017 and noted that the insulation was saturated with water, along with the sub-base sand, but noted no leaks in the underground piping associated with the sub-soil heating system. On May 15, 2017, ESi performed a further visual inspection at the ice arena, noting that much of the sub-soil heating system and related underground piping had been pulled up and removed out of the rinks, piled up at the curb, making further inspection of that piping difficult. Additionally, no damage to the underground piping associated with the sub-soil heating system for the NHL rink was brought to ESi's attention at the time, or otherwise documented.

ESi returned to the ice arena again in early June and mid-July 2017, and during the July visit participated in field leak testing of the shell and tube heat exchanger and pressure testing of the sub-soil heating system for the Olympic rink. During the testing that occurred in July, leaking was confirmed from one of tubes in the heat exchanger and from two drain branch pipes associated with the sub-soil heating system for the Olympic rink.

Thereafter, the heat exchanger was provided to ESi for examination and testing, which was performed on August 8-9, 2017, at which time heavy accumulations of foreign material were found on the tube interior surfaces of 67 of 86 tubes, and a pinhole leak in one of the tubes of the heat exchanger was confirmed. In September, the drain branch pipes from the sub-soil heating system for the Olympic rink were also provided to and tested by ESi. The drain branch pipes were examined by a metallurgist and found to have suffered severe corrosion, and the heat exchanger tube with the pinhole leak was also determined to be corroded from the inside out.

### Summary of Factual Findings to Date

Based upon the investigation, inspection, and testing, the results of such inspection and testing, the information provided by Addison and its repair contractors during the investigation, and review and assessment with the assistance of engineering consultants, Indian Harbor's findings to this point are as follows:

1.  Faulty, inadequate, or defective maintenance of the sub-soil heating system as demonstrated by the buildup of heavy accumulations of foreign material on the inside of a majority of the heat exchanger tubes;

2.  A leak in one heat exchanger tube caused by corrosion from the inside of the tube to the outside;

3.  Heavily corroded underground drain branch pipes forming a part of the sub-soil heating system for the Olympic rink, resulting in more leaking;

4.  Water saturated insulation and sub-soil sand forming a part of the sub-soil heating system for the rinks;

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

5.   An otherwise aged, deteriorated and corroded heat exchanger and sub-soil heating system unable to perform its intended heating function and prevent the formation of frost and/or permafrost due to faulty, inadequate, or defective maintenance, corrosion, leakage of water, brine and even ammonia, and overall wear, tear and deterioration of 20-year old equipment, piping and systems;

6.   Resulting buildup of frost and frost heaving of sub-soil such as sand beneath the ice rinks; and

7.   Uneven and heaving ice and dasher boards located along and around the perimeter of the rinks.

## Coverage Analysis to Date

In order for a loss to be covered under the Policy's Commercial Property Coverage Part, there must be direct physical loss or damage commencing during the policy period to covered property resulting from a covered cause of loss, or a loss not otherwise excluded or limited. Specifically, the Policy forms and terms setting forth this coverage grant are as follows:

### Building and Personal Property Coverage Form (CP 00 10 10 12)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

A.   **Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### Causes of Loss – Special Form (CP 1030 10 12)

A.   **Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in the policy.

### Commercial Property Conditions (CP 00 90 07 88)

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

*     *     *

H.   **POLICY PERIOD, COVERAGE TERRITORY**

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

Under this Coverage Part:

I.     We cover loss or damage commencing:

        a.    During the policy period shown in the Declarations; and
        b.    Within the coverage territory.

Furthermore, it is Addison's initial burden to demonstrate under these Policy terms that a loss has occurred, the loss was caused by a fortuitous event and falls within the Policy's coverage grant set forth above. It is not enough to merely show that a loss may have occurred, as insureds such as Addison must come forward with proof of the nature, extent, and amount of their loss to a reasonable degree of certainty before coverage can be afforded. To this point, however, Addison's claim presentation does not appear to demonstrate that it suffered a fortuitous loss to covered property commencing during the policy period resulting from a covered cause of loss and, thus, its loss and claim would not be covered for this reason.

Additionally, the Policy contains exclusions which appear to apply and bar coverage, including exclusions stating that underground pipes, flues or drains, land (including land on which the property is located), and the cost of excavations, grading, backfilling or filling are not covered property. The specific Policy form and language setting forth these exclusions are the following:

### Building and Personal Property Coverage Form (CP 00 10 10 12)

A.     Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

    1.    **Covered Property**

      Covered Property, as used in this Coverage Part, means the type of property described in this section A.1., and limited in A.2. Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

           \*      \*      \*

    2.    **Property Not Covered**

      Covered Property does not include:

           \*      \*      \*

        f.    The cost of excavations, grading, backfilling or filling;

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

\*　　　\*　　　\*

h.　　Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

\*　　　\*　　　\*

m.　　Underground pipes, flues or drains.[1]

These exclusions would apply for instance to any costs expended by Addison for excavation, grading, backfilling or filling, for any loss to land, including land on which the ice rinks are located which has been remediated or otherwise addressed in repairing or replacing the rinks, or for repairing or replacing any of the brine piping or other pipes forming a part of the sub-soil heating system that are located underground.

The Policy also has exclusions stating that it will not pay for loss or damage caused directly or indirectly by earth movement, such as earth rising or shifting, including soil conditions which cause disarrangement of foundations or other parts of realty, or expansion or freezing of soil, and certain types of water damage, such as water under the ground surface pressing on, or flowing or seeping through foundations, or other openings, regardless of any other cause or event that contributes concurrently or in any sequence to such loss. Similarly, the Policy also states it will not pay for loss or damage caused by wear and tear, rust, corrosion, deterioration, or faulty, inadequate, or defective design, construction, materials, or maintenance. The specific Policy form and language setting forth these exclusions are the following:

### Causes of Loss – Special Form (CP 1030 10 12)

B.　　Exclusions

1.　　We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

\*　　　\*　　　\*

b.　　**Earth Movement**

\*　　　\*　　　\*

---

[1] By way of Endorsement, the Policy later makes "pipes, flues, drains, and refrigeration equipment" Covered Property, but not "underground pipes, flues or drains," which remain Property Not Covered under the Policy.

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

    (4)      Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But, if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

             \*       \*       \*

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused.

             \*       \*       \*

**g.**    **Water**

             \*       \*       \*

    (4)      Water under the ground surface pressing on, or flowing or seeping through:

        (a)      Foundations, walls, floors or paved surfaces;
        (b)      Basements, whether paved or not;
        (c)      Doors, windows or other openings; or

             \*       \*       \*

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails, in whole or in part, for any reason, to contain water.

But if any of the above, in Paragraph (1) through (5), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

\*    \*    \*

2.    We will not pay for loss or damage caused by or resulting from any of the following:

\*    \*    \*

d.    (1)    Wear and tear;

    (2)    Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

\*    \*    \*

    (4)    Settling, cracking, shrinking or expansion;

\*    \*    \*

But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

\*    \*    \*

3.    We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by the Covered Cause of Loss.

\*    \*    \*

c.    Faulty, inadequate or defective:

    (1)    Planning, zoning, development, surveying, siting;
    (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
    (3)    Materials used in repair, construction, renovation or remodeling; or
    (4)    Maintenance;

of part or all of any property on or off the described premises.

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

To this point of the investigation, it appears to Indian Harbor that there was faulty, inadequate, or defective maintenance as demonstrated by the buildup of heavy accumulations of foreign material on the inside of a majority of the heat exchanger tubes, which would be excluded by exclusion 3.c. quoted above. It would also appear based on Indian Harbor's investigation to date that the leak in the hear exchanger tube was caused by corrosion from the inside of the tube to the outside, and the leaking and other damage to the underground drain branch pipes forming a part of the sub-soil heating system of the Olympic rink was caused by wear and tear, rust or other corrosion, or deterioration, which would be excluded by exclusions 2.d.1. and 2. quoted above.

The investigation to date also found water saturated insulation and sub-soil sand forming a part of the sub-soil heating system for the rinks, buildup of frost and frost heaving of sub-soil such as in the sand beneath the ice rinks, and heaving of the ice rinks themselves and dasher boards located along and around the perimeter of the rinks, which would be excluded by exclusions 1.b.4., 1.g.4., and 2.d.4. quoted above. Such heaving of sub-soil amounts to earth movement such as earth rising or shifting, including soil conditions which cause disarrangement of foundations or other parts of realty, or soil conditions such as expansion and freezing.

Finally, while the Policy also provides Equipment Breakdown Coverage in an endorsement attached to and forming a part of the Policy's Commercial Property Coverage Part, Indian Harbor's and HSB's investigation to this point under this Endorsement also does not appear to support a claim for equipment breakdown coverage. Specifically, the Policy's Equipment Breakdown Coverage Endorsement provides in pertinent part as follows:

A.  The following is added as an Additional Coverage to the Causes of Loss – Basic Form, Broad Form or Special Form.

Additional Coverage – Equipment Breakdown

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below.

1.  We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

a.  Mechanical breakdown, including rupture or bursting caused by centrifugal force;

b.  Artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

electrical or electronic wire, device, appliance, system or network:

c.     Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

d.     Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

e.     Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

Under this language, Addison must prove that the damage claimed is the direct result of an "accident," which is expressly defined to mean one of the listed fortuitous events, such as "mechanical breakdown," or "loss or damage" to "steam boilers, steam pipes," or to "hot water boilers or other water heating equipment," which causes direct physical damage to "covered equipment." Here, however, Addison has not come forward with the requisite proof of an "accident" as defined under the Equipment Breakdown Coverage Endorsement, and its claim would not be covered for this reason.

Furthermore, Indian Harbor's and HSB's investigation under the Equipment Breakdown Coverage Endorsement did not otherwise reveal any evidence of a covered "accident" as defined in the Endorsement. To the contrary, the investigation revealed that the heaving of the ice surfaces at the Addison Ice Arena was the result of freezing, expansion and heaving of, at a minimum, the sub-soil sand underlying the two ice rinks.

However, freezing, expansion and heaving of such sub-soil underneath the two rinks occurred not because of any "accident," but because insufficient heat was delivered to the sub-soil heating system by the shell-and-tube heat exchanger as a direct result of faulty, inadequate, or defective maintenance and/or cleaning of the heat exchanger, its tubes and the rest of the sub-soil heating system as evidenced by the build-up of significant amounts of foreign material in the majority of the heat exchanger tubes, a heat exchanger tube leak due to corrosion, drain branch piping leaks due to wear, corrosion, or deterioration, water saturated insulation and sand. Such wear and tear, corrosion and deterioration of tubes and/or piping are excluded under the Equipment Breakdown Coverage Endorsement as set forth in the following exclusions:

3.     EXCLUSIONS

All exclusions in the applicable Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this endorsement.

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

**a.**  The following exclusions are modified but only as it applies to Equipment Breakdown Coverage:

*    *    *

    **(2)**  If the Causes of Loss – Special Form applies, as respects this endorsement only, the last paragraph of Exclusion B.2.d. is deleted and replaced with the following:

    But if an excluded cause of loss that is listed in **2.d.(1)** through (7) results in an "accident," we will pay for the loss or damage caused by that "accident."

**b.**  The following exclusions are added:

    **(1)**  We will not pay for loss, damage or expense caused by or resulting from:

*    *    *

        **(c)**  Any of the following:

*    *    *

            **(ii)**  Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

        However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by the "accident."

As can be seen, "[a]ll exclusions in the applicable Causes of Loss form apply except as modified below," which means that the exclusions discussed above for such things as "wear and tear," "rust or other corrosion," "deterioration" also apply under the Equipment Breakdown Coverage Endorsement and would bar coverage for the same reasons addressed above. Likewise, the Endorsement makes clear it will not pay for loss, damage or expense caused by or resulting from any condition which can be corrected by cleaning or by the performance of maintenance, and since many of the conditions discovered at Addison could have been so addressed, there would be no coverage under the Endorsement of this reason too.

    Accordingly, due to the facts, findings, Policy language, and coverage analysis to date, Indian Harbor is unable at this point to find coverage under the Policy or issue payment for the amounts Addison has claimed in the Proof or otherwise. To the extent, however, that Addison's investigation, findings, or conclusions as to cause or coverage for Addison's claimed damages

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

under the Policy differ from Indian Harbor's, we would encourage you to contact us and provide the factual details and coverage contentions you believe support your claimed losses.

In the meantime, Indian Harbor and HSB will leave this claim matter open while you are considering the facts, findings, Policy language and coverage analysis detailed above, and as any further investigation and/or assessment otherwise continues. Additionally, Indian Harbor respectfully advises you that the actions of Indian Harbor, HSB, or any of their representatives taken in connection with the loss investigation and claim response thus far shall not be construed as a waiver or relinquishment of any policy rights, defenses, or legal grounds available in response to Addison's claim or Proof, including any that may subsequently become apparent, or that may inadvertently have been omitted at this time. Nor shall Indian Harbor be deemed to be estopped in the future from asserting any such additional policy rights, defenses, or legal grounds in response to Addison's claim or Proof, all such rights, defenses, and/or legal grounds under the Policy, including the Equipment Breakdown Coverage Endorsement, or otherwise under the law being hereby fully reserved.

Of course, if you have any questions concerning this matter, please feel free to contact us. Otherwise, on behalf of Indian Harbor we look forward to further working toward a final position and resolution of this claim matter.

Finally, Part 919 of the Rules and Regulations of the Illinois Department of Insurance provides that we advise you if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at 122 South Michigan Avenue, 19th Floor, Chicago, IL 60603, (312) 814-2420, and in Springfield at 320 West Washington Street, Springfield, IL 62767, (217) 782-4515.

Sincerely,


Kevin J. McGuire
Adjuster
Phone: 321-441-1291
Email: Mailroom@NARisk.com

cc:     Amiel J. Rossabi, Attorney for Addison
        Isaac Franks, ACII, Senior Claims Specialist - Energy, Property, Construction, XL Catlin
        Travis Henderson, General Adjuster, HSB

Offices: Nationwide

Mail – P.O. Box 166002 · Altamonte Springs, FL · 32716-6002 · Toll Free (800) 315-6090 · Fax (866) 261-8507
www.narisk.com

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

March 7, 2018

**VIA ELECTRONIC MAIL AND**
**FIRST CLASS MAIL**
Mr. Kevin J. McGuire
Adjuster
North American Risk Services
Post Office Box 166002
Altamonte Springs, Florida 32716-6002

| RE: | Insured: | Addison Ice Arena |
|---|---|---|
| | Policy No.: | RPP5435093-01 |
| | Reported Date of Loss: | January 10, 2017 |
| | Loss Location: | 475 South Grace Street, Addison, Illinois 60101 |
| | NARS Claim No.: | RPIH17020004 |

Dear Mr. McGuire:

I am in receipt of your letter dated January 11, 2018 regarding the claim that was submitted by my client, Addison Ice Arena ("Addison Ice"), to Indian Harbor Insurance Company ("Indian Harbor"), under insurance policy number RPP5435093-01 (the "Policy"). We do not agree with your recitation of the facts as described in your letter, nor do we agree with your conclusion that Addison Ice's loss is not covered by the Policy.

Leak in Sub-Soil System

A major issue which you have failed to address, and which is not explained by the information or "facts" presented in your January 11, 2018 letter, is that the leak that occurred in the sub-soil heating system would have immediately led to corrosion when the brine was exposed to the air, and that alone more likely than not caused the corrosion in the heat exchanger. Further, due to the fact that corrosion immediately occurred once the brine escaped through the initial breach in the sub-soil heating system, any evidence which would clarify the cause of that breach was destroyed by the corrosion. Thus, all existing evidence shows that the leak occurred first and that all corrosion was secondary to the failure, once the fluid had exposure to the atmosphere. We have seen no evidence from your expert refuting this finding regarding the timing of the failure.

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

Mr. Kevin J. McGuire
March 7, 2018
Page 2

Since you have no evidence to establish an actual cause of the breach, other than that identified by Addison Ice, Addison Ice's claims were wrongfully denied.

The other "facts" and evidence referenced in your letter do not support your conclusion that this should not be a covered loss. For example, you stated that a single pinhole leak was found among the eighty-six (86) heat exchanger tubes, yet, you claim that the single leak was due to corrosion. This is not evidence of a system-wide problem. No evidence has been presented regarding the heat exchanger failure, despite our expert requesting a specific protocol be followed before the examination process. Further, evidence supports that the failure of the heat exchanger was secondary to failure in the floor. You have produced no evidence from your expert that refutes the timing of the failure produced by Addison Ice. If, as your expert appears to posit, corrosion was significant enough to cause leaks within the system, there would have been more than a single pinhole among the eighty-six (86) tubes.

pH Testing

Additionally, despite your claims that there was significant corrosion throughout both the heat exchanger system and the sub-soil heating system, absent from your letter was any mention of pH testing. As you should be aware, that should have been among the first tests run to truly determine whether corrosion was systemic. The pH reading of the calcium chloride, as found through testing conducted by an independent third-party testing agency, is further evidence that any corrosion was not caused by an internal fluid problem. The high pH reading of the calcium chloride that was found in the system is not indicative of a corrosion causing material. However, as you know, once calcium chloride is exposed to the atmosphere, the byproduct, carbon dioxide, causes the fluid to become extremely corrosive. Thus, at the point of the sub-soil heat failure, fluids which leaked from the breach would create an extremely aggressive external attack on the system around the point of the breach.

Maintenance

You also conclude that faulty, inadequate or defective maintenance was performed in the sub-soil system based upon the finding of sediment and foreign materials within the heat exchanger tubes. However, sediment and foreign materials is to be expected anytime there is a breach in the tubes, which you acknowledge there was in this case. As the brine escapes the tubes, mud forms, which can easily filter back in through the tubes. You also failed to address the location of the sediment and foreign materials within the tube. Further, and more basic, is that your analysis is not based upon actual maintenance records, which were provided to you upon request, and reflect that the system has been appropriately maintained. You also characterize the equipment as "aged" and you blame "20-year old equipment," however, the heat exchanger was replaced in 2005, after a mechanical failure, making it approximately twelve (12) years old at the time of Addison Ice's loss. Further, even if the system was twenty (20) years old, that is not the life of such a system. It

Mr. Kevin J. McGuire
March 7, 2018
Page 3

is not unusual for systems to last thirty (30) to fifty (50) years. There are other, supported, explanations for the sediment and foreign materials being found in the tubes, and, as such, your conclusion is inappropriate.

Exclusions

Among the exclusions to the Policy that you cite as reasons for Addison Ice's loss not to be covered, none apply. For example, as already addressed, any exclusion for corrosion should not preclude coverage, as the evidence does not support widespread corrosion within the sub-soil system or the heat exchanger. Although you categorize the sub-soil system as "underground pipes, flues or drains," you are fully aware that, in other cases, such systems, which are present for heat transfer, and not transportation, did not serve as a basis to preclude coverage. You also reference exclusions for earth movement, claiming that Addison Ice's losses should not be covered based upon the fact that there was water-saturated insulation and sub-soil sand, as well as a build-up of frost and frost heaving beneath the ice rinks, and heaving of the rinks. However, such heaving or movement, was more likely caused not by the earth suddenly shifting, but instead, by the leaks, where brine combined with soil created mud, which would make movement of the earth more likely.

Also addressed in your letter was the Equipment Breakdown Coverage endorsement, which would permit recovery for the breakdown of equipment when it is the direct result of an accident. The position taken in your letter is that Addison Ice's loss did not occur as a result of an accident, so therefore this endorsement would not apply. To the contrary, there is no evidence which tends to support that this was not an accident. As stated above, you have no evidence to show that the leak in the sub-soil system did not first occur, which then led to the corrosion as the brine within the system made contact with the soil. Therefore, there is no basis for Addison Ice's loss to be covered by this endorsement.

Collateral Damage

Your letter did not address the fact that, even if you are accurate regarding the purported corrosion, which is denied, at least some of Addison Ice's losses were not caused by corrosion and are, therefore, collateral issues. These losses should have been paid immediately upon receipt of a claim. For, example, you have ignored the claim for a covered loss to the compressors, which would be collateral damage, and any expenses and work related to the loss of the compressors should have been immediately covered under the Policy. Reimbursement of such costs and expenses should have already been made to my client.

Mr. Kevin J. McGuire
March 7, 2018
Page 4

<u>Demand for Information</u>

Finally, there are multiple representations that you make regarding "factual findings" that you include in your letter, however, the underlying tests and/or inspections from which such "facts" were devised have not been presented, despite our requests for that information. This claim was initially reported on February 28, 2017. We demand that any and all reports or information regarding the testing and inspections that have taken place be produced to us within ten (10) days. The reports and information we demand includes any and all tests performed by ESi, any and all metallurgical testing, and any and all pH tests. Additionally, we demand all documentary evidence identifying where exactly the pinhole was found in the heat exchanger tube and photographs or videos taken during any and all inspections,

I look forward to your prompt response and immediate payment.

Sincerely,

Amiel J. Rossabi

AJR/emk

**Beth Klein**

| | |
|---|---|
| **From:** | Amiel Rossabi |
| **Sent:** | Friday, June 08, 2018 10:54 AM |
| **To:** | Steven Knoche |
| **Subject:** | RE: Claim# RPIH17020004 : Addison Ice claim; 000481158 |

Steve, thanks for calling the other day; sorry we had to cut the conversation short. Please feel free to call me today or just send all of the information you have upon which you are basing your opinion that you don't have to pay the claim.

Thank you
Amiel

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Amiel Rossabi
**Sent:** Wednesday, June 06, 2018 10:53 AM
**To:** 'Steven Knoche' <SKnoche@narisk.com>
**Subject:** RE: Claim# RPIH17020004 : Addison Ice claim; 000481158

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

Steve, after our phone discussion this past Monday, I am confused at how your handling and settling of this matter has materially changed from the prior adjuster.

We still do not have a basis for your denial of the claim, nor do we even know if you are still denying the claim.
We do not have any of the underlying reports which form the basis of your company's January 2018 denial letter (even though you have them).
I still do not have a certified copy of the relevant insurance policy.
You have given me no time frame by when you will have a final answer for me as to whether you are denying the claim.
You have refused to get on a conference call with me, my expert and your expert whereby my expert can show clearly why the claim should be paid.
You have promised to get back to me this week; I hope that you will.

Amiel

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina  27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site:  www.r2kslaw.com



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee.  Do not read, copy or share this communication unless you are the intended addressee.  If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone.  Thank you.

**From:** Amiel Rossabi
**Sent:** Sunday, June 03, 2018 3:36 PM
**To:** 'Steven Knoche' <SKnoche@narisk.com>
**Subject:** RE: Claim# RPIH17020004 : Addison Ice claim; 000481158

Steve, I received your voicemail late Friday night. I'm not sure of your position now that you have reviewed your expert's report; however, we need to get this matter moving.  If you have questions before you pay this claim, let's get on a

2

conference call with my expert so that we can answer all of your questions. If that does not satisfy you, then we'll file our complaint.

Please email me Monday morning with three dates and times that you are available this week and I will check those dates and times with our expert witness.

Amiel

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Amiel Rossabi
**Sent:** Friday, June 01, 2018 2:03 PM
**To:** 'Steven Knoche' <SKnoche@narisk.com>
**Subject:** RE: Claim# RPIH17020004 : Addison Ice claim; 000481158

Steve?

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**

3

**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Amiel Rossabi
**Sent:** Tuesday, May 29, 2018 10:05 AM
**To:** 'Steven Knoche' <SKnoche@narisk.com>
**Subject:** RE: Claim# RPIH17020004 : Addison Ice claim; 000481158

Steve, when are we talking this week?

Amiel

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515



## ROSSABI LAW PARTNERS
### ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Steven Knoche <SKnoche@narisk.com>
**Sent:** Tuesday, May 22, 2018 4:41 PM
**To:** Amiel Rossabi <arossabi@r2kslaw.com>
**Subject:** RE: Claim# RPIH17020004 : Addison Ice claim; 000481158

Amiel,
I received the report.
Let me review and I'll call you tomorrow.

Sound good?
Thanks,

**From:** Amiel Rossabi [mailto:arossabi@r2kslaw.com]
**Sent:** Friday, May 11, 2018 10:21 AM
**To:** Steven Knoche <SKnoche@narisk.com>
**Subject:** RE: Claim# RPIH17020004 : Addison Ice claim; 000481158

Happy to talk next week. Frankly, I'm just waiting for you to pay our claim.

Thanks
Amiel

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site:  www.r2kslaw.com

5



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Steven Knoche <SKnoche@narisk.com>
**Sent:** Friday, May 11, 2018 10:51 AM
**To:** Amiel Rossabi <arossabi@r2kslaw.com>
**Subject:** Claim# RPIH17020004 : Addison Ice claim; 000481158

Amiel,
I've received response to my request for a cert copy of policy.
One will be sent out.
We'll talk next week?
Thanks,
Steve

**From:** Amiel Rossabi [mailto:arossabi@r2kslaw.com]
**Sent:** Wednesday, May 9, 2018 7:35 AM
**To:** Steven Knoche <SKnoche@narisk.com>
**Subject:** Addison Ice claim; 000481158

Steve, here you go.

Amiel

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com

6



**ROSSABI LAW PARTNERS**
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – – –
This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Amiel Rossabi
**Sent:** Sunday, September 03, 2017 10:22 AM
**To:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>; Leon Lekai <leonlekai@gmail.com>; John S. Burley <jburley@everything-ice.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Mark Sanchez <msanchez@ams-pmt.com>
**Subject:** RE: 000481158/Claim Update Letter

Mr. Henderson, you have already received my response regarding the testing. I need to know whether the testing planned to be performed will alter in any way the properties of the material tested. It is your responsibility to process this claim promptly and you have failed to do so. So, this is what will happen this week:

1) I'll send you a representation letter—even though my previous emails to you on this subject should have been enough to prove my representation;
2) You will have Jim from ESI contact me to explain to me what testing is planned;
3) You will provide to me a certified copy of the insurance policy or policies that may provide coverage for the referenced claim;
4) You will notify me if you want to inspect the piping without testing;
5) You will notify me what other steps you are taking to comply with your obligations under the relevant insurance policy or policies;
6) You will identify specifically what else, if anything, you believe your insured needs to do under the policy.

Please confirm.

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

7

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com



**From:** Henderson Travis - Hartford-HSB [mailto:Travis_Henderson@hsb.com]
**Sent:** Monday, August 28, 2017 1:43 PM
**To:** Amiel Rossabi <arossabi@r2kslaw.com>; Leon Lekai <leonlekai@gmail.com>; John S. Burley <jburley@everything-ice.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Mark Sanchez <msanchez@ams-pmt.com>
**Subject:** 000481158/Claim Update Letter

Mr. Rossabi,  As you are now the contact person for this claim I will need a letter of representation.  I also am still awaiting a response to when and where we can collect the Olympic rink piping for inspection.

**Travis Henderson**
General Adjuster
Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

1011 Warrenville Rd Ste 400
Lisle, IL 60532
Telephone: (860) 856-4625
Mobile: (847) 212-6324
Fax: (877) 472- 4329
Travis_Henderson@hsb.com

www.hsb.com

 Risk Solutions

 Munich RE


Hartford Steam Boiler

**From:** Henderson Travis - Hartford-HSB
**Sent:** Friday, August 25, 2017 3:49 PM
**To:** 'Amiel Rossabi' <arossabi@r2kslaw.com>; Leon Lekai <leonlekai@gmail.com>; John S. Burley <jburley@everything-ice.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Mark Sanchez <msanchez@ams-pmt.com>
**Subject:** RE: 000481158/Claim Update Letter

8

You will need to discuss the testing protocol with Jim from ESI and any affects it would have on the metal. When will the Olympic rink warm floor piping pieces be made available for inspection?

**Travis Henderson**
General Adjuster
Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

1011 Warrenville Rd Ste 400
Lisle, IL 60532
Telephone: (860) 856-4625
Mobile: (847) 212-6324
Fax: (877) 472- 4329
Travis_Henderson@hsb.com

www.hsb.com

  

**Risk Solutions**

MUNICH RE

Hartford Steam Boiler

**From:** Amiel Rossabi [mailto:arossabi@r2kslaw.com]
**Sent:** Friday, August 25, 2017 3:43 PM
**To:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>; Leon Lekai <leonlekai@gmail.com>; John S. Burley <jburley@everything-ice.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Mark Sanchez <msanchez@ams-pmt.com>
**Subject:** RE: 000481158/Claim Update Letter

Mr. Henderson, I understand that you plan to do some testing of the heat exchanger tubes on Tuesday, August 29, 2017.

First, please copy me on all future correspondence;
Second, how will your testing alter the properties of the heat exchanger tubes?

Thank you for your anticipated prompt response.

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site: www.r2kslaw.com

9



ROSSABI LAW PARTNERS
ROSSABI REARDON KLEIN SPIVEY PLLC

– – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Amiel Rossabi
**Sent:** Friday, August 25, 2017 1:49 PM
**To:** 'Henderson Travis - Hartford-HSB' <Travis_Henderson@hsb.com>; Leon Lekai <leonlekai@gmail.com>; John S. Burley <jburley@everything-ice.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Mark Sanchez <msanchez@ams-pmt.com>
**Subject:** RE: 000481158/Claim Update Letter

Mr. Henderson, I represent Addison Ice LLC. I, frankly, don't understand your last email. Put simply, a pipe breaking falls within your policy terms. If you believe that it broke as a result of corrosion (and nothing else), you need to prove that to fall within an exclusion. Otherwise, you should be paying this claim unless you want to be exposed to a bad faith claim.

So, please promptly send to me a certified copy of your policy and identify to me the basis of your position under the terms of the policy. I'll expect to receive those two things on or before September 5, 2017.

Thank you.

**Amiel J. Rossabi**

**Rossabi Reardon Klein Spivey PLLC**
**706 Green Valley Road, Suite 410**
**Greensboro, North Carolina 27408**

**Telephone: (336) 895-4350**
**Facsimile: (336) 663-1143**

arossabi@r2kslaw.com
Firm Web Site:  www.r2kslaw.com



**ROSSABI LAW PARTNERS**
Rossabi Reardon Klein Spivey PLLC

– – – – – – – – – – – – – – –

This e-mail contains confidential information for the addressee. Do not read, copy or share this communication unless you are the intended addressee. If you receive this e-mail in error, please contact the sender by reply e-mail or by telephone. Thank you.

**From:** Henderson Travis - Hartford-HSB [mailto:Travis_Henderson@hsb.com]
**Sent:** Friday, August 25, 2017 1:36 PM
**To:** Leon Lekai <leonlekai@gmail.com>; John S. Burley <jburley@everything-ice.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Amiel Rossabi <arossabi@r2kslaw.com>; Mark Sanchez <msanchez@ams-pmt.com>
**Subject:** 000481158/Claim Update Letter

Leon, We have yet to accept liability for this loss. Therefore I am unable to issue any payments at this time. We are working to confirm that a covered equipment breakdown accident has occurred per the policy. We need to view the section of piping that was repaired by AMS. Please advise the location of this piping so that we may view it. I have requested that Jim complete his review of the loss as a whole. I should be able to provide you with our final coverage position once his final report has been received and reviewed.

Thank you

**Travis Henderson**
General Adjuster
Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

1011 Warrenville Rd Ste 400
Lisle, IL 60532
Telephone: (860) 856-4625
Mobile: (847) 212-6324
Fax: (877) 472- 4329
Travis_Henderson@hsb.com

www.hsb.com

 Risk Solutions

 Munich RE

 Hartford Steam Boiler

   

11

**From:** Leon Lekai [mailto:leonlekai@gmail.com]
**Sent:** Friday, August 25, 2017 11:38 AM
**To:** John S. Burley <jburley@everything-ice.com>
**Cc:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>; HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Amiel Rossabi <arossabi@r2kslaw.com>; Mark Sanchez <msanchez@ams-pmt.com>
**Subject:** Re: 000481158/Claim Update Letter

Travis -

We have patiently waited for resolution. The exchange of emails below continues to indicate no resolution in sight however we paid our premiums on time and promptly for coverage for our mechanical systems and business interruption for exactly this scenario. Sometime things like this happen. It appears from the exchanges I have read and reviewed with my attorney, it will be impossible to determine if corrosion caused the initial failure or if it was a subsequent result. It appears the

1. integrity of the rest of the heat exchange pipes (85 of 86 in excellent working order without corrosion although trapped in the same small metal housing), and
2. the integrity of the remaining 350 ft of non-corroded header pipe that had one breach at its extremity, and
3. the 3rd party tested brine analysis indicating non-corrosive brine that was treated and maintained correctly by the business ownership

when combined makes it highly, highly unlikely that this was a corrosion issue thus why we are seeking resolution and coverage under our fully paid up policy. We are willing to accept a partial payment at this time and willing to work with you to fully resolve this matter but we have to move this along and my preference is to do so with communication as opposed to incur any additional expenses in seeking recovery under our policy.

In speaking with John Burley, there is no way for any person to determine that the initial and sole cause of the problem was corrosion and from the evidence he examined, particularly the one location limited corrosion that existed on the expansive header system system and combined the report he received from Jim that only one pipe out of eighty-six was leaking while 85 of 86 were sound and without corrosion, the evidence does not support a corrosion cause conclusion.

Leon Lekai
615-395-2000

On Fri, Aug 25, 2017 at 10:35 AM, John S. Burley <jburley@everything-ice.com> wrote:

Gentlemen:

Here is Mark's contact information. As the refrigeration company who saw the failure and did the repairs, he is really the best person to speak with about the known facts about this incident as I was not on site at the time of the repair.

12



**Mark J. Sanchez** | Project Manager

Refrigeration & Food Processing

Direct 630.320.7740 | Cell 630.688.9044

www.amsmechanicalsystems.com

While I am an expert on my own opinion and always eager to share it, I am not prepared to offer it until all of the information is provided to me from both Mark and Jim Marciniak regarding the heat exchanger findings and analysis. Only with complete, all encompassing data, can the most accurate conclusions be derived.

I always believed that one important details of this claim will hinge on timing of the events regarding what was primary and secondary results given the nature of the calcium chloride solution. We know there was a leak and we know there was some corrosion. Corrosion can cause a leak, but a leak can also lead to corrosion. I believe that to determine which happened first will require our investigation to step back and look at the bigger picture such as the condition of the sub-floor header beyond the area of the failure and what condition the overall header is in.

I look forward to getting more information from Mark & John so I can given a conclusion as opposed to just speculating which is where I still remain until said information is provided.

Thanks,

John Burley

13

**From:** Henderson Travis - Hartford-HSB [mailto:Travis_Henderson@hsb.com]
**Sent:** Friday, August 25, 2017 10:57 AM
**To:** Leon Lekai; Jim Marciniak; Amiel Rossabi; John S. Burley
**Cc:** HSB-BDL-Claims Documentation
**Subject:** 000481158/Claim Update Letter

Leon, I spoke to John Burley. He could not give me an opinion on why the Olympic ring was leaking. He needs time to discuss this with AMS and get back to Jim and myself. Jim and I would also like to view the piping that was leaking. Please let us know where this evidence is located so we may inspect it.

Travis Henderson

General Adjuster

Complex Claims Unit

The Hartford Steam Boiler Inspection and Insurance Company

1011 Warrenville Rd Ste 400

Lisle, IL 60532

Telephone: (860) 856-4625

Mobile: (847) 212-6324

Fax: (877) 472- 4329

Travis_Henderson@hsb.com

www.hsb.com



 

14

Document received on 8/23/18 11:27 AM. Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

**From:** Henderson Travis - Hartford-HSB
**Sent:** Friday, August 25, 2017 8:47 AM
**To:** 'Leon Lekai' <leonlekai@gmail.com>; Jim Marciniak <jgmarciniak@engsys.com>; Amiel Rossabi
<arossabi@r2kslaw.com>; John S. Burley <jburley@everything-ice.com>
**Cc:** HSB-BDL-Claims Documentation <Claims_Documentation@hsb.com>
**Subject:** 000481158/Claim Update Letter

Leon, I am in receipt of your letter. I have left a voice mail for John Burley as I still have some outstanding
questions for him. I requested photos and a report regarding the leak he located within the Olympic
ring. That information is still outstanding. Jim Marciniak is still investigating the loss and does not have
enough information to provide a final report at this time. Jim and I have spoken and Jim will make this a
priority to conclude his investigation in the very near future. Please be advised we are still investigating
coverage for your claim at this time.

**Travis Henderson**

General Adjuster

Complex Claims Unit

**The Hartford Steam Boiler Inspection and Insurance Company**

1011 Warrenville Rd Ste 400

Lisle, IL 60532

Telephone: (860) 856-4625

Mobile: (847) 212-6324

Fax: (877) 472- 4329

Travis_Henderson@hsb.com

www.hsb.com



 

Document received on 8/23/18 11:27 AM  Document accepted on 08/23/2018 14:13:26 # 4348629/170431049515

**From:** Leon Lekai [mailto:leonlekai@gmail.com]
**Sent:** Thursday, August 24, 2017 6:11 PM
**To:** Henderson Travis - Hartford-HSB <Travis_Henderson@hsb.com>; Jim Marciniak <jgmarciniak@engsys.com>; Amiel Rossabi <arossabi@r2kslaw.com>; John S. Burley <jburley@everything-ice.com>
**Subject:** Claim Update Letter

Travis & Jim:

Please see attached letter.

Thanks

Leon

IMPORTANT NOTICE:
The information in this email (and any attachments hereto) is confidential. If you are not the intended recipient, you must not use or disseminate the information thereof. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by The Hartford Steam Boiler Inspection and Insurance Company or its subsidiaries or affiliates either jointly or severally, for any loss or damage arising in any way from its use.

Steven Knoche
Sr. Claims Adjuster
North American Risk Services, Inc.
P.O. Box 166002
Altamonte Springs, FL 32716-6002
www.narisk.com
Phone: (407) 215-9437
Toll Free: (800) 315-6090 Ext. 9437
Fax: (866) 261-8507
Mobile:

16

If you send an e-mail related to a claim, please send it to the following address so that it can be posted to the claim file:
mailroom@narisk.com

Emails cannot be guaranteed to be error-free, as information can be corrupted, lost, delayed, or contain viruses. NARS accepts no liability for the content of any e-mail, or for the consequences of any actions taken on the basis of information provided.

All claims e-mails are retained and subject to review by clients, federal and state regulatory authorities, and legal discovery.

NARS internal security may unintentionally prevent your e-mail from reaching its destination. If you do not receive a timely response to your email, please call us.

This email is intended solely for the use of the individual to whom it is addressed. It may contain information that is privileged, confidential or exempt from disclosure. If the reader of the email is not the intended recipient, any dissemination or copying is strictly prohibited. If you have received this communication in error, please immediately notify us and return the original message at the listed email address.

Steven Knoche
Sr. Claims Adjuster
North American Risk Services, Inc.
P.O. Box 166002
Altamonte Springs, FL 32716-6002
www.narisk.com
Phone: (407) 215-9437
Toll Free: (800) 315-6090 Ext. 9437
Fax: (866) 261-8507
Mobile:

If you send an e-mail related to a claim, please send it to the following address so that it can be posted to the claim file:
mailroom@narisk.com

Emails cannot be guaranteed to be error-free, as information can be corrupted, lost, delayed, or contain viruses. NARS accepts no liability for the content of any e-mail, or for the consequences of any actions taken on the basis of information provided.

All claims e-mails are retained and subject to review by clients, federal and state regulatory authorities, and legal discovery.

NARS internal security may unintentionally prevent your e-mail from reaching its destination. If you do not receive a timely response to your email, please call us.

This email is intended solely for the use of the individual to whom it is addressed. It may contain information that is privileged, confidential or exempt from disclosure. If the reader of the email is not the intended recipient, any

17

dissemination or copying is strictly prohibited. If you have received this communication in error, please immediately notify us and return the original message at the listed email address.

18